# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

StandWithUs Center for Legal Justice, Katerina Boukin, and
Marilyn Meyers

*Plaintiffs-Appellants*,

v.

Massachusetts Institute of Technology,

*Defendant-Appellee*,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:24-cv-10577; HON. RICHARD G. STEARNS

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Melissa S. Weiner
PEARSON
WARSHAW, LLP
328 Barry Avenue S,
Suite 200
Wayzata, MN 55391
Tel. (612) 389-0600

*Glenn A. Danas
Ashley M. Boulton
CLARKSON LAW
FIRM, P.C.
22525 Pacific Coast
Highway
Malibu, CA 90265
Tel. (213) 788-4050

Marlene J. Goldenberg
NIGH GOLDENBERG
RASO & VAUGHN,
PLLC
14 Ridge Square NW,
3rd Fl.
Washington, D.C.
20016
Tel. (202) 792-7927

*Attorneys for Plaintiffs-Appellants StandWithUs Center for Legal
Justice, Katerina Boukin, and Marilyn Meyers*

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............... 1

STATEMENT OF JURISDICTION ......................................... 2

STATEMENT OF THE ISSUES ............................................. 3

INTRODUCTION ................................................................ 4

STATEMENT OF THE CASE ............................................... 7

    A.    Antisemitism on MIT's Campus in the Wake of October 7, 2023 Attacks. ......................................................... 7

    B.    MIT Has the Authority to Control Hateful Speech and Discrimination Against Jews on Its Campus Through Its Antidiscrimination and Antisemitic Policies. ...................... 9

    C.    Before the October 7, 2023 Attacks, MIT Approves the Registration of Anti-Israel and Antisemitic Student Groups on Campus and Tolerates Antisemitic Conduct on Campus. ................................................................. 10

    D.    Hamas Invades Israel and Commits a Violent Terrorist Attack; Antisemitic Conduct on Campus Intensifies. ............. 11

    E.    The Student Groups Hold November 9, 2023 Protest and MIT Fails to Meaningfully Respond. ...................................... 15

    F.    From November 10, 2023 through May 6, 2024, The Antisemitic Conduct on Campus Continues. .......................... 17

    G.    Congress Steps In and Singles Out MIT as One of Three Universities to Call Before a Committee for Failing to Respond to Spiraling Campus Antisemitism. ......................... 21

    H.    The Next Semester, MIT Allows a Hostile Mass-Encampment to Remain on Kresge Lawn, Directly Adjacent to Hillel, for Nearly Three Weeks. ......................... 22

    I.    Plaintiffs File a Class Action Complaint Against MIT for its Deliberate Indifference to a Hostile Campus Environment, and MIT Moves to Dismiss. ............................. 24

J.    The District Court Grants MIT's Motion to Dismiss Without Leave to Amend. ....................................... 24

SUMMARY OF THE ARGUMENT ......................................... 27

ARGUMENT ......................................................................... 28

I.    Standard of Review ................................................. 28

II.   The District Court Erred by Granting MIT's Motion to Dismiss as to Plaintiffs' Title VI Claim ................................ 29

    A. The District Court's Analysis of the "Deliberate Indifference" Prong was Wrong and Should be Reversed. .......................................................... 30

    B. Plaintiffs Adequately Alleged MIT had Actual Notice of Antisemitic Harassment in its Programs. ..................... 49

    C. Plaintiffs Adequately Alleged the Harassment was Severe, Pervasive and Objectively Offensive, and Caused the Plaintiffs to be Deprived of Educational Opportunities or Benefits ..................................... 51

III.  Plaintiffs Plausibly Alleged Their Failure to Prevent Conspiracy Claim Under 42 U.S.C. Section 1986. .................. 54

    A. Contrary to the District Court's Order, Plaintiffs Sufficiently Pleaded a Conspiratorial Agreement. ............. 54

    B. Groups of Individuals Can, and Here Did, Form A Conspiracy. ...................................................... 59

    C. Defendant Need Not be A "Participant" in the Conspiracy for Purposes of Liability under 42 U.S.C. Section 1986 ........................................................ 60

    D. Plaintiffs Adequately Pleaded All Other Requirements of Their Section 1986 Claim ...................... 61

IV.  Plaintiff's Plausibly Alleged Breach of Contract and Negligence Claims. .................................................. 63

V.   The District Court Abused Its Discretion in Denying Leave to Amend. ................................................... 66

CONCLUSION ................................................................... 68

CERTIFICATE OF COMPLIANCE...................................... 70

CERTIFICATE OF SERVICE................................................ 71

PLAINTIFFS-APPELLANTS' ADDENDUM ..................................... A-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Soc'y Without a Name v. Virginia*
    655 F.3d 342, 347 (4th Cir. 2011) ........................................59, 60

*Alianza Ams. v. DeSantis*
    2024 U.S. Dist. LEXIS 59893 (D. Mass. March 29, 2024) .......... 56

*Aulson v. Blanchard*
    83 F.3d 1 (1st Cir. 1996) ............................................... 55

*Bray v. Alexandria Women's Health Clinic*
    506 U.S. 263 (1993)..................................................55, 56

*Canty v. Old Rochester Regional Sch. Dist.*
    66 F. Supp. 2d 114 (D. Mass. 1999) ................................ 39

*Clark v. Clabaugh*
    20 F.3d 1290 (3d. Cir. 1994) ........................................ 54

*Davis v. Monroe Cnty. Bd. of Educ.*
    526 U.S. 629 (1999).............................29, 30, 43, 51, 53

*Doe v. Fairfax Cty. Sch. Bd.*
    1 F.4th 257 (4th Cir. 2021) .......................................... 48

*Doe v. Metro. Gov't & Davidson Cnty.*
    35 F.4th 459 (6th Cir. 2022) ......................................... 45

*Doe v. Sch. Bd. of Broward Cnty.*
    604 F.3d 1248 (11th Cir. 2010) ..................................... 49

*Doe ex rel. A.N. v. E. Haven Bd. of Educ.*
    200 Fed. Appx. 46 (2d Cir. 2006) .................................. 41

*Donahue v. City of Boston*
    304 F.3d 110 (1st Cir. 2002) ........................................ 55

*Durbeck v. Suffolk Univ.*
    547 F. Supp. 3d 133 (D. Mass. 2021) ............................. 64

*Earle v. Benoit*
850 F.2d 836 (1st Cir. 1988) ........................................ 59

*Farmer v. Brennan*
511 U.S. 825 (1994)............................................31, 32

*Feminist Majority Found. v. Hurley*
911 F.3d 674 (4th Cir. 2018) ...........................39, 42, 44

*Fennell v. Marion Indep. Sch. Dist.*
804 F.3d 398 (5th Cir. 2015)........................................ 29

*Foisie v. Worcester Polytechnic Institute*
967 F.3d 27 (1st Cir. 2020) ........................................ 29

*Foman v. Davis*
371 U.S. 178 (1962)........................................ 37

*Forth v. Laramie Cnty. Sch. Dist. No. 1*
85 F.4th 1044 (10th Cir. 2023) .................................... 49

*Gebser v. Lago Vista Indep. Sch. Dist.*
524 U.S. 274 (1998)........................................48, 49, 50

*Grace v. Bd. of Trs., Brooke East Boston*
85 F.4th 1 (1st Cir. 2023)........................................ 30

*Griffin v. Breckenridge*
403 U.S. 88 (1971)........................................ 55

*Hatch v. Dep't for Children, Youth & Their Families*
274 F.3d 12 (1st Cir. 2001) ........................................ 67

*Jennings v. University of North Carolina*
482 F.3d 686 (4th Cir. 2007) ...................................... 51

*Judge v. City of Lowell*
160 F.3d 67 (1st Cir. 1998) ........................................ 37

*Kristiansen v. Town of Kittery*
Case No. 2:18-cv-00420-JAW
2019 U.S. Dist. LEXIS 106905 (D. Me. June 2, 2019) ................. 56

*M.L. ex rel. D.L. v. Concord Sch. Dist.*
86 F.4th 501 (1st Cir. 2023)........................................ 30

*Monteiro v. Tempe Union High Sch. Dist.*
158 F.3d 1022 (9th Cir. 1998) ...................................... 51

*Nikitine v. Wilmington Trust Co.*
715 F.3d 388 (1st Cir. 2013) ........................................ 28

*Park v. City of Atlanta*
120 F.3d 1157 (11th Cir. 1997)...........................53, 60, 61

*Plourde v. Sorin Grp. USA, Inc.*
23 F.4th 29 (1st Cir. 2022) ........................................... 66

*Porto v. Town of Tewksbury*
488 F.3d 67 (1st Cir. 2007) ........................................... 29

*Santos v. U.S. Bank N.A.*
54 N.E.3d 548 (Mass. App. 2016) ................................. 65

*Schaefer v. Yongjie Fu*
272 F. Supp. 3d 285 (D. Mass. 2017)............................. 66

*Schofield v. First Commodity Corp. of Bos.*
793 F.3d 28, 30 (1st Cir. 1986) ................................59, 60

*Sines v. Kessler*
324 F. Supp. 3d 765 (W.D. Va. 2018) .......................56, 57

*Shulse v. W. New Eng. Univ.*
Case No. 3:19-cv-30146-KAR
2020 U.S. Dist. LEXIS 138106 (D. Mass, Aug. 4, 2020) .........64, 65

*Sonoiki v. Harvard Univ.*
37 F.4th 691 (1st Cir. 2022) ......................................... 64

*Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*
524 F.3d 315 (1st Cir. 2008) ........................................ 25

*United Bhd. of Carpenters & Joinders, Local 610 v. Scott*
463 U.S. 825 (1983) .................................................... 59

*United States v. Brown*
49 F.3d 1162 (6th Cir. 1995)......................................... 58

*Vance v. Spencer County Public School District*
231 F.3d 253 (6th Cir. 2000)...............................37, 38, 39

*Walker v. President & Fellows of Harvard Coll.*
   840 F.3d 57 (1st Cir. 2016) .......................................... 64

*Wells v. Rhodes*
   928 F. Supp. 2d 920 (S.D. Ohio 2013) .......................... 57

*Whitfield v. Notre Dame Middle Sch.*
   412 F. App'x 517 (3d Cir. 2011) ................................... 29

*Wills v. Brown Univ.*
   184 F.3d 20 (1st Cir. 1999) ................................... 30, 46

*Wilson v. HSBC Mortgage Services, Inc.*
   744 F.3d 1 (1st Cir. 2014) .......................................... 28

*Witten v. A.H. Smith & Co.*
   567 F. Supp. 1063 (D. Md. 1983) ................................. 57

*Zeno v. Pine Plains Cent. Sch. Dist.*
   702 F.3d 655 (2d Cir. 2012) ....................... 38, 40, 41, 43

## Statutes

42 U.S.C. § 1981 ...................................................... 56, 57

42 U.S.C. § 1982 ................................................ 56, 57, 58

42 U.S.C. § 1985 ...................................................... *passim*

42 U.S.C. § 1986 ...................................................... *passim*

Title VI of the Civil Rights Act of 1964 ..................... *passim*

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................ 24, 25, 28

Fed. R. Civ. P. 15(a).............................................. 67, 68

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Plaintiffs-Appellants respectfully request oral argument in this appeal. This case presents complex issues involving the meaning of "deliberate indifference" under Title VI of the Civil Rights Act of 1964, and what constitutes a failure to prevent a civil rights conspiracy under 42 U.S.C. section 1986. Resolution of these issues, given the abhorrent factual setting from which they arise, stands to have a significant and widespread impact on the legal obligations of universities in protecting students' rights on campuses throughout the country in the face of an unprecedented explosion of antisemitism. Accordingly, this case warrants oral argument to ensure a proper application of the law.

## STATEMENT OF JURISDICTION

The district court had jurisdiction because Plaintiffs allege violations of Title VI of the Civil Rights Act of 1964 and 42 U.S.C. section 1986 and thereby present federal questions. 28 U.S.C. §§1331; 1343. This Court has jurisdiction because Plaintiffs-Appellants appeal from a final order disposing of all their claims following a grant of a motion to dismiss. 28 U.S.C. §1291. The district court entered the order dismissing the case on August 21, 2024 and Plaintiffs-Appellants timely appealed on August 29, 2024.

## STATEMENT OF THE ISSUES

The issues presented on appeal are:

1. Whether the district court erred by granting MIT's motion to dismiss Plaintiffs' Title VI claim despite allegations showing MIT had clear notice of pervasive antisemitism on its campus, and responded unreasonably with delay, inaction, and toothless, superficial remediation that allowed severe, pervasive, and objectively offensive discriminatory conduct to proceed for months on end, thereby denying MIT's Jewish and Israeli students access to the range of MIT's benefits enjoyed by other students;

2. Whether the district court erred by granting MIT's motion to dismiss Plaintiffs' 42 U.S.C. section 1986 claim for failure to state a claim where Plaintiffs alleged a conspiratorial agreement between the student groups at MIT, a purpose of which was to deprive Jewish and Israeli students of their protected rights;

3. Whether the district court erred by also granting MIT's motion to dismiss Plaintiffs' state law claims for negligence and breach of contract despite MIT's handbook constituting a binding contract and MIT's duty to protect its students from foreseeable harm, including

harassment; and

4. Whether the district court abused its discretion by failing to address Plaintiffs' request for leave to amend the operative complaint to address any of the deficiencies it identified.

## INTRODUCTION

Following the October 7, 2023 massacre perpetrated by Hamas in Israel, antisemitism on many American university campuses increased. However, the antisemitism on Defendant-Appellee Massachusetts Institute of Technology's ("MIT") campus became so prevalent that MIT's president was selected to appear in front of Congress on December 5, 2023, to explain what her school was doing to respond to the spiraling hostility toward campus Jews and Israelis. Her responses were, as Judge Stearns noted, "hairsplitting and legalistic," and failed to indicate a serious determination to root out and stop the antisemitic conduct.

Unfortunately, in the months that followed, MIT refused to enforce its own time, place, and manner restrictions to protect its Jewish students, refused to meaningfully discipline the students responsible for brazenly violating MIT policies, permitted speakers on campus that fomented hostility toward MIT's Jewish students, and permitted MIT's

4

Hillel to be targeted for almost three weeks with the erection of a hostile encampment directly adjacent to it on Kresge Lawn. MIT's deliberate decision to allow several pro-Palestine groups to flout campus policies violated the law by depriving MIT's Jewish students of the benefits of an MIT education, as these students were repeatedly prevented from accessing portions of campus or attending in-person classes, were physically intimidated, were verbally ridiculed, and were shunned and excluded from study groups.

The district court dismissed Plaintiffs' Title VI claim solely because it found MIT's response was sufficient to preclude a finding of deliberate indifference. This was erroneous. The district court credited MIT with having suspended some of the pro-Palestine student protesters after the November 9, 2023 protest, and this having been a sufficient response until the Kresge Lawn encampment boiled over in May, 2024. This was wrong for multiple reasons—not only did MIT merely withdraw some "non-academic activities" from an unknown subset of students (a half-hearted response that proved immediately to have no remedial effect), but pro-Palestine groups continued violating MIT's own rules repeatedly, for the entire six-month period between November 9, 2023 and May 10,

2024, when MIT finally cleared the Kresge Lawn encampment. The district court failed to consider any of those allegations, including the effect of this continuous conduct on Jewish students' rights under Title VI. At a minimum, the district court should have permitted discovery on those intensely fact-bound issues.

Moreover, the district court dismissed Plaintiffs' claim under 42 U.S.C. section 1986 for failure to prevent conspiracy because it concluded Plaintiffs failed to allege a conspiratorial agreement between the student groups at MIT, a purpose of which was to deprive Jewish and Israeli students of their protected rights. But Plaintiffs expressly allege the coconspirators acted *with the intent* to deprive Plaintiffs as well as other Jewish and Israeli students their civil rights. Specifically, the complaint alleges Jewish and Israeli students (and specifically Plaintiffs) have endured chants that are overtly antisemitic, been subjected to walkouts, been doxed, been kicked out of study groups, been prevented from entering public areas of campus as a result of rallies, demonstrations, and encampments while other students were allowed in and were repeatedly ignored by MIT when these concerns were raised. This conduct was alleged to have taken place with the purpose of engaging in

"racially and ethnically motivated violence against Jews and Israelis" in contravention of the Thirteenth Amendment. The district court erred by failing to consider these allegations.

The district court also erred by dismissing Plaintiffs' state law claims, which it dismissed solely based on not exercising supplemental jurisdiction over them. Once the federal claims are revived, the state law claims should be as well.

Finally, the district court erred by dismissing without granting (or even considering) leave to amend.

The court should reverse the district court's order, vacate the dismissal, and remand for further proceedings.

## STATEMENT OF THE CASE

### A. Antisemitism on MIT's Campus in the Wake of October 7, 2023 Attacks.

Under the International Holocaust Remembrance Alliance ("IHRA") Working Definition, which has been adopted by the Departments of State and Education, "antisemitism" is a certain perception of Jews, which may be expressed as hatred towards Jews, and includes denying Jews' right to self-determination in Israel, holding Israel to double-standards, and holding Jews collectively responsible for

actions of the state of Israel.  JA-22[1] at ¶¶32–34.  Modern antisemitism includes anti-Zionism.  Zionism, simply put, is the belief that Jews have the right to self-determination in their ancestral homeland of Israel.  JA-42 ¶95.  For most Jews, Zionism is not a political viewpoint, but a key component of their Jewish ethnic and ancestral identity.  JA-42 ¶99.  Viewed in this context, "anti-Zionism" is a movement against an integral part of Jewish identity, and therefore antisemitism.  JA-44 ¶106.

Antisemitism on college campuses, and specifically at MIT, has been on the rise in recent years.  JA-14 ¶1.  However, the attacks that took place on October 7, 2023 have resulted in an unprecedented explosion of antisemitism in this space.  JA-14 ¶2.  Through its grossly dangerous and ineffective response to this conduct, MIT repeatedly and intentionally disregarded its legal obligations to its students.  JA-14–17 ¶¶2, 11.

---

[1] All references to "JA" indicate the Joint Appendix ("JA").

**B.** **MIT Has the Authority to Control Hateful Speech and Discrimination Against Jews on Its Campus Through Its Antidiscrimination and Antisemitic Policies.**

MIT requires compliance with the policies contained in its MIT Mind and Hand Book (the "Handbook"), which governs student behavior and outlines the university's expectations of students. JA-27 ¶¶41–42. The Handbook includes provisions regarding: (1) MIT's discrimination and harassment policy, which applies to conduct occurring outside the academic environment (JA-28–30 ¶¶45–53); (2) MIT's student behavior and integrity policy, which demands a "high standard of civility" and "respect" and further prohibits misconduct on- or off-campus (JA-30 ¶¶54–55); (3) MIT's policy prohibiting "threats, intimidation, or coercion" (JA-31 ¶57); (4) MIT's chalking and poster policies (JA-31–32 ¶¶59–60); and (5) MIT's policy on events and demonstration which provides that such activities cannot, among other things, be used for the purposes of "harassment, discrimination, . . . threats of violence, targeting of groups or individuals" or disrupt MIT activities or interfere with access to MIT activities or facilities (JA-32–34 ¶¶61–66). All recognized groups on MIT's campus must adhere to the MIT Handbook, including its Non-Discrimination Clause, which prohibits discrimination based on race,

religion, ancestry, or national ethnic origin.  JA-48 ¶123.

## C. Before the October 7, 2023 Attacks, MIT Approves the Registration of Anti-Israel and Antisemitic Student Groups on Campus and Tolerates Antisemitic Conduct on Campus.

Student groups at MIT are approved by the Association of Student Activities.  JA-47 ¶118.  All approved groups receive official recognition by the university, can reserve space on campus, can serve as the basis for a community on campus, and are permitted to use MIT in their names and event descriptions.  JA-47–48 ¶¶120, 122.  Recognized student groups must comply with the MIT Handbook.  JA-48 ¶123.

The MIT Coalition Against Apartheid ("CAA") is one registered student group that was approved by MIT which has multiple faculty representatives who teach and advise MIT students.  JA-49 ¶¶125–26. The CAA opposes Israel's right to exist and has openly endorsed the violent attacks against Jews and Israelis, including at official group functions on MIT's campus, which it has the authority to host by virtue of being a registered student group.  JA-50 ¶130.  CAA also has a history of disrupting pro-Jewish and Israel events on MIT's campus, including holding protests on Israeli Independence Day and regularly hosting openly antisemitic speakers on campus.  JA-49 ¶128.

Palestine@MIT is another registered student group on MIT's campus that exists to "raise political and cultural awareness regarding the Palestinian people in the MIT community and greater Boston area. JA-51 ¶132. Palestine@MIT publicly endorses the CAA, inviting its community to join in the CAA's activities. JA-51 ¶132. Like the CAA, Palestine@MIT has also called for the genocide of Jews and Israelis and blamed Israel for Hamas' attack on Israeli civilians. JA-51 ¶133.

MIT was on notice for years preceding October 7, 2023, that these approved student groups were harassing and intimidating Jewish and Israeli students on campus. JA-53 ¶137. For example, on May 17, 2021, Palestine@MIT posted a picture on its Instagram page of students holding signs at an organized event in front of an MIT building on MIT's campus, with one sign containing the antisemitic slogan "From the River to the Sea."[2] JA-53–54 ¶¶137–39.

## D. Hamas Invades Israel and Commits a Violent Terrorist Attack; Antisemitic Conduct on Campus Intensifies.

On October 7, 2023, Hamas terrorists invaded Israel and carried

---

[2] "From the River to the Sea" is "fundamentally a call for a Palestinian state extending from the Jordan River to the Mediterranean Sea, territory that includes the State of Israel, which would mean destroying the Jewish state. JA-54 ¶138.

out the deadliest attack against Jews since the Holocaust. JA-14 ¶1. With more than 1,000 civilians slaughtered by Hamas, President Biden described the invasion as "an act of sheer evil." JA-14 ¶4.

Shortly thereafter, several violent rallies and protests on campus began, without any response by MIT. JA-60–61 ¶158. On October 19, 2023, the CAA hosted a two-day rally outside the MIT Student Center on campus where Jewish and Israeli students were harassed and assaulted when they could not walk by or pass through. JA-59–60 ¶¶153–55. Plaintiff Meyers was assaulted when approached by a protestor who raised the front wheels of his bike at her and another Jewish student and said, "Your ancestors (referring to Holocaust victims) didn't die to kill more people." JA-60 ¶156. Attendees chanted slogans, many of which directly call for violence against Jews. JA-60 ¶157.

Then, on October 23, 2023, the CAA staged a walkout and planned disruptions of classes throughout campus which included shouting, unfurling Palestinian flags in classrooms, and using megaphones to broadcast antisemitic messages. JA-61 ¶159. Protestors also gathered in the vicinity of Lobby 7, which is not an authorized protest area. JA-61 ¶159. Indeed, Lobby 7 is a major thoroughfare through which many

students often must travel to attend class or other on-campus events. JA-61 ¶159.

On October 30, 2023, the CAA organized another protest known as a "Die-In" in Lobby 7 and taped up posters of Gazans all over lecture halls and campus buildings, all in contravention of MIT policy. JA-61 ¶160.

Shortly thereafter, on November 2, 2023, the CAA organized targeted protests outside the offices of Jewish MIT professors and MIT's Israel internship program (known as "MISTI"), rattling office doorknobs, chanting antisemitic slogans and other threats ("MISTI, MITSI, you can't hide") and causing staff to feel intimidated, afraid, and trapped in their offices. JA-61 ¶¶161–62. MIT did not send police, and there were no repercussions for this incident. JA-61 ¶¶161–62.

In addition to the rallies and protests, just one day after the horrific attacks on Israel, the CAA and Palestine@MIT posted on its blog and emailed all undergraduate students a "Joint Statement on the Current Situation in Palestine," which explained the student groups "hold the Israeli regime responsible for all unfolding violence" and defended the massacre of Israeli civilians as "a response to the settler colonial regime." JA-57–58 ¶147. The statement was signed off, "Until liberation,"

implying more violence against Jews and Israelis was necessary and welcome.  JA-58 ¶148.

Then, on October 10, 2023, counter-protesting students used chalk to write "Free Palestine" and "Occupation on Gaza" directly outside a vigil held by Jewish students on campus in the wake of the attacks.  JA-58 ¶150.  This chalking was done in violation of MIT policy and intended to target, harass, and intimidate Jewish and Israeli students.  JA-58 ¶150.

On October 17, 2023, the CAA circulated an email to all student group members at MIT using the MIT email system to falsely state "Israel dropped bombs on the al-Ahli Arab Hospital where thousands of Palestinians displaced by the current genocide were seeking shelter and care. Over 500 people and counting were massacred."  JA-59 ¶151.  The claims have been widely discredited by governmental sources which confirmed the damage was actually caused by a rocket launched by the Palestinian Islamic Jihad.  JA-59 ¶151.  Nonetheless, the false information was circulated in MIT's name through its university-wide email system and MIT chose to do nothing.  JA-59 ¶151.

**E.    The Student Groups Hold November 9, 2023 Protest and MIT Fails to Meaningfully Respond.**

Rather than heed the requirements of the "Dear Colleague Letter" sent by the Department of Education ("DOE") just two days prior reminding schools of their obligations under Title VI[3] (JA-62 ¶163), MIT allowed a mass protest to take place on campus.   JA-63 ¶169.  On November 9, 2023, the CAA and MIT student group Coalition for Palestine again held an all-day protest in Lobby 7 with MIT professors, faculty, and staff as well as members of the public, in violation of MIT's policies.   JA-63–68 ¶¶170–85.  An MIT professor publicly detailed the horrific experience on campus that day, noting Jewish and Israeli

_____

[3] The letter stated:

> OCR interprets Title VI to mean that the following type of harassment creates a hostile environment: unwelcome conduct based on shared ancestry or ethnic characteristics that, based on the totality of circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. Schools must take immediate and effective action to respond to harassment that creates a hostile environment.

JA-63 ¶¶167–68.

students were physically prevented from attending class and made to feel unsafe on campus due to the hostile protest. JA-65–66 ¶¶179.

While MIT was aware this unauthorized protest was taking place, rather than enforce its own policy or attempt to control its manner, it instead shifted the burden and only warned Jewish students to stay away from their own campus. JA-64–65 ¶¶172–73. MIT officials warned protestors to leave no later than 12:15 P.M., or they could face disciplinary action. JA-65 ¶177. However, the protestors remained. JA-65–68 ¶¶177, 183.

Later that day, MIT President Sally Kornbluth issued a letter explicitly acknowledging that the conduct of the protestors violated MIT's policies and stating that students who remained in Lobby 7 would be subject to suspension. JA-67–68 ¶¶180, 182–83. However, other members of MIT's faculty wrote to students to let them know if they were disciplined, they could approach faculty for support. JA-67 ¶181. Ultimately, the MIT administration also backtracked on its threat, stating that the students who remained at the protest after the deadline would remain enrolled at MIT and be able to attend academic classes and labs. JA-68 ¶184. No actual disciplinary measures were taken against

the students who violated MIT's policies on November 9.  JA-68–69 ¶185.

**F.     From November 10, 2023 through May 6, 2024, The Antisemitic Conduct on Campus Continues.**

Undeterred by MIT's toothless response, the CAA co-sponsored another rally on November 10, 2023, which blocked entrances to campus buildings, including Lobby 7, as well as streets around campus.  JA-69 ¶186.  Protestors again called for violence against Jews, chanting "There is only one solution: Intifada revolution," noting that they would not "back down" to Kornbluth, and calling for "resistance" (which Jewish students understand to threaten violence against them).  JA-69–70 ¶¶186–88.

On February 12, 2024, MIT CAA, assisted by MIT faculty and staff members, held yet another unauthorized protest in Lobby 7, where students once again, in contravention of MIT policies, unfurled large flags, took over the lobby of the building, and chanted "From the River to the Sea, Palestine will be free!"  JA-95 ¶259.  This protest violated MIT's time, place, and manner restrictions, its rule that protests must be registered at least three days in advance, its policy that protests should not be disruptive, and MIT's policy on flags.  JA-95 ¶259.

The hostile environment fostered by MIT's failure to meaningfully

respond continue to fester in ways beyond protests and rallies. For example, in December 2023, the CAA and Coalition for Palestine hosted an event with Miko Peled, who encouraged his audience to go to MIT Hillel and confront Jewish students about Gaza. JA-75 ¶204. Peled openly denied many of the atrocities of the October 7, 2023 attacks and made jokes about Jewish backlash against the phrase "From the river to the sea." JA-75 ¶204.

That same month, the MIT Women and Gender Studies Department similarly co-hosted an event with the Coalition for Palestine and sponsored a book club reading of a book by Ahed Tamimi, who had publicly stated, "Come on settlers, we will slaughter you. We are waiting for you in all cities of the West Bank. What Hitler did to you was a joke. We will drink your blood and eat your skulls. We are waiting for you." JA-76 ¶206. In response, the Program Manager for the MIT Women and Gender Studies Department invited students to sympathize with Tamimi, further isolating Jewish and Israeli students. JA-76 ¶207.

On January 16, 2024, an interfaith event entitled "Planetary Healthy, indigenous Land, People and Bodies" also took place on campus, where MIT's Interfaith Chaplain and Spiritual Advisor to the Indigenous

Community at MIT diverted the conversion and referred to Israelis as "white European colonizers" oppressing the Palestinians. JA-71 ¶192. One non-Jewish student in attendance wrote to MIT to express alarm about the Chaplain's conduct, noting that the behavior was "destructive and divisive" and "made us students feel unsafe." JA-71 ¶193.

Other students similarly reached out to MIT administration for support, only to receive a response from MIT's Institute Discrimination and Harassment Response ("IDHR") office stating that the reported conduct did not "seem to violate the policies that the IDHR has jurisdiction over" and suggesting the student might be confused about the policies' definition of harassment. JA-76 ¶205. Plaintiff Meyers' reports were responded to with statements that Jewish students were not members of a protected class. JA-76 ¶205. Ultimately, no action was taken.

The MIT Israel Alliance similarly sent an email to MIT's administration more broadly expressing concern for its failure to deter any of the discriminatory and harassing behavior toward Jewish and Israeli students. JA-78 ¶212. The email explained how some students had responded by relocating to or choosing to stay in Israel, an active war

zone, following the winter break, rather than stay at MIT. JA-78 ¶213. The email requested MIT administration outline what measures it planned to take to ensure that students could attend MIT in an environment free from discrimination and harassment. JA-78 ¶214.

However, MIT did not take protective measures in response to Jewish and Israeli students' requests. JA-78–79 ¶216. Neither the CAA nor Palestine@MIT or their members were disciplined, suspended, or banned from campus activities. JA-78–79 ¶216. While IDHR staff was issued a non-contact order as to pro-Palestine group members,[4] MIT did not issue no-contact orders on behalf of Jewish or Israeli students or otherwise take protective measures to ensure a safe campus environment. JA-78–79 ¶216.

Throughout the spring of 2024, in accordance with its mission to spread antisemitic hate further, the CAA and Palestine@MIT displayed antisemitic posters stating "No to Zionism and Racism" throughout

---

[4] On February 26, 2024, CAA affiliates distributed a pamphlet entitled "Written Revolution," which included an open letter to Kornbluth. JA-78 ¶215. The pamphlet included details of a CAA protest held outside the IDHR office. JA-78 ¶215. According to the pamphlet, following this protest, the IDHR had issued no contact orders for all CAA members from the IDHR staff. JA-78 ¶215.

campus, with no intervention by university administration. JA-80 ¶ 220.

In addition to the registered student groups, a postdoc MIT associate tweeted that Zionism is a "mental illness" and equating Jews with Nazis. JA-70 ¶189. When concerned students contacted the MIT DEI office about this, the response they received denied that it was blood libel and counseled "caution" in laying such accusations. JA-70 ¶190.

**G.     Congress Steps In and Singles Out MIT as One of Three Universities to Call Before a Committee for Failing to Respond to Spiraling Campus Antisemitism.**

On November 28, 2023, Congress held a hearing titled "Holding Campus Leaders Accountable and Confronting Antisemitism." JA-72 ¶194. On December 5, 2023, along with the presidents of the University of Pennsylvania and Harvard, Kornbluth appeared before Congress where she denied hearing a calling for genocide for Jews and Israelis on MIT's campus and noted that such action may not violate MIT's code of conduct. JA-73–74 ¶¶197–98. A Title VI investigation was opened relating to MIT on December 13, 2023. JA-74 ¶199.

Still unsatisfied with MIT's efforts, on March 21, 2024, Jason Smith, Chairman of the U.S. House of Representatives Committee of Ways and Means, strongly urged Kornbluth to take more proactive

measures to ensure the safety and inclusion of Jewish students on MIT's campus. JA-25–26 ¶38. In a letter questioning the university's efforts to combat antisemitism, Smith highlighted specific actions by MIT and urged its administration to act in accordance with its legal obligations. JA-26 ¶39.

## H. The Next Semester, MIT Allows a Hostile Mass-Encampment to Remain on Kresge Lawn, Directly Adjacent to Hillel, for Nearly Three Weeks.

On April 21, 2024, the violent acts of antisemitism continued on MIT's campus, with approximately thirty students setting up tents on the Kresge lawn on campus, which is directly adjacent to Hillel on campus. JA-81 ¶221. The encampment displayed several overtly discriminatory and antisemitic signs with statements such as "Boys in Blue, KKK, IDF, They are all the SAME." JA-81–83 ¶222. Protestors again engaged in discriminatory and harassing chants. JA-89 ¶237. As a result, the Passover seder scheduled for April 22, 2024 and the Israel Day celebration scheduled for May 7, 2024 (for which Hillel had a permit), which were to take place at Hillel had to be moved. JA-87–90 ¶¶232, 241.

On April 22, 2024, MIT students again emailed MIT

administrators, including Kornbluth, begging for the administration to address the encampments and to consider the safety of Jewish and Israeli students.  JA-83 ¶223.  On April 24, 2024, Chancellor Melisa Nobles responded by asking for the students' patience in addition to urging the students and peers not to counter protest.  JA-85 ¶224.  Nearly a week passed, and on April 27, 2024, Kornbluth released a video statement acknowledging the encampment constituted clear violations of MIT's policies "from the start."  JA-86 ¶227.  Nevertheless, Kornbluth stated that MIT had not interfered with the encampment.  JA-86 ¶229.

As other universities acted against similar encampments on their campuses, it was not until weeks later, on May 6, 2024, that Kornbluth announced that students within the encampment would face discipline if they failed to leave by an established deadline.  JA-87–90 ¶¶233–36, 238.  That same day, in further protest, the students put out calls on social media for others to join and, when an individual jumped over the fencing surrounding the tents, a surge was caused resulting in a breach of the area.  JA-90 ¶239.  Well after the deadline imposed by Kornbluth, approximately 150 protestors remained at the encampment, yet no arrests had been made.  JA-90 ¶240.

Overall, MIT's response and lack of intervention were wholly inadequate to combat the antisemitism occurring on its campus.

## I. Plaintiffs File a Class Action Complaint Against MIT for its Deliberate Indifference to a Hostile Campus Environment, and MIT Moves to Dismiss.

On May 30, 2024, Plaintiffs SCLJ, Boukin, and Meyers filed the operative complaint against MIT alleging (1) violation of Title VI of the Civil Rights Act of 1964; (2) failure to prevent a conspiracy to interfere with civil rights in violation of 42 U.S.C. section 1986; (3) negligence; and (4) breach of contract. JA-137–146 ¶¶378–435. MIT moved to dismiss all claims under FRCP 12(b)(1) arguing SCLJ lacked associational standing, all Plaintiffs lacked standing to seek injunctive relief, and Plaintiffs' Title VI claim was unripe. MTD at 31–35. MIT also moved under rule 12(b)(6), challenging three of the five elements of the Title VI claim, one of the three elements of the 42 U.S.C. section 1986 claim, as well as both of Plaintiffs' state law claims. *Id.* Plaintiffs opposed and to the extent the court deemed any allegations inadequate, Plaintiffs requested leave to amend. Opposition at 35.

## J. The District Court Grants MIT's Motion to Dismiss Without Leave to Amend.

At the hearing on MIT's motion to dismiss, the Parties discussed

the application of the First Amendment, upon which MIT conceded MIT is not constrained, as recognized by the DOE. JA-233:20–234:1. The Parties also acknowledged the current circuit split regarding whether statutory violations can constitute a 42 U.S.C. section 1985 violation, as well as the lack of authority addressing whether a private party can be held liable under 42 U.S.C. section 1986 where they were not a part of the alleged civil conspiracy. JA-235:1–4; JA-235:24–236:3; JA-257:9–14.

In its order, the court properly refused to consider the exhibits MIT offered in support of Rule 12(b)(6). Add.3–4, n.4 (citing *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008)). The district court also rejected MIT's ripeness challenges; it held Plaintiffs' claims for damages were ripe because all the conduct had already occurred, and the ripeness of the claims for injunctive relief was intertwined with the merits, and therefore need not be addressed on a pleadings challenge. Add.9–10.

As to Plaintiffs' Title VI claim, the district court reasoned MIT's suspension of student protestors from non-academic activities and suspension of one pro-Palestine student group was a sufficient response. Add.13. Despite acknowledging these measures "proved ineffective[,]" the

district court noted MIT had "immediately warned" of further harassment while also recognizing "its threat went unheeded[.]" Add.13. The district court admitted MIT could have acted differently but reasoned that because the standard was not to address its action in hindsight, Plaintiffs' Title VI claim must be dismissed. Add.13–14.

Regarding Plaintiffs claim under 42 U.S.C. section 1986, the district court concluded the complaint failed to plead any conspiratorial agreement. Add.16. Reasoning that allegations of rallies, walkouts, and encampments with overlapping membership and recruitment efforts did not demonstrate an agreement to plan events for the purpose of depriving Plaintiffs of their civil rights, the district court dismissed Plaintiffs' second claim. Add.16.

The district court did not analyze Plaintiffs' remaining state law claims, instead refusing to exercise supplemental jurisdiction over them after dismissing the only federal claims. Add.17. The district court closed the case without affording Plaintiffs' opportunity to amend, or even addressing whether amendment would have been possible. Add.17–18. Plaintiffs timely filed their notice of appeal. JA-278.

## SUMMARY OF THE ARGUMENT

Plaintiffs' allegations, when taken as true as they must be at this stage of the proceedings, demonstrate that MIT failed its Jewish and Israeli students and violated the law repeatedly. The FAC plausibly alleges claims under Title VI, 42 U.S.C. section 1986, and state law claims for negligence and breach of contract. The district court erred by concluding otherwise and should be reversed for four reasons.

*First*, Plaintiffs allege MIT had clear notice of pervasive antisemitism on its campus, and responded unreasonably with delay, inaction, and toothless, superficial remediation that allowed severe, pervasive, and objectively offensive discriminatory conduct to proceed for months on end, thereby denying MIT's Jewish and Israeli students access to the range of MIT's benefits enjoyed by other students. These allegations are sufficient to state a violation of Title VI.

*Second*, Plaintiffs alleged a conspiratorial agreement between the student groups at MIT, a purpose of which was to deprive Jewish and Israeli students of their protected rights. Further, Plaintiffs plausibly alleged MIT not only knew of the conduct giving rise to this conspiracy and had the power to stop it, but affirmatively failed to do so. These

allegations are sufficient to withstand dismissal of Plaintiffs' U.S.C. section 1986 claim.

*Third*, the district court dismissed the state law claims because it declined to exercise supplemental jurisdiction, having dismissed the only federal claims alleged. However, if either of the federal claims remain (which they should), Plaintiffs adequately pleaded state law claims for negligence and breach of contract because they alleged MIT's handbook constitutes a binding contract and MIT has duty to protect students from foreseeable harm, including harassment.

*Fourth*, the district court abused its discretion by failing to address Plaintiffs' request for leave to amend the operative complaint to address any of the deficiencies it identified.

## ARGUMENT

### I. Standard of Review

This Court reviews de novo the district court's grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Wilson v. HSBC Mortgage Services, Inc.*, 744 F.3d 1, 7 (1st Cir. 2014). The Court "construe[s] all factual allegations in the light most favorable to the [plaintiff] to determine if there exists a plausible claim

upon which relief may be granted." *Id*. In such a posture, the Court "may not stray beyond the facts averred in the complaint and its attachments … [and] official public records." *Foisie v. Worcester Polytechnic Institute*, 967 F.3d 27, 34 n.1 (1st Cir. 2020). The court reviews the denial of leave to amend for abuse of discretion. *Nikitine v. Wilmington Trust Co.*, 715 F.3d 388, 389 (1st Cir. 2013).

## II. The District Court Erred by Granting MIT's Motion to Dismiss as to Plaintiffs' Title VI Claim.

A Title VI hostile environment claim has five elements: (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the harassment occurred "in [the school's] programs and activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007) (quoting *Davis v. Monroe*

*Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).[5]

The district court only addressed the "deliberate indifference" element, granting MIT's motion as to Plaintiffs' Title VI claim solely on that basis. Add.13–14. The below analysis shows Plaintiffs adequately alleged all five elements, and the district court's erroneous holding should be reversed.

### A. The District Court's Analysis of the "Deliberate Indifference" Prong was Wrong and Should be Reversed.

A school is liable for harassment when it "acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis*, 526 U.S. at 633. An institution is deliberately indifferent if it "had notice of harassment and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Grace v. Bd. of Trs., Brooke East Boston*, 85 F.4th 1, 11 (1st Cir. 2023) (quotations omitted). While "[A] claim that an institution

---

[5] Although *Davis* is a Title IX case, nearly every other Circuit has concluded that its deliberate indifference test applies in the Title VI context. *See, e.g.*, *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015).

could or should have done more does not establish deliberate indifference," *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023), if a school "learns that its measures have proved inadequate, it may be required to take further steps." *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999).

The district court held Plaintiffs had not adequately alleged deliberate indifference because "MIT took steps to contain the escalating on-campus protests." Add.13. The district court cited MIT's actions "suspending student protesters from non-academic activities" and suspending one of the pro-Palestine student groups. Add.13. The district court continued, finding that when the Kresge lawn encampment was erected in April 2024, which first demonstrated that "these measures proved ineffective," MIT "warned students of impending disciplinary action" and when students ignored those warnings "MIT suspended and arrested trespassing students." Add.13.

The district court's brief analysis, however, ignores nearly all the critical details in Plaintiffs' allegations, including the timeline of events, thus effectively and improperly resolving factual issues at the pleading stage. Properly considered, these allegations demonstrate MIT

deliberately dragged its feet for months, only ever acting when the pressure and potential embarrassment due to its inaction boiled over, and even then, took only minimal action that fell far short of its legal obligations. The allegations also describe MIT's selective enforcement of its rules to the detriment of its Jewish students, and in some circumstances simply refusing to protect its Jewish students. In short, in no case could such a response be considered "reasonable" given the circumstances, as was required of MIT under Title VI. Add.12 (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).

Plaintiffs alleged that on the day after the October 7, 2023, massacre perpetrated by Hamas, pro-Palestinian student groups began a sustained, escalating campaign of hostility and harassment of campus Jews and Israelis. Throughout October, 2023, this included mass emails to students justifying the attack (JA-57–58 ¶¶145–48) and making false, inflammatory accusations against Israel (JA-59 ¶¶151–53); violating MIT's chalking policy to vandalize Jewish students' vigil for the October 7 victims (JA-58 ¶150); protests at which Plaintiffs were assaulted (JA-60 ¶¶155–57); mass walkouts and interruptions of classes with protesters shouting through megaphones and unfurled Palestinian flags in classes,

(JA-61 ¶159); and a "Die-In" which, in contravention of MIT rules, was staged in Lobby 7 (JA-61 ¶160).

Then in November, CAA organized protests outside the offices of Jewish MIT professors and MIT's Israel internship program, rattling office doorknobs and causing staff to feel intimidated, afraid and trapped in their offices (JA-61–62 ¶¶161–62); and on November 9, 2023, CAA and Coalition for Palestine and organized the protest held in Lobby 7, in violation of MIT's rules (JA-63–68 ¶¶170–85).

MIT's response to this campaign of harassment was anemic. For instance, in response to the November 2, 2023 protest targeting individual Jewish professors and the office of MIT's Israel internship program such that the staff and professors felt trapped in their offices, MIT punished no students and sent no police. JA-61–62 ¶¶161–62. In response to the November 9, 2023 protest in Lobby 7, MIT warned students to protect themselves by avoiding Lobby 7—a central artery of the campus through which students must pass to attend class—rather than remove the students who were flagrantly violating MIT policy. JA-64–65 ¶¶173–74. President Kornbluth publicly acknowledged that the November 9, 2023 protest violated MIT rules and "could lead to violence,"

and threatened to suspend students who failed to clear Lobby 7.  JA-68 ¶182.  Yet, the school almost immediately retreated from this threat due to fear that suspension might cause "visa issues" for disciplined students, and instead merely promised to suspend such students "from non-academic campus activities."  JA-68 ¶184.  Moreover, MIT failed even to carry out this far more lenient punishment.  JA-68–69 at ¶185.

After the November 9, 2023 protest, MIT did almost nothing to stanch campus antisemitism until May of 2024.  However, during this approximately six-month period, the following critical events occurred, none of which the district court considered:

- On February 12, 2024 and other dates, pro-Palestine groups led additional unauthorized protests that violate MIT's own time, place and manner policies in the same Lobby 7 location as the November 9, 2023 protest (JA-69–95 ¶¶186, 259);

- April 22, 2024, Jewish students at MIT had to move their Passover seder from the Hillel building to an off-campus location, due to safety concerns posed by the Kresge Lawn encampment (JA-87–95 ¶¶232, 261–62);

- The five Plaintiffs were personally impacted by being doxed

and shunned, avoiding common areas and in-person classes, and being excluded from study groups (JA-125–133 ¶¶334, 351, 360–65);

- December 6, 2023 MIT pro-Palestine student groups invited a speaker onto campus who encouraged the students to go confront campus Jews and Israelis about the conflict, and led the students in antisemitic chants (JA-75 ¶204);

- December, 2023 MIT Women and Gender Studies Department co-hosted an event with MIT Coalition for Palestine, in which they read a book by a notorious Palestinian activist who had recently praised Hitler and threatened to murder Israelis (JA-76 ¶206);

- January 16, 2024 an MIT chaplain targeted Jewish attendees at an interfaith event provoking a non-Jewish attendee to complain that the conduct violated MIT's Discrimination and Harassment Policy (JA-71–72 ¶¶192–93);

- MIT's IDHR and DEI offices expressly told campus Jews and Israelis they were not a protected class, were not within their jurisdiction, and therefore could not help them (JA-76 ¶205);

- MIT's president was haled before a Congressional Committee due to MIT's failure to address mounting campus antisemitism (JA-73–74 ¶¶196–98);

- The Department of Education opened a Title VI investigation of MIT (JA-74 ¶199);

- Jewish students and professors pleaded with the administration for help due to the continuing harassment of campus Jews and Israelis (JA-77–78 ¶¶209–10, 212–14);

- January 22, 2024, the MIT Israel Alliance, of which at least one Plaintiff is a member, emailed MIT's administration warning of the hostility toward Jews on campus (JA-78 ¶¶212–13);

- March 21, 2024, Jason Smith, Chairman of the U.S. House of Representatives Committee of Ways and Means, wrote President Kornbluth to express concern over MIT's deficient response to continuing antisemitism at MIT (JA-25–26 ¶38 & n.18); and

- CAA continued to operate as it had before, despite its "provisional suspension" (JA-52–113 ¶¶134–35, 186, 204,

211, 215–16, 259, 300–01).

Notwithstanding these events, the district court found MIT's remedial measures had been reasonable because it was not until the April/May 2024 encampment incidents that they became ineffective, and then MIT acted anew. Add.13. The district court's conclusion that Plaintiffs had not pleaded "deliberate indifference" is mistaken, for at least five reasons.

*First*, the district court failed to consider allegations demonstrating MIT's response to the November 9, 2023 protest was unreasonable, as shown by the fact it was immediately ignored by the protesters. For instance, just after MIT announced its emasculated threat regarding the November 9, 2023 Lobby 7 protest, the CAA quickly co-sponsored *another* protest that blocked Lobby 7, during which participants chanted "There is only one solution: Intifada revolution," an overt call for violence against Jews and Israelis. JA-69 ¶186; *see also* JA-95 ¶259 (describing February 12, 2024 protest in Lobby 7). Thus, it should have been immediately apparent—and certainly apparent no later than February 12, 2024—that merely threatening to suspend some students from "non-academic campus activities" was entirely ineffective and thus "unreasonable." *See,*

*e.g.*, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260–61 (6th Cir. 2000) (explaining where a school knows "its efforts to remediate are ineffective and continues to use those same methods to no avail [it] has failed to act reasonably in light of the known circumstances.").

*Vance* supports Plaintiffs' position. In *Vance*, the plaintiff, a female student, was harassed both verbally and physically by multiple students, on multiple occasions. *Id*. at 259. The defendant school responded to the incidents by repeatedly "talking to the offenders," a method that "produced no results" yet the school continued to employ. *Id* at 262. The court emphasized there was no evidence the school had "ever disciplined the offending students nor informed law enforcement" of the conduct. *Id*. at 262. The Sixth Circuit held the school had been deliberately indifferent because repeatedly "talking to" the offending students, without disciplining them or alerting the police, was unreasonable under the circumstances. *Id*.

Also on point is *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012). There, the school argued the plaintiff failed to show deliberate indifference because the school had "immediately suspended nearly every student who was identified as harassing" the plaintiff and

also "withdrew privileges such as the right to engage in extracurricular activities." *Id.* at 668. The court rejected this argument, explaining the school knew that suspending individual harassers "did not deter others from engaging in serious and offensive racial conduct." *Id.* at 669. Moreover, the selective disciplinary actions "had little effect, if any, on the taunting and other hallway harassment, which persisted . . . ." *Id.*

MIT's failure to discipline the pro-Palestine students who trapped professors in their offices (JA-61–62 ¶¶161–62) or who repeatedly ignored the school's request to vacate Lobby 7 protests (JA-63–69 ¶¶170–86) are analogous to the *Vance* school's unreasonable response. *See also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018) (finding university's efforts, including two "listening circles," campus-wide emails, and security escorts inadequate because they "failed to address the more than six-month harassment campaign" and "listening to students is not a remedy"); *Canty v. Old Rochester Regional Sch. Dist.*, 66 F. Supp. 2d 114, 115-117 (D. Mass. 1999) (holding school's response of merely issuing reprimand letters and barring contact were not "reasonable measures to end the harassment"). And even if MIT suspended some small number of students "from non-academic campus

activities," like the school in *Zeno* suspending a subset of students and withdrawing their access to extracurricular activities, this was patently insufficient given the unabated, continuing harassment that occurred thereafter.

Moreover, MIT's response to the November 9, 2023 protest of placing the onus on victims of campus harassment rather than on perpetrators by warning MIT's students to avoid Lobby 7 rather than removing the protesters, had the predictable effect of making MIT's Jews and Israelis vulnerable to additional harassing conduct. When the protesters realized there would be no meaningful repercussions to their continuing to protest in violation of MIT's time, place and manner restrictions, they were emboldened to continue to do so. *See* JA-69–95 ¶¶186, 259. Courts have held responses that make Plaintiffs vulnerable to repeated harassment evince deliberate indifference. *See, e.g.*, *Grace*, 85 F.4th at 13 (finding school exacerbated hostile environment to which the plaintiff was subjected where a staff member warned student being bullied for his sexual orientation to "watch his flamboyant hands" while the school merely "had a conversation" with the staff member without taking corrective action).

Further, given the harassment continued between the November 9, 2023 protest and the erection of the Kresge Lawn encampment, MIT sat on its hands for months delaying any sort of remedial efforts. A delay of this kind is evidence of deliberate indifference. *See, e.g.*, *Zeno*, 702 F.3d at 670 (holding school was deliberately indifferent where it "dragged its feet" because "once a school is aware of its ineffective response, a delay before implementing further remedial action is no less problematic."); *Doe ex rel. A.N. v. E. Haven Bd. of Educ.*, 200 Fed. Appx. 46, 49 (2d Cir. 2006) (school district's delay of five weeks in responding to complaints of verbal harassment of rape victim sufficient to demonstrate deliberate indifference).

Finally, the district court noted in passing that MIT's response included suspending "one of the most undisciplined of the Pro-Palestine student groups," which supported its conclusion that MIT did not act unreasonably. Add.13. However, this does not undermine a finding that MIT was deliberately indifferent. For one thing, the suspension of CAA was merely "provisional," (JA-49 ¶125 & n.73) and the district court cited nothing to indicate it ever matured into an actual suspension. For another, the group continued to operate, including by post on their official

"mit_caa" Instagram account; hosted another rally in Lobby 7, after the November 9, 2023 protest; hosted Miko Peled in December 2023; posted on Instagram on December 14, 2023 that its members planned to continue business as usual; on February 12, 2024 staged another rally in Lobby 7 in violation of MIT polices; on February 26, 2024 touted its ability to persuade IDHR to issue a "no contact" order preventing IDHR from interfering with CAA; and ultimately CAA was one of the main organizers of the Kresge Lawn encampment in April 2024. JA-52–113 ¶¶135, 186, 204, 211, 215–216, 259, 300–01. In fact, it was after its "provisional suspension" that CAA was "tabling" in Lobby 10 (in violation of MIT policy) and heckled one of Plaintiffs because he's visibly Jewish. JA-131–32 ¶357.

MIT also never disciplined *other* groups like Palestine@MIT and Scientists Against Genocide that have been active in fomenting harassment. (JA-109 ¶289.) In short, CAA's "provisional suspension" does not support the district court's erroneous conclusion regarding MIT's deliberate indifference. *See Feminist Majority Found.*, 911 F.3d at 689 (holding plaintiffs had adequately alleged deliberate indifference notwithstanding the University's suspension of rugby team, which

included some of the perpetrators).[6]

**Second**, the district court ignored allegations as to other neutral observers that corroborated the unreasonableness of MIT's response to mounting campus antisemitism. *See Davis*, 526 U.S. at 647 (observing that National School Boards Association opinions and EEOC guidelines supported extending Title IX liability to the school). Specifically, on December 5, 2023, out of dozens of campuses nationwide, MIT's president (along with the presidents of Harvard and the University of Pennsylvania) was singled out to appear before the Committee out because President Kornbluth and the other two "largely stood by,

---

[6]Although the district court did not mention it, MIT argued below that the creation of "STAH" ("Standing Together Against Hate") evidenced MIT's remedial efforts. MTD at 8. In its brief six weeks of life, STAH put on a program featuring Dalia Mogahed, an activist who has endorsed Hamas terrorism as lawful "resistance" and described Israelis as "savages." JA-74–75 ¶¶201–02; JA-172. STAH refused to include any speakers in its spring lectures program addressing campus antisemitism and disbanded when the four Jewish professors on its taskforce quit because STAH would not address "anti-Israeli hate and the demonization of Zionism." JA-75 n.117. Because it refused to address the core issue of campus antisemitism, and invited speakers who strongly oppose Israel, STAH cannot be considered a response intended to remedy campus antisemitism. *See Zeno*, 702 F.3d at 670 (finding "half-hearted measures" like school's creation of "STOP ('Students and Teachers Opposed to Prejudice')" were not evidence of a reasonable response given that membership was self-selected and it failed to confront the particular issue of racial prejudice).

43

allowing horrific rhetoric to fester and grow."[7]  JA-72–73 ¶¶195–96.

President Kornbluth's equivocations in front of the Congressional Committee, in which she stated that calls for genocide or "intifada" against Jews and Israelis might only be investigated at MIT as harassment under certain circumstances, JA-73 ¶198, involve the same refusal to acknowledge harassment and plain violations of policy that courts have found to show deliberate indifference.  *See, e.g.*, *Feminist Majority Found.*, 911 F.3d at 691 (noting University President's "public[] downplay[ing] [of] the seriousness of the threats aimed at" the plaintiffs, coupled with declining to take meaningful action to stop the harassment, made out sufficient allegations of deliberate indifference).

Moreover, on March 21, 2024, Jason Smith, Chairman of the U.S. House of Representatives Committee of Ways and Means, wrote President Kornbluth to explain that her actions, including by "revers[ing] course" and deciding against expelling students responsible for the November 9, 2023 protest, cast doubt on MIT's desire to remedy antisemitism on campus, demonstrating that the problem persisted.  JA-

---

[7] A Title VI investigation was opened relating to MIT on December 13, 2023.  JA-74 ¶199.

25–26 ¶38 & fn.18.

   ***Third***, the district court overlooked responses by MIT that demonstrated a lack of good faith in its handling of campus antisemitism. For instance, CAA and MIT Coalition for Palestine hosted an event on December 6, 2023, in which the guest (Miko Peled) exhorted the audience to visit MIT Hillel to confront MIT's Jewish students regarding the conflict in the Middle East. JA-75 ¶204. When students (including Plaintiff Meyers) contacted IDHR, concerned about the Peled visit and other antisemitic conduct on campus, IDHR staff told the students this was not conduct over which IDHR had jurisdiction and that Jewish students were not members of a protested class.[8] JA-76 ¶205.

   Aside from being demonstrably false, this response from IDHR also illustrates MIT's deliberate indifference when confronted by its Jewish and Israeli students raising the alarm. *See Grace*, 85 F.4th at 12 (school's mischaracterization of bullying as mere "peer-to-peer conflict" thus

---

[8] Notably, when geophysicist Doran Abbott was scheduled to speak on MIT's campus in 2021, the school prohibited him from speaking due to his views opposing certain aspects of affirmative action and diversity programs. *See* JA-92 ¶¶249–50. By allowing speakers like Peled or Dalia Mogahed, *see supra*, n.6, but prohibiting Doran, MIT communicates that it prioritizes other groups over its Jewish students, faculty, and staff.

outside the scope of the school's anti-bullying policy sufficient basis for jury to find deliberate indifference); *Doe v. Metro. Gov't & Davidson Cnty.*, 35 F.4th 459, 466–67 (6th Cir. 2022) (finding a juror could conclude the school was deliberately indifferent to sexual harassment of a student where the assistant principal responded by saying "the matter was out of [her] hands" and telling the mother to contact the police).

**Fourth**, the district court failed to consider allegations regarding pleas from Jewish students to MIT, alerting it that whatever minor steps it had taken were clearly deficient. Indeed, even if its initial step of threatening to suspend some students from only non-academic campus activities had been sufficient (it wasn't, and there is no evidence MIT ever made good on the threat), once a school is on notice of additional complaints, it may be required to take further remedial steps. *See, e.g.*, *Grace*, 85 F.4th at 11 (noting a school is deliberately indifferent if it "had notice of harassment and either did nothing or failed to take additional reasonable measures after it learned its initial remedies were ineffective."); *Wills*, 184 F.3d at 26 (explaining if a school "learns that its measures have proved inadequate, it may be required to take further steps.").

Here, Plaintiffs' allegations show student complaints put MIT on notice that its scant remedial efforts were ineffective, long before the Kresge encampment incidents in April and May of 2024. For instance, Plaintiffs alleged that on January 22, 2024, the MIT Israel Alliance emailed the MIT administration "expressing their concern that MIT had failed to deter any of the discriminatory and harassing behavior toward Jewish and Israeli students," notifying the administration that Israeli students were fleeing back to Israel due to the campus's hostile environment, and asking what measures the school planned to take to remedy the situation. JA-78 ¶¶212–14. In addition, in December, 2023 one of MIT's best-known professors, Mauricio Karchmer, resigned, publicly explaining it was due to the hostile anti-Jewish environment on campus. JA-77 ¶¶209–10. If MIT had not understood that its prior remedial efforts had fallen short based on President Kornbluth's pillorying in Congress, then these additional pleas for help should have spurred the school on to take new measures to help protect campus Jews and Israelis.

*Fifth*, even if there had not been allegations showing MIT knew of the need for further remedial action far earlier, MIT's response to the

Kresge Lawn encampment was also unreasonable, insofar as it was not designed to protect its Jewish students. Starting on April 22, 2024 Jewish students pleaded with MIT to address the encampment, which violated MIT's own policies. JA-83 ¶223. Rather than remove the encampment, MIT instructed its Jewish students to avoid the area and not counter-protest, JA-85–86 ¶¶224–25, thus improperly placing the onus on the victims of the campus harassment rather than on the perpetrators. *See Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 271–74 (4th Cir. 2021) (finding the school's "blame-the-victim mentality" evidenced deliberate indifference to student's sexual harassment).

MIT deliberately decided "not [to] interfere[ ] with the encampment," for two weeks, during which time Jewish students were forced to move their Passover seder, JA-87 ¶232 and prevented Hillel from celebrating Israel Day on the Kresge Lawn (for which Hillel had a permit). JA-90 ¶241. In short, MIT deliberately allowed the encampment to fester from April 21 until May 10, despite knowing the

damage it was causing to MIT's Jewish students.[9]  This also demonstrates MIT's deliberate indifference.  *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998) (recognizing school is deliberately indifferent where it makes "official decision" not to remedy Title IX violation).

### B.    Plaintiffs Adequately Alleged MIT had Actual Notice of Antisemitic Harassment in its Programs.

For a damages remedy to lie, the school must have actual knowledge of a substantial risk of peer harassment in the "recipient's program." *Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1055 (10th Cir. 2023).  Moreover, reported incidents of harassment against students other than the plaintiff may establish actual notice of Title IX discrimination.  *See id*. at 1056 (citing *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1257 (11th Cir. 2010) ("[N]o circuit has interpreted *Gebser*'s actual notice requirement so as to require notice of the prior harassment of the Title IX plaintiff *herself*.")).

Plaintiffs' allegations show MIT had actual knowledge of the

---

[9] The district court also ignored Plaintiffs' allegations demonstrating that MIT easily could have acted much more quickly and more effectively, as evidenced by the fact that numerous other universities were able to quickly dismantle similar encampments.  *See* JA-87–88 ¶¶234–35.

antisemitic harassment in its programs from multiple sources. For instance, MIT students, including Plaintiffs, and MIT faculty directly reported the harassment of Jews and Israelis on campus, to MIT. *See*, JA-70–189 ¶¶189–90, 193, 205, 208, 212–14, 223–24, 260, 363, 365; JA-150–89.

Moreover, in many instances when Jewish and Israeli MIT students tried to report harassment, the very administrators tasked with addressing harassment compounded it by telling them they were not a protected class, repeating antisemitic tropes, or dissuading them from exercising their own speech rights. JA-70–76 ¶¶189–90, 205; JA-150–89. This establishes actual notice of discrimination in "the recipient's programs." *Gebser*, 524 U.S. at 290.

Finally, MIT has acknowledged the harassment repeatedly. *See* JA-67–86 ¶¶180–82, 198, 227. Indeed, the hostility towards Jews and Israelis was so visible and prevalent on campus following October 7, 2023 that the school's own observations of it also suffice for satisfying the "actual knowledge" requirement. JP-14–133 ¶¶3, 159–62, 170–76, 186–88, 220, 225–33, 237–38, 243, 259, 297, 299, 301, 355, 361, 365. In short, Plaintiffs satisfied the actual knowledge and the "in the recipient's

programs" elements of a Title VI claim.

###   C.   Plaintiffs Adequately Alleged the Harassment was Severe, Pervasive and Objectively Offensive, and Caused the Plaintiffs to be Deprived of Educational Opportunities or Benefits.

A Title VI claim premised on student-on-student harassment will lie for "harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Harassment that is "severe, pervasive, and objectively offensive" is harassment that goes beyond mere teasing and name calling to "den[y] its victims the equal access to education" that Title VI "is designed to protect." *Id.* at 652. Moreover, the harassment that must be alleged to adequately state a claim need not be specific to the plaintiff. In Title VI cases, "racial attacks need not be directed at the complainant in order to create a hostile educational environment." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033–34 (9th Cir. 1998) (finding racial epithets and offensive language on school walls impeded ability to "obtain the same benefit from schooling"); *see also Jennings v. University of North Carolina*, 482 F.3d 686, 695–96 (4th Cir. 2007) (en banc) (finding, in an analogous Title IX case, the plaintiff had demonstrated a hostile environment where most

of the sexist comments were directed at others).

Plaintiffs amply alleged anti-Jewish and anti-Israeli harassment permeated the MIT campus, creating a hostile atmosphere that impeded equal access to education, both via allegations as to Plaintiffs themselves as well as to other MIT Jewish or Israeli students. Plaintiffs alleged each named Plaintiff and SCLJ member received antisemitic emails at their MIT email addresses and provided specific examples of the nature of this content. JA-129 ¶352. On October 8, 2023, all undergraduate students received by a "Joint Statement" from the CAA and Palestine@MIT on their MIT-provided emails, which characterized the October 7, 2023 Hamas terrorist attacks as "a response to an ongoing 75 years of occupation" and "affirm[ed] the right of all occupied peoples to resist[10] oppression and colonization." JA-57–58 ¶¶145–49. Plaintiffs also alleged that each named Plaintiff and SCLJ member was subjected to antisemitic rhetoric at protests on MIT's campus. JA-130–32 ¶¶354–57; *see also* JA-60–133 ¶¶156, 174, 297, 301, 357, 362.

Plaintiffs also alleged other Jewish and Israeli students were

---

[10] The "resistance" referred to is the October 7 attacks, which included the brutal murder, rape, torture, and kidnapping of innocents—primarily Jews and Israelis. JA-58 ¶149.

subjected to similar harassment.  JA-17–90 ¶¶11, 152, 174, 176, 179, 192–193, 204, 206–07, 232, 241.

These allegations show Plaintiffs and other Jewish and Israeli students at MIT were subject to a near constant barrage of violent and antisemitic chants, signs and messages, were prevented from going to class or from living, studying or worshipping on campus.  The Supreme Court characterized the "overt, physical deprivation of school resources," such as restricting access to a field—exactly what happened here with Kresge Lawn—as the "most obvious example of harassment triggering a damages claim." *Davis*, 526 U.S. at 650–51.  However, the bar is not even set that high, as Plaintiffs need only allege the harassment "undermines and detracts from the victims' educational experience" such that they "are effectively denied equal access to [MIT's] resources and opportunities." *Id.*  The environment MIT fostered is exactly what is meant by objectively offensive, severe, and pervasive harassment. Therefore, Plaintiffs satisfied the first and second prongs of the Title VI claim test.

**III. Plaintiffs Plausibly Alleged Their Failure to Prevent Conspiracy Claim Under 42 U.S.C. Section 1986.**

The district court further erred in concluding Plaintiffs failed to state a claim for MIT's knowing failure to prevent a conspiracy under 42 U.S.C. section 1986. To survive dismissal on this claim, Plaintiffs were required to allege (1) the defendant had knowledge of a § 1985 conspiracy; (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation; and (3) the defendant neglected or refused to try to prevent a § 1985 violation. *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997); *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d. Cir. 1994). Plaintiffs' allegations on this claim suffice at the pleadings stage.

**A. Contrary to the District Court's Order, Plaintiffs Sufficiently Pleaded a Conspiratorial Agreement.**

To succeed on their 42 U.S.C. section 1986 claim, this Court requires Plaintiffs first show the existence of a conspiracy as defined by 42 U.S.C. section 1985. Here, Plaintiffs expressly alleged a conspiracy under section 1985(3)—that is, a conspiracy undertaken "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); JA-140 ¶¶394–96.

54

To state such a claim, a plaintiff must allege "the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996), (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). The district court focused solely on the second element and concluded Plaintiffs' claim should be dismissed because "Plaintiffs fail to plead any conspiratorial agreement" under section 1985(3). Add.16. Specifically, while the district court acknowledged the allegations established the MIT student groups "acted in concert to plan protest events advocating their shared views," JA-105–33 ¶¶279–365, it concluded nothing in the FAC raised a plausible inference that the conduct was "at least in part for the very purpose of" depriving plaintiffs of their civil rights. Add.16. Generously construing the FAC in Plaintiffs' favor, this was error.

The United States Supreme Court clarified that section 1985(3) requires the plaintiff to show (1) some class-based invidiously

discriminatory animus lay behind the coconspirators' action, and (2) the conspiracy was "aimed at" interfering with protected rights. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993); *see also Donahue v. City of Boston*, 304 F.3d 110, 122 (1st Cir. 2002). "Aimed at" means the impairment of a protected right must be "a conscious objective of the enterprise." *Bray*, 506 U.S. at 275. While the district court is correct that a plaintiff must allege more than the mere fact that a protected right was "incidentally affected" by the conspiracy, Plaintiffs here have sufficiently alleged as much to survive dismissal at this stage of the proceedings. *See Alianza Ams. v. DeSantis*, 2024 U.S. Dist. LEXIS 59893, at *86–87 (D. Mass. March 29, 2024) (concluding allegations that the defendants "exclusively targeted Latinx immigrants" and "turned their attention . . . to immigrants who had crossed the southern border" were sufficient to state a claim under § 1985(3)); *Kristiansen v. Town of Kittery*, 2019 U.S. Dist. LEXIS 106905, at *12 (D. Me. June 2, 2019) (finding allegations that the defendants deprived the plaintiff of her rights met the plausibility standard sufficient to state a claim under section 1985(3)).

Here, Plaintiffs assert their rights, which exist under the

Thirteenth Amendment and corresponding statutes enacted by Congress, were violated by the coconspirators' actions. JA-105–28 ¶¶279–349. Plaintiffs also specifically cite 42 U.S.C. sections 1981 and 1982, which protect the rights to make and enforce contracts (42 U.S.C. § 1981) and the right to "purchase, lease, sell, hold, and convey real and personal property" (42 U.S.C. § 1982). JA-105–28 ¶¶279–349. The Thirteenth Amendment provides an underlying right to be free from racial violence that can sustain a Section 1985(3) claim. *Sines v. Kessler*, 324 F. Supp. 3d 765, 798 (W.D. Va. 2018). Further, courts have recognized that "42 U.S.C. § 1981 is a proper substantive basis for a claim of redress under § 1985(3)," *Witten v. A.H. Smith & Co.*, 567 F. Supp. 1063, 1072 (D. Md. 1983), as are section 1982 claims, *Wells v. Rhodes*, 928 F. Supp. 2d 920, 930–31 (S.D. Ohio 2013). Given this, the question before the court is whether the allegations give rise to a plausible inference that impairment of those rights was a "a conscious objective" of the conspiracy. Here they do.

The Complaint is replete with allegations containing examples of the coconspirators' actions for which a conscious objective was to curtail the rights of Jews and Israelis on campus. *See e.g.*, JA-56–81 ¶¶144–54,

162, 179, 189, 192, 220, 222.  Specifically, Plaintiffs outlined in detail how the coconspirators impaired their contractual rights, including violations of the student handbook, and MIT's policies and procedures.  JA-27–132 ¶¶41–67, 118–24, 136–62; 169–93, 200–32, 237–44, 261–362.  The coconspirators also impaired contracts that Jewish and Israeli groups had with MIT to host events like the Israel Day celebration, which had to be relocated due to the encampment.  JA-118–147 ¶¶318, 357, 372(b), 419–35.  Plaintiffs alleged their property rights were violated when they were prevented from using Hillel to host their Passover seder and when protesters urinated on Hillel.  JA-131–32 ¶357; *see United States v. Brown*, 49 F.3d 1162, 1166 (6th Cir. 1995) ("The legislative history therefore supports the proposition that a Jewish person's 'use' of property is protected under Section 1982.")  Moreover, Plaintiffs expressly allege the coconspirators acted with the intent to deprive Plaintiffs as well as other Jewish and Israeli students their civil rights, including under the Thirteenth Amendment.  JA-124–27 ¶331–42.  Specifically, the complaint alleges Jewish and Israeli students (and specifically Plaintiffs) have endured chants that are overtly antisemitic, been subjected to walkouts, been doxed, been kicked out of study groups, been prevented

from entering public areas of campus as a result of rallies, demonstrations, and encampments while other students were allowed in and were repeatedly ignored by MIT when these concerns were raised. JA-125–26 ¶334, 337. This conduct was alleged to have taken place with the purpose of engaging in "racially and ethnically motivated violence against Jews and Israelis" in contravention of the Thirteenth Amendment. JA-126 ¶337.

These allegations, taken together, satisfy the conspiratorial agreement element necessary to state a claim under section 1985(3). This is particularly true as courts have acknowledged the "agreement" element of a conspiracy claim "is seldom susceptible of direct proof," and that "more often than not such an agreement must be inferred from all the circumstances." *Earle v. Benoit*, 850 F.2d 836, 843 (1st Cir. 1988).

## B. Groups of Individuals Can, and Here Did, Form A Conspiracy.

Although it did not form the basis for its decision, the district court noted in a footnote that "it is unclear whether student groups, rather than their constituent members can form a § 1985(3) claim." Add.16 n.10 (citing *Schofield v. First Commodity Corp. of Bos.*, 793 F.3d 28, 30 (1st Cir. 1986); *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 347 (4th

Cir. 2011)). The Supreme Court authority in *United Bhd. of Carpenters & Joinders, Local 610 v. Scott*, 463 U.S. 825, 830 (1983) suggests otherwise, acknowledging a conspiracy formed in part by an organized group (a union), rather than its individual members. Here, Plaintiffs alleged the coconspirators are comprised of MIT student groups each of which aimed to organize and further antisemitic conduct on campus and collaborated closely with each other to do so. JA-94–96 ¶¶288–96. *Schofield* does not suggest otherwise. 793 F.2d at 30 ("Although a corporation may be a 'person' . . . the [RICO] statute envisions liability only when there is the specified interaction between two entities; thus, the same corporation may not serve in two roles at the same time.") And, unlike in *Soc'y Without a Name*, where the court rejected conclusory allegations that "Doe[s] and the City entered into a conspiracy," here, Plaintiffs have supported the formation of the conspiracy between student groups with concrete facts. 655 F.3d at 347; *but see* JA-94–96 ¶¶288–96.

## C. Defendant Need Not be A "Participant" in the Conspiracy for Purposes of Liability under 42 U.S.C. Section 1986.

Additionally, in a footnote, the district court noted it was "aware of

no case (and plaintiffs cite none) holding a party liable under § 1986 for failing to prevent a conspiracy in which the party was not involved. Nonetheless, the court will proceed on the shaky assumption that § 1986 liability could attach in these circumstances." Add.15 n.9. The Eleventh Circuit answered that very question in *Park*, which presented the issue of "whether a defendant must be a participant in a § 1985(3) conspiracy for liability to attach under 42 U.S.C. § 1986." *Park*, 120 F.3d at 1160. It held the statute does not require the individual to have "participated in the conspiracy or shared in the discriminatory animus with members of the conspiracy." *Id.*

### D. Plaintiffs Adequately Pleaded All Other Requirements of Their Section 1986 Claim.

Although not analyzed by the district court, Plaintiffs' allegations sufficiently stated each of the remaining elements of their claim. First, as to the underlying violation of section 1985(3), Plaintiffs adequately allege a conspiracy of two or more persons at MIT. Here, the student groups explicitly announced their meeting of the minds or agreement to conspire directly in stating its intent to coordinate, plan, organize, and attend events aimed at depriving Jewish and Israeli students of their rights. JA-51–109 ¶¶133, 211, 288. And those events went just as

planned and advertised. JA-53–1321 ¶¶136–62, 169–93, 200–32, 237–44, 261–362.  The overlapping of members between the student groups also demonstrates their joint initiative and agreement to work together to engage in activities which form the basis for Plaintiffs' section 1986 claim.  JA-81–109 ¶¶221–43, 289.  Second, the allegations support that the conspiracy was motivated by class-based invidiously discriminatory animus.  *Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995) (discounting conspirators' averments that their intentions were benign and equating the argument to "saying that a bank robber lacks mens rea . . . because his ultimate objective was to make money, not to commit robbery."). Plaintiffs plainly alleged the protests went beyond politics, particularly when the conspirators targeted Zionism, which the Complaint explains in detail is an antisemitic dog whistle. JA-42–45 ¶¶95–111.

Second, Plaintiffs sufficiently allege MIT's knowledge of the wrongs being committed.  As evidenced by MIT's multiple announcements, letters, emails, and videos regarding the situation, its administration had clear notice of the conduct occurring on its campus.  JA-67–133 ¶¶180–82, 198, 227–29, 189–90, 205, 223, 260, 363, 365.  Indeed, MIT issued a statement to the entire student body indicating the violations

of its policies were resulting from the conduct against Jewish and Israeli students.  JA-86 ¶227.  Moreover, President Kornbluth openly testified at Congress regarding the conduct on MIT's campus.  JA-72–74 ¶¶194–99.

Third, Plaintiffs allege MIT's power (and legal obligation under Title VI) to prevent the conspiracy and failure to take any steps to prevent the conduct from occurring or continuing.  MIT neglected or refused to prevent the violations of section 1985, JA-105–28 ¶¶279–349, even when students, faculty, and even Congress begged it to act. *Id*. As discussed in relation to Plaintiffs' Title VI claim, *supra* Section II(A), MIT's inaction was wholly deficient in addressing the conspiracy amongst the student groups which was aimed to deprive Jewish and Israeli students of their rights.

## IV. Plaintiff's Plausibly Alleged Breach of Contract and Negligence Claims.

Having dismissed Plaintiffs' only federal claims, the district court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims.  However, because the district court's determination with respect to the federal claims was incorrect, this Court should also reverse its dismissal of Plaintiffs' state law claims.

Plaintiffs' claim for breach of contract plausibly alleges (1) a valid binding contract formed between the Parties; (2) breach of that contract in MIT's failure to uphold its policies to ensure safety and access to Plaintiffs and the Class Members. Indeed, "'a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials.'" *Durbeck v. Suffolk Univ.*, 547 F. Supp. 3d 133, 145 (D. Mass. 2021) (internal citation omitted); *Shulse v. W. New Eng. Univ.*, 2020 U.S. Dist. LEXIS 138106, at *30 (D. Mass, Aug. 4, 2020). "'Where, as here, a private-school student or former student sues a school alleging breach of contract, the standard of reasonable expectation applies,' under which 'courts ask, in interpreting the contractual terms, what meaning the party making the manifestation, the university, should reasonably expect the other party, the student, to give it.'" *Walker v. President & Fellows of Harvard Coll.*, 840 F.3d 57, 61–62 (1st Cir. 2016); *see Sonoiki v. Harvard Univ.*, 37 F.4th 691, 711 (1st Cir. 2022) (considering students' "reasonable expectation . . . of the contract's terms" on a motion to dismiss).

Here, based on MIT's written policies, Plaintiffs have alleged a reasonable expectation that the terms therein promise an environment

free from discrimination. JA-144–45 ¶¶423–27. In *Shulse* the court held a "Student Handbook" and "Parent's Guide," "plausibly support[ed] Plaintiff's reasonable expectation that [the university] would provide an environment free from . . . discrimination." 2020 U.S. Dist. LEXIS 138106, at *32. There, the court reasoned that the university's handbook included a non-discrimination policy promising not to discriminate. *Id.* Similarly, here, MIT's handbook specifically contains a non-discrimination policy that "prohibits discrimination against individuals on the basis of race, color, sex, sexual orientation, gender identity, pregnancy, religion, disability, age, genetic information, veteran status, or national or ethnic origin." JA-28-29 ¶¶45–49. Like in *Shulse*, this Court should find Plaintiffs thus allege a reasonable interpretation of MIT's handbook that gives rise to a plausible breach of contract claim under Massachusetts law, including for failure to act to enforce its non-discrimination policy.

As to their negligence claim, Plaintiffs similarly sufficiently pleaded (1) MIT had a duty of care; (2) MIT breached that duty; (3) damages; and (4) causation. *See Santos v. U.S. Bank N.A.*, 54 N.E.3d 548, 558 (Mass. App. 2016). Massachusetts imposes a duty to protect

students from foreseeable harm, including from harassment that may occur in "the university context." *Schaefer v. Yongjie Fu*, 272 F. Supp. 3d 285, 288 (D. Mass. 2017). In *Schaefer*, while viewing the allegations in a light most favorable to the plaintiff, the court explained that "a reasonable inference can be drawn that Fu's alleged verbal and physical harassment of plaintiff was foreseeable and that the University should have taken some action to prevent that harassment from occurring." *Id*. Plaintiffs' harassment was foreseeable here, as evidence by MIT's numerous recognitions of the harassing nature of the conduct that was occurring. JA-67–86 ¶¶180, 182, 226–28. Moreover, because Plaintiffs' federal claims also involve allegations of discrimination, a duty of care arises from the similar federal requirements imposed on MIT. *See, e.g., Plourde v. Sorin Grp. USA, Inc.*, 23 F.4th 29, 33 (1st Cir. 2022) (explaining remedies for violations of common law duties are available where they parallel federal requirements).

Accordingly, although not addressed by the district court, Plaintiffs' allegations as to the state law claims are sufficient to survive dismissal.

## V. The District Court Abused Its Discretion in Denying Leave to Amend.

A district court's denial of leave to amend is reviewed for abuse of

discretion, *Judge v. City of Lowell*, 160 F.3d 67, 79 (1st Cir. 1998), but the decision is examined "through the prism of Federal Rule of Civil Procedure 15(a), which indicates that leave to amend a complaint 'shall be freely given when justice so requires[.]'" *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001). "In practice, this means that the denial of such a motion will be upheld so long as the record evinces an arguably adequate basis for the court's decision (e.g., futility, bad faith, undue delay, or a dilatory motive on the movant's part)." *Id.* Under this mandate, a denial of leave to amend cannot be founded on judicial whim. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Where, as here, the district court fails to even make mention of Plaintiffs' request for leave to amend, (Opposition at 35), there appears to be no adequate basis for the court's decision at all. *See Foman*, 371 U.S. at 182 ("In the absence of any apparent or declared reason … the leave sought should, as the rules require, be 'freely given.'"). Here, Plaintiff's original complaint was filed less than nine months ago. *See generally*, Complaint (filed March 7, 2024). Thereafter, Plaintiffs filed an FAC on May 30, 2024. *See generally*, JA-14–149. Accordingly, Plaintiffs have not demonstrated, and the district court failed to identify, any

reason for denying leave to amend.

Rather, the district court even indicated some instances where amended allegations could have made a difference as to its conclusions regarding dismissal. *See* Add.16 (noting "nothing in the FAC raises a plausible inference that the groups agreed to plan the events 'at least in part for the very purpose of' depriving plaintiffs of their civil rights'"). Here, the opportunity for amendment could have afforded Plaintiffs an opportunity to clarify that the conspiracy here had more than the practical effect of impeding Plaintiffs' rights. Amended allegations could have clarified that the very purpose of the conspiracy was specifically aimed at impeding Plaintiffs' protected rights, including the right to be free from racial and ethnically motivated violence

Because the district failed to identify any reason for denying leave to amend, this Court should reverse and find that, under Federal Rule of Civil Procedure 15(a), leave should have been "freely given."

## CONCLUSION

For these reasons, this Court should reverse the judgment with instructions that MIT's motion to dismiss be denied. If the Court determines Plaintiffs' complaint was deficient in any way, Plaintiffs

respectfully request the opportunity to amend on remand.

Dated: December 4, 2024      By: /s/ Glenn A. Danas
         Glenn A. Danas
         Ashley M. Boulton
         CLARKSON LAW FIRM, P.C.

         Melissa S. Weiner
         PEARSON WARSHAW, LLP

         Marlene J. Goldenberg
         NIGH GOLDENBERG RASO &
         VAUGHN, PLLC

         Attorneys for Plaintiffs-
         Appellants StandWithUs
         Center for Legal Justice,
         Katerina Boukin, and Marilyn
         Meyers

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,994 words, excluding parts of the brief exempted by Fed. R. App. P 32(f).

2.    This brief complies with the typeface and type-size requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in proportionally spaced typeface using Microsoft Word, in 14-point size.


Dated: December 4, 2024          By:  /s/ Glenn A. Danas
                                       Glenn A. Danas
                                       Ashley M. Boulton
                                       CLARKSON LAW FIRM, P.C.

                                       Melissa S. Weiner
                                       PEARSON WARSHAW, LLP

                                       Marlene J. Goldenberg
                                       NIGH GOLDENBERG RASO &
                                       VAUGHN, PLLC

                                       Attorneys for Plaintiffs-
                                       Appellants StandWithUs Center
                                       for Legal Justice, Katerina
                                       Boukin, and Marilyn Meyers

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2024 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system:

Dated: December 4, 2024
By: /s/ Glenn A. Danas
Glenn A. Danas
Ashley M. Boulton
CLARKSON LAW FIRM, P.C.

Melissa S. Weiner
PEARSON WARSHAW, LLP

Marlene J. Goldenberg
NIGH GOLDENBERG RASO &
VAUGHN, PLLC

Attorneys for Plaintiffs-
Appellants StandWithUs
Center for Legal Justice,
Katerina Boukin, and Marilyn
Meyers

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

StandWithUs Center for Legal Justice, Katerina Boukin, and
Marilyn Meyers

*Plaintiffs-Appellants,*

v.

Massachusetts Institute of Technology,

*Defendant-Appellee,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:24-cv-10577; HON. RICHARD G. STEARNS

### PLAINTIFFS-APPELLANTS' ADDENDUM

Melissa S. Weiner
PEARSON
WARSHAW, LLP
328 Barry Avenue S,
Suite 200
Wayzata, MN 55391
Tel. (612) 389-0600

*Glenn A. Danas
Ashley M. Boulton
CLARKSON LAW
FIRM, P.C.
22525 Pacific Coast
Highway
Malibu, CA 90265
Tel. (213) 788-4050

Marlene J. Goldenberg
NIGH GOLDENBERG
RASO & VAUGHN,
PLLC
14 Ridge Square NW,
3rd Fl.
Washington, D.C.
20016
Tel. (202) 792-7927

*Attorneys for Plaintiffs-Appellants StandWithUs Center for Legal
Justice, Katerina Boukin, and Marilyn Meyers*

# ADDENDUM TABLE OF CONTENTS

Order Granting Motion to Dismiss ...............................................Add.1

Order of Dismissal.......................................................................Add.18

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 24-10577-RGS

STANDWITHUS CENTER FOR LEGAL JUSTICE,
KATERINA BOUKIN, and MARILYN MEYERS

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS

July 30, 2024

STEARNS, D.J.

This putative class action against Massachusetts Institute of Technology (MIT) challenges the adequacy of MIT's response to acts of antisemitism occurring on its campus.  Plaintiffs StandWithUs Center for Legal Justice (SCLJ), Katerina Boukin, and Marilyn Meyers claim that, after the bloody October 7, 2023 Hamas terrorist attack on Israel, repeated incidents of antisemitic conduct took place on the MIT campus, causing Jewish and Israeli students to fear for their personal safety.  The First Amended Complaint (FAC) alleges four counts:  deliberate indifference to a hostile educational environment impacting Jewish and Israeli students in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I); failure to prevent a conspiracy to interfere with civil rights in

violation of 42 U.S.C. § 1986 (Count II); negligence (Count III); and breach of contract (Count IV).[1]  Plaintiffs seek compensatory and punitive damages and prospective injunctive relief.

MIT now moves to dismiss the FAC, lodging challenges under Rules 12(b)(1) and 12(b)(6).  On July 24, 2024, the court convened a hearing on MIT's motion.  After careful consideration and commendable argument from both sides, the court will allow MIT's motion.

## BACKGROUND

The relevant facts, drawn from the FAC and taken in the light most favorable to plaintiffs, are as follows.  On October 7, 2023, the Palestinian Sunni Islamist terrorist group Hamas committed a violent terrorist attack on Israel.[2]  The day after the attack, multiple MIT student groups – including the Coalition Against Apartheid (CAA) and Palestine@MIT – released a joint statement "hold[ing] the Israeli regime responsible for all unfolding violence."  FAC ¶ 147.  The statement was posted on CAA's and

---

[1] Counts I-III are alleged by all plaintiffs.  Count IV is alleged by Boukin and Meyers individually and, for injunctive relief only, on behalf of a putative class of "[a]ll Jewish and/or Israeli students enrolled at MIT after October 7, 2023, who did not participate in the pro-Palestine protests described [in the FAC]."  First Am. Compl. (FAC) (Dkt. # 40) ¶ 366.

[2] "Hamas" is an acronym for Harakat al-Muqawama al-Islamiya, which translates roughly into Islamic Resistance Movement.  In 1997, the U.S. Department of State designated Hamas as a Terrorist Organization under § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

Palestine@MIT's blogs, was sent to every undergraduate student's email, and was shared on Palestine@MIT's Instagram account. *See id.* ¶ 145. On October 19, 2023, CAA hosted a rally, which Meyers attended. A protestor shouted at Meyers and a friend, "Your ancestors . . . didn't die to kill more people." *Id.* ¶ 156. Others at the rally chanted phrases such as "Palestine will be free, from the river to the sea."[3] *Id.* ¶ 157. Student groups continued demonstrating throughout the semester, walking out of classes, organizing "die-ins," and protesting in Lobby 7, a "major thoroughfare" on the MIT campus. *See id.* ¶¶ 159-162, 169-188.

On November 9, President Sally Kornbluth issued a statement warning the Lobby 7 protestors that their conduct violated MIT's Code of Conduct; threatening the students with disciplinary action, including potential suspension; and ordering them to vacate Lobby 7 immediately.[4]

---

[3] "From the river to the sea" refers to the area between the Jordan River and the Mediterranean Sea, in which Israel, the West Bank, East Jerusalem, and the Gaza Strip are located. While some claim the phrase is a call for peace in the region, many, including the majority of members of the U.S. House of Representatives, condemn the phrase as "outrightly antisemitic." *See* H.R. Res. 883, 118th Cong. (2023).

[4] MIT provided documents intended to show that MIT began responding forcefully to the intimidation of Jewish and Israeli students on October 10, 2023. *See* Mem. of Law in Supp. of Def. MIT's Mot. to Dismiss the Am. Compl. (Mot.), Ex. 1 (Dkt. # 42-2). As these are not properly before the court on a 12(b)(6) motion (and they have no bearing on MIT's

After deciding that suspending students could lead to "collateral consequences . . . such as visa issues," MIT changed course and chose to suspend student violators from only non-academic campus activities. *Id.* ¶ 184. Around the same time, MIT also provisionally suspended CAA, *see id.* ¶ 125 n.3, and created the Standing Together Against Hate initiative, which was intended to "spearhead efforts to combat antisemitism at MIT,"[5] *id.* ¶ 201.

As the protests continued over the academic year, many Jewish and Israeli MIT students, including plaintiffs and SCLJ's members, felt abandoned by the school's administration. For example, when a member of Congress asked President Kornbluth whether "calling for the genocide of Jews violate[s] MIT's code of conduct," President Kornbluth gave a hairsplitting legalistic response: "If targeted at individuals, not making public statements." *Id.* ¶ 198. And when students complained to MIT's Institute Discrimination & Harassment Response Office (IDHR) about the perceived antisemitic incidents, IDHR responded that the complained-of conduct "did not seem to violate the policies that IDHR has jurisdiction

---

12(b)(1) motion), the court is unable to consider them. *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).

[5] MIT disbanded the initiative in February of 2024. FAC ¶ 202.

4

over" and, moreover, that Jews are not members of a protected class. *Id.* ¶ 205.

The protest activity at MIT reached a boiling point on April 21, 2024, when students erected an encampment on Kresge lawn (across from Hillel, an organization promoting Jewish campus life), protesting Zionism and MIT's ties to Israeli academics and government contractors. *See id.* ¶ 221. A Jewish student promptly emailed MIT Chancellor Melissa Nobles expressing dismay over the encampment, prompting Chancellor Nobles to reply that MIT was "working to move in a constructive direction with those who are protesting." *Id.* ¶ 224.

A week after the encampment appeared, President Kornbluth released a video statement. She informed students that the encampment violated MIT policy but, in the interest of protecting free speech, MIT had elected not to forcibly remove the student protestors. *See MIT Community Message from President Kornbluth* (April 27, 2024), https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth.[6]  President Kornbluth directed the MIT Police Department to patrol the area around the encampment 24

---

[6] Plaintiffs cite – and link – to the transcript of President Kornbluth's speech in the FAC, so the court may consider it. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

hours a day.  *See id*.  On May 6, President Kornbluth warned student demonstrators that if they did not take down the tents and leave by 2:30pm, they would face disciplinary proceedings.  FAC ¶ 238.  All but five students eventually complied with President Kornbluth's ultimatum.  *See* Sally Kornbluth, *Update on the Encampment* (May 6, 2024), https://orgchart.mit.edu/letters/update-encampment.  Despite the departure of most of the protestors, that evening, "an individual jumped over the fencing surrounding the [mostly abandoned encampment], causing a surge, and soon the area was breached," and the encampment started anew.  FAC ¶ 239.  Tensions continued to rise over the next several days.  On May 8, after protestors defaced Israeli flags, "[t]he day ended with more suspensions."  Sally Kornbluth, *Actions This Morning* (May 10, 2024),  https://orgchart.mit.edu/letters/actions-encampment.  The next day, protestors blocked Vassar Street – a main campus thoroughfare – and, after refusing to disperse, nine of them were arrested.  *Id*.  On May 10, after further police pressure, the encampment was discontinued.  *See id*.

MIT maintains various policies that govern student conduct, including the Code of Conduct, Chalking Policy, and Events Policy, (together, the Policies).  The Policies proscribe, *inter alia*, physical violence, behavior that has "serious ramifications" for the wellbeing of any student,

Add.6

and discrimination.  If a student violates the Policies, they are subject to a salmagundi of discipline, including a warning, probation, suspension, expulsion, or degree revocation.  The Chalking Policy limits where students may chalk and hang posters and prohibits the removing or defacing of other groups' posters.  The Events Policy bans expression used to harass, discriminate against, or target any groups or individuals.

## DISCUSSION

### Subject Matter Jurisdiction

MIT challenges the court's jurisdiction on three grounds: (1) SCLJ lacks associational standing to pursue any of the claims; (2) all plaintiffs lack standing to obtain prospective injunctive relief; and (3) Count I is unripe.  To establish standing, plaintiffs must, "for each claim that they press and for each form of relief that they seek," "establish each part of a familiar triad: injury, causation, and redressability."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012).  Standing to seek prospective relief hinges on a showing that the plaintiff is "likely to suffer future injury."  *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).

An association has standing to sue on its members' behalf when "(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Because an association's members are not parties to the case, to recover damages on behalf of its members, the association must show that the damages are "common to the entire membership." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). Similar conditions apply to injunctive relief; if "member circumstances differ and proof of them is important," the association lacks standing to obtain an injunction for its members. *N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006), quoting *Pharm. Care Mgm't Ass'n v. Rowe*, 429 F.3d 294, 314 (1st Cir. 2005) (Boudin, J., concurring).

In assessing ripeness, the court considers "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). A claim is not fit for decision if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *City of Fall River v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007), quoting *Texas v. United States*, 523 U.S. 296, 300 (1998).

The court perceives no jurisdictional bar to this case proceeding. Although MIT is correct that SCLJ lacks standing to seek damages on Counts I and III,[7] Boukin and Meyers have standing to seek damages for these counts. Because the FAC plausibly alleges ongoing injuries, Boukin and Meyers also have standing to seek prospective injunctive relief. *See Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023). Nor is the court persuaded that SCLJ's members need to be joined as parties to the case. Even if SCLJ's claims require "proof specific to individual members of the association," this is no bar to associational standing for purposes of injunctive relief. *See Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 35 (1st Cir. 1990).

Plaintiffs' Title VI claim is also ripe. MIT argues that it should not have to "defend the adequacy of its response [to on-campus antisemitism] while that response [is] underway." Mot. at 21. Boukin's and Meyers's damages claims depend, however, on past events that have fully unfolded,

---

[7] SCLJ seeks to recover compensatory and punitive damages on behalf of its members. Because Title VI is "much in the nature of a contract," the scope of available damages relief is contractual in nature. *Barnes v. Gorman*, 536 U.S. 181, 186-187 (2002), quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis omitted). Contractual damages, however, are not "common to the entire membership." *See Warth*, 422 U.S. at 515. So, too, is the case with tort-based damages, which are designed to redress individualized non-economic losses.

so there can be no dispute that they are ripe.  *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 535 (1st Cir. 1995).  And MIT's arguments that plaintiffs' claim for prospective injunctive relief is unripe turn largely on the merits of the dispute, *i.e.*, whether MIT has been deliberately indifferent and whether this alleged deliberate indifference is "sufficiently likely to happen" when campus life resumes this fall.  *See Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 205 (1st Cir. 2002).  Because the ripeness issue is intertwined with the merits, the court need not rule on it at this juncture.  *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 n.3 (1st Cir. 2001)

**Failure to State a Claim**

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  If the allegations in the complaint are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," the complaint will be dismissed.  *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

Add.10

### (a)  Count I:  Title VI

Title VI forbids recipients of federal funds from discriminating "on the ground of race, color, or national origin."  42 U.S.C. § 2000d.  The parties agree that discrimination against Jewish students comes within the statute's prohibition.  A Title VI hostile environment claim[8] has five elements:  (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . . harassment"; (2) the harassment "caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the school "knew of the harassment"; (4) the harassment occurred "in [the school's] programs and activities"; and (5) the school "was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances."  *Porto v. Town of Tewksbury*, 488

---

[8] Although the FAC also gestures at a direct discrimination theory, plaintiffs have not pursued this theory in their briefing on the motion to dismiss.  At any rate, plaintiffs' direct discrimination theory is indubitably one of vicarious liability.  Although there is no Supreme Court or First Circuit precedent squarely addressing the issue, the Supreme Court has held that a school district cannot be held vicariously liable under Title IX for the actions of its teachers.  *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998).  The remedial schemes for Titles VI and IX generally mirror one another.  *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009); *see also Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014) ("Title VI and Title IX are so similar that a decision interpreting one generally applies to the other.").  It follows that vicarious liability is unavailable under Title VI.  *See Corbett ex rel. Corbett v. Browning*, 2024 WL 862160, at *3 (D. Mass. Feb. 13, 2024).

F.3d 67, 72-73 (1st Cir. 2007), quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Deliberate indifference is a "stringent standard of fault." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "[A] claim that an institution could or should have done more does not establish deliberate indifference." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023). Rather, plaintiffs must allege facts showing that MIT's response to the incidents was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 175 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). The test is not to be viewed through the lens of hindsight; instead, the court must consider whether MIT responded in a clearly unreasonable manner based on what it knew at the time. *See Porto*, 488 F.3d at 74; *see also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (even where officials are aware of a risk of harm, they "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted"). Boiled down to its essence, deliberate indifference means affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires. Tempered by this understanding, the court cannot find that MIT acted with deliberate indifference.

The FAC compellingly depicts a campus embroiled in an internecine conflict that caused Jewish and Israeli students great anguish.  Plaintiffs frame MIT's response to the conflict largely as one of inaction.  But the facts alleged tell a different story.  Far from sitting on its hands, MIT took steps to contain the escalating on-campus protests that, in some instances, posed a genuine threat to the welfare and safety of Jewish and Israeli students, who were at times personally victimized by the hostile demonstrators.  MIT began by suspending student protestors from non-academic activities, permitting them only to attend academic classes, while suspending one of the most undisciplined of the pro-Palestine student groups.  These measures proved ineffective when, in April of 2024, protestors erected the Kresge lawn encampment.  MIT immediately warned students of impending disciplinary action, but its threat went unheeded when student demonstrators "surge[d]" and "breached" the largely evacuated encampment.  When MIT's attempt to peacefully clear the encampment proved futile, it suspended and arrested trespassing students.

In hindsight, one might envision things MIT could have done differently.  Indeed, some campus administrators elsewhere, as plaintiffs allege, reacted to the protests differently (and with more positive results) than MIT.  But that is not the applicable standard.  That MIT's evolving and

progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students shows that MIT did not react in a clearly unreasonable manner.

The court adds some concluding thoughts. The pain and hurt felt by plaintiffs and the Jewish and Israeli students that they seek to represent is genuine and fully understandable. But at bottom, the fault attributed to MIT is its failure to anticipate the bigoted behavior that some demonstrators – however sincere their disagreement with U.S. and Israeli policies – would exhibit as events unfolded. The transgressors were, after all, mostly MIT students whom the school (perhaps naively) thought had internalized the values of tolerance and respect for others – even those with whom one might disagree – that a modern liberal university education seeks to instill. To fault MIT for what proved to be a failure of clairvoyance and a perhaps too measured response to an outburst of ugliness on its campus would send the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law. Count I will thus be dismissed.

### (b)   Count II:  42 U.S.C. § 1986

Plaintiffs seek to hold MIT liable under § 1986 for knowingly failing to prevent the formation of a conspiracy consisting of MIT student groups

to deprive plaintiffs of their civil rights.[9]  An essential element of this claim is proof of at least one of the conspiracies defined by 42 U.S.C. § 1985.  *See Gattineri v. Town of Lynnfield*, 58 F.4th 512, 516 (1st Cir. 2023).  Plaintiffs look to § 1985(3), which prohibits conspiracies undertaken to deprive, "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).

To plead an actionable § 1985(3) conspiracy, plaintiffs must allege: (1) the existence of a conspiracy; (2) that the "purpose of the conspiracy [was] 'to deprive the plaintiff[s] of the equal protection of the laws'"; (3) at least one overt act was committed in furtherance of the conspiracy; and (4) "either injury to person or property, or deprivation of a constitutionally protected right" followed as a consequence of the illegal undertaking. *Alston v. Spiegel*, 988 F.3d 564, 577 (1st Cir. 2021), quoting *Péréz-Sánchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008).  To plausibly plead that a conspiracy existed, plaintiffs must allege either "facts indicating an agreement among the conspirators" or facts "sufficient to support a reasonable inference that such an agreement was made."  *Parker v.*

---

[9] The court is aware of no case (and plaintiffs cite none) holding a party liable under § 1986 for failing to prevent a conspiracy in which the party was not involved.  Nonetheless, the court will proceed on the shaky assumption that § 1986 liability could attach in these circumstances.

*Landry*, 935 F.3d 9, 18 (1st Cir. 2019).  The requisite agreement must be to deprive plaintiffs of their civil rights.  *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (the right's "impairment must be a conscious objective of the enterprise").

Plaintiffs fail to plead any conspiratorial agreement.  They claim that MIT student groups (1) jointly announced rallies, walkouts, and the encampment; (2) had overlapping membership; and (3) recruited participants for (and participated in) the encampment.  These allegations establish that student groups acted in concert to plan protest events advocating their shared views, but nothing in the FAC raises a plausible inference that the groups agreed to plan the events "at least in part for the very purpose of" depriving plaintiffs of their civil rights. *See id.* at 276.  Nor does plaintiffs' contention that the "clear practical effect" of the protests "was to impede the rights of Jewish and Israeli students on campus" rescue their claim.  *See* Pls.' Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Am. Compl. (Dkt. # 46) at 26.  "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right."[10]  *Bray*, 506 U.S. at 275.  Count II will therefore be dismissed.

---

[10] It is also unclear whether student groups, rather than their constituent members, can form a § 1985(3) conspiracy.  In the somewhat analogous civil RICO context, "[i]t is only a person, or one associated with

### *(c)*   *Counts III and IV:  Negligence and Breach of Contract*

Having dismissed all claims over which the court has original jurisdiction (and because plaintiffs have not pled diversity jurisdiction), the court will decline to exercise supplemental jurisdiction over plaintiffs' state-law claims.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); 28 U.S.C. § 1367(c)(3).

### ORDER

For the foregoing reasons, MIT's motion to dismiss the federal claims (Counts I and II) is <u>ALLOWED</u>.  The court declines to exercise jurisdiction over the state-law claims (Counts III and IV).  The Clerk will close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

an enterprise, not the enterprise itself, who can violate" RICO.  *Schofield v. First Commodity Corp. of Bos.*, 793 F.2d 28, 30 (1st Cir. 1986).  Other courts have concluded in the § 1985(3) context that "fail[ure] to allege with any specificity the persons who agreed to the alleged conspiracy" dooms a civil rights conspiracy claim.  *E.g.*, *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011).

Add.17

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

<u>**StandWithUs Center for Legal Justice et al**</u>
                            Plaintiffs

                                                    CIVIL ACTION

            V.
                                                    NO. **1:24-cv-10577-RGS**

<u>**Massachusetts Institute of Technology**</u>
                            Defendant

<u>**ORDER OF DISMISSAL**</u>

<u>Stearns, D. J.</u>

        Pursuant to the Court's Memorandum and Order [Doc. No. 53] GRANTING
Defendant's motion to dismiss the federal claims, Plaintiffs' Complaint is hereby
dismissed. This case is CLOSED.

        IT IS SO ORDERED.

                                            By the Court,

<u>8/21/2024</u>                                       <u>/s/ Caetlin McManus</u>
        Date                                             Deputy Clerk

Add.18