# United States Court of Appeals
# for the First Circuit

STANDWITHUS CENTER FOR LEGAL JUSTICE,
KATERINA BOUKIN, AND MARILYN MEYERS,

*Plaintiff-
Appellants,*

v.

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

*Defendant-Appellee,*

## BRIEF OF *AMICUS CURIAE* NATIONAL JEWISH ADVOCACY CENTER IN SUPPORT OF APPELLANTS AND REVERSAL

On Appeal from the United States District Court
for the District of Massachusetts (No. 24-cv-10577)

Mark Goldfeder
Bencion Schlager
NATIONAL JEWISH
ADVOCACY CENTER
666 Harless Place
West Hempstead, NY
11552
Tel: (917) 301-8746
*mark@
jewishadvocacycenter.org
ben@
jewishadvocacycenter.org*

Edward M. Wenger
Jason Torchinsky
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
2300 N Street NW,
Suite 643A
Washington, D.C. 20037
Tel: (202) 737-8808
*emwenger@
holtzmanvogel.com
jtorchinsky@
holtzmanvogel.com*

Mark Pinkert
HOLTZMAN VOGEL
BARAN TORCHINSKY &
JOSEFIAK
119 S. Monroe Street,
Suite 500
Tallahassee, FL 32301
Tel: (850) 270-5938
*mpinkert@
holtzmanvogel.com*

*Counsel for* Amicus Curiae

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the National Jewish Advocacy Center, Inc. ("NJAC") certifies that it is a non-profit corporation, has no parent corporation, does not issue stock, and has no publicly held affiliates.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTERESTS OF *AMICUS CURIAE*.........................................................1

INTRODUCTION & SUMMARY OF THE ARGUMENT.......................2

ARGUMENT .........................................................................................6

   I.  The District Court's Misunderstanding of Title VI's Deliberate Indifference Inquiry Would Water Down Title VI for All Students......6

     a.  The District Court Interpretation of Title VI's Inquiry Is Incomplete and Conflicts with Decisions of Other Courts.................6

     b.  The District Court's Interpretation of the Deliberate Indifference Standard Would Render Title VI Meaningless ................................16

   II.  The District Court Misunderstood the Key Facts and the Nature of Antisemitic Harassment that Made MIT's Conduct Unreasonable....18

CONCLUSION .....................................................................................30

CERTIFICATE OF COMPLIANCE......................................................31

CERTIFICATE OF SERVICE...............................................................32

# TABLE OF AUTHORITIES

**Cases**                                           **Page(s)**

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..............................................................28

*Brooks v. Skinner,*
139 F. Supp. 3d 869 (S.D. Ohio 2015) .....................................8, 11, 28

*Counterman v. Colorado,*
600 U.S. 66 (2023) ..............................................................23

*Davis v. Monroe Cnty. Bd. of Educ.,*
526 U.S. 629 (1999) ............................................... 6, 7 , 11, 14, 24

*Doe ex rel. Doe v. Dall. Indep. Sch. Dist.,*
220 F.3d 380 (5th Cir. 2000) .....................................................6

*Doe v. Sch. Bd.,*
604 F.3d 1248 (11th Cir. 2010) .................................................7

*Fennell v. Marion Indep. Sch. Dist.,*
804 F.3d 398 (5th Cir. 2015) ...................................................10

*Grace v. Bd. of Trs.,*
85 F.4th 1 (1st Cir. 2023) ..............................................7, 17, 24

*Menzia v. Austin Indep. Sch. Dist.,*
47 F.4th 354 (5th Cir. 2022) ................................................6, 10

*Monteiro v. Tempe Union High Sch. Dist.,*
158 F.3d 1022 (9th Cir. 1998) ..............................................25, 26

*Patterson v. Hudson Area Sch.,*
551 F.3d 438 (6th Cir. 2009) ...............................................8, 9, 28

*Porter v. Erie Foods Int'l, Inc.,*
576 F.3d 629 (7th Cir. 2009) ...................................................25

*Porto v. Town of Tewksbury,*
  488 F.3d 67 (1st Cir. 2007) ................................................... 7

*T.B. v. Indep. Sch. Dist. 112,*
  2022 U.S. Dist. LEXIS 135812 (D. Minn. Aug. 1, 2022) ...................... 9

*Wills v. Brown Univ.,*
  184 F.3d 20 (1st Cir. 1999) ................................................. 8

**Statutes**

8 U.S.C. § 1182 ....................................................... 27

8 U.S.C. § 1227 ....................................................... 27

## INTERESTS OF *AMICUS CURIAE*[1]

The National Jewish Advocacy Center ("NJAC") is a nonprofit organization dedicated to combatting antisemitism in all its forms. The proper resolution of this case is of critical importance to NJAC, as it involves the Massachusetts Institute of Technology's ("MIT" or "the Institute") legal obligation to protect its Jewish and Israeli students by implementing effective measures to identify and combat unlawful antisemitism on campus.

---

[1] No counsel for any party authored this brief in whole or in part, and no party, party's counsel, or any person other than *amicus curiae* or its counsel contributed money intended to fund preparation or submission of this brief.

## INTRODUCTION &
## SUMMARY OF THE ARGUMENT

This Court should reverse the dismissal of Appellants' complaint because the district court made critical legal and factual errors in granting Appellee MIT's motion to dismiss. Those errors will have far-reaching consequences that undermine the enforcement of Title VI of the Civil Rights Act of 1964—not only for Jewish students but for all minorities facing discrimination. Because of NJAC's work in this area, it is well-situated to provide the Court with legal insight into the scope and effect of this ruling on Title VI enforcement, and to explain the violent meaning of the antisemitic harassment that students faced.

*First*, the district court misunderstood the Title VI "deliberate indifference" inquiry by assuming that a federally funded university fails its Title VI obligation *only* if it (a) willfully takes the wrong steps or (b) does nothing. But that is incomplete. As several courts have correctly recognized, a school also violates Title VI if it takes insufficient steps to remedy a hostile environment, when it knows or is negligent in failing to understand that those particular steps will not improve the environment. Here, applying an artificially narrow standard, the court dismissed the complaint because it found that MIT took *some* nominal action in

response to increasing antisemitism. But because the allegations show that those steps were unreasonable under the circumstances—and that MIT was aware that they would be insufficient—Appellants plausibly stated a claim under Title VI.

Allowing this ruling to stand would make it difficult if not impossible for Jews and other minorities to sustain Title VI claims—and easy for schools to skirt their responsibility—by immunizing schools from liability based on inadequate, token remedies. Here, MIT has permitted antisemitic rot to fester within its community for years. Despite knowing about the rise of antisemitism both at MIT and on college campuses around the country, MIT has allowed for an educational environment where it is acceptable for student groups to openly call for the genocide of others, where professors openly support these pernicious student groups, and where administrators ignore or gaslight Jewish students' pleas for help. MIT pays lip service to Jewish students' concerns by making empty threats to suspend students, while simultaneously negotiating with and kowtowing to protestors who violate MIT's rules and policies. MIT already knew that the few actions it took would be inadequate to stop the harassment—which is what it is required to do by

law—and yet the administration did nothing to bolster its response to sufficiently address the hostile environment. Accordingly, as time progressed, the atmosphere for Jewish students on campus only deteriorated.

MIT's response to the ongoing antisemitism crisis has been woefully inadequate and unreasonable under the law. MIT's Jewish and Israeli students deserve the broad protection afforded to them by Title VI of the Civil Rights Act, as do other minority students who may face similar harassment. The district court has imposed an unwarranted legal hurdle that will make it more difficult for those students to obtain relief.

**Second**, the district court misunderstood key facts that made MIT's response to antisemitism unreasonable. Deliberate indifference is a fact- and context-specific inquiry that turns on the degree of hostility of the environment vis-à-vis the reasonableness of the disciplinary measures enacted.

Here, the district court substantially understated the hostility of the environment by misunderstanding the meaning and import of the hateful conduct directed at Jewish students. Phrases like "From the River to the Sea" and "Globalize the Intifada" are not harmless

statements—they are explicit calls for violence against Jews. Indeed, many people around the world have heeded that call, beating Jews in the streets and firebombing synagogues. And it does not make it any less harassing because the students who chant these hateful, violent slogans try to claim *post hoc* that they are making political statements. Just as MIT policy deems "deadnaming" a form of harassment against transgender students, so too can Jewish students reasonably determine that these slogans are threats and harassment against them.

In weighing the hostility of the environment versus the adequacy of MIT's response, the district court not only erred by understanding the hostility and harassment, but it also took this fact-intensive question out of the jury's hands. At the very least, these questions must be evaluated by the factfinder after a full evidentiary record is developed. This premature factfinding threatens to undermine the successful enforcement of Title VI to protect Jews and other minority students.

# ARGUMENT

## I. The District Court's Misunderstanding of Title VI's Deliberate Indifference Inquiry Would Water Down Title VI for All Students

### a. The District Court Interpretation of Title VI's Inquiry Is Incomplete and Conflicts with Decisions of Other Courts

The district court misunderstood Title VI's deliberate indifference inquiry when it concluded that MIT's ineffectual response to rising antisemitism satisfied its legal obligation under federal law. Specifically, in granting MIT's motion to dismiss, the district court held that "deliberate indifference means affirmatively choosing to do the wrong thing, or doing nothing, despite knowing what the law requires." (DC Dkt. 54 at 12). But the court offered no statutory or case support for this "boiling down" of the Title VI inquiry, and its decision conflicts with existing precedent.

As several courts have held, schools must respond *reasonably* to a hostile environment on campus, and the appropriate remedial action will depend on the specific facts of the case. *See, e.g.*, *Menzia v. Austin Indep. Sch. Dist.*, 47 F.4th 354, 361 (5th Cir. 2022) (citing *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999)); *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (a school district must

"respond[] reasonably to a risk of harm. . .")." "The [ ] inquiry is contextual: it does not require school districts to simply do *something* in response to [ ] harassment; rather, they must respond in a manner that is not 'clearly unreasonable in light of the *known* circumstances.'" *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1263 (11th Cir. 2010) (quoting *Davis*, 526 U.S. at 648). In addition, a school can be held liable if it "failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007).

It follows that a school cannot absolve itself of responsibility for providing a safe educational environment by engaging in remedial action which it knows will be ineffective. That is particularly true when the environment is gravely hostile or threatening to students. In such a situation, the school must respond not just with *anything* but with a response that is appropriate to meet the severity and nature of the harassment reported. *Davis*, 526 U.S. at 648. An institution is deliberately indifferent if it "had notice of [the] harassment and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Grace v. Bd. of Trs.,*

*Brooke East Boston*, 85 F.4th 1, 11 (1st Cir. 2023) (quotations omitted). As this Court has recognized, a school should take further steps if it learns that its remedial measures have proved inadequate. *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) ("Of course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability.").

The Sixth Circuit has echoed this observation, explaining, "[w]e cannot say that, as a matter of law, [that] a school district is shielded from liability if that school district knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student. Such a situation raises a genuine issue of material fact for a jury to decide." *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 448 (6th Cir. 2009). Indeed, courts have held that schools violated their Title VI obligations when they refused to take further remedial action despite knowledge that those actions were ineffective.

For example, in *Brooks v. Skinner*, 139 F. Supp. 3d 869, 889 (S.D. Ohio 2015), the district court addressing a Title VI racial discrimination claim denied the school district's motion for summary judgment. The

school district disciplined individual students engaged in racial harassment, and, in some instances, the disciplinary measures were effective against those individual harassers. *Id.* Still, the court denied the school district's motion for summary judgment, finding that a jury could conclude that the school's remedial measures were *overall* not effective for ending the severely hostile environment. *Id.* (citing *Patterson*, 551 F.3d at 448).

Similarly, in *T.B. v. Independent School District 112*, 2022 U.S. Dist. LEXIS 135812, at *25–26 (D.C. Minn. Aug. 1, 2022), a district court addressing a Title VI racial discrimination claim denied the school district's motion for summary judgment even though the school disciplined the offending students. The plaintiffs argued that the school's measures were unreasonable because they merely involved "talking to" the responsible students, which proved inadequate in ameliorating the hostile environment. *Id.* (citing *Theno v. Tonganoxie Unified Sch. Dist No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005) (denying summary judgment where "the school rarely took any disciplinary measures above and beyond merely talking to and warning the harassers")). The district

court reasoned that the inquiry was a factual question that would involve credibility determinations that "must be presented to a jury." *Id.*

The Fifth Circuit's decisions in *Menzia* and *Fennell* are also instructive, as the court in those cases explained the mere fact that a school takes *some* responsive action is not sufficient. *See Menzia*, 47 F.4th at 361 ("[W]e require a school district do more than simply respond to harassment, it must "'respond[] reasonably to a risk of harm.'") (internal citations omitted). Likewise, in *Fennell*, the Fifth Circuit held that the school district acted reasonably precisely because it tailored its responses appropriately to the degree of harassment. *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015). The court noted that the school district used "relatively strong action to address the most egregious incidents" and "relatively mild" action in response to the less severe allegations. *Id*. This is what the law requires.

Here, the district court misunderstood this framework articulated by several courts. The Title VI inquiry does not depend on whether the school "affirmatively chos[e] to do the wrong thing[] or d[id] nothing, despite knowing what the law requires." D.C. Dkt. 54 at 12. Rather, it

turns on whether the response was reasonable in light of all the known circumstances.

Under the proper framework, Appellants plausibly alleged that MIT's actions were unreasonable in light of the "known" circumstances. *Davis*, 526 U.S. at 648. Specifically, MIT continued to take hollow remedial actions that it knew would be ineffective and were, in fact, ineffective. Those allegations suffice for Appellants to survive the pleading stage.

For example, MIT's response to antagonistic and hate-promoting student groups was woefully inadequate. MIT knew that *several* student groups were already engaging in antisemitic activity well before October 7, 2023. D.C. Dkt. 40 ¶¶ 140–42. While it suspended one group, it did not suspend or discipline other groups who signed onto harassing, discriminating statements. *Id.* ¶¶ 154, 159, 160–61, 170. At this stage, it is plausible—especially when the inferences are drawn in Appellants' favor—that this response was unreasonable overall given the massive and dangerous growth of antisemitism around the country and that it was not tailored to the issues at hand. *See Brooks*, 139 F. Supp. 3d at 889. Unsurprisingly, those undisciplined student groups went on to continue

harassing Jewish students (*see id.* ¶¶ 186–88, 204, 216, 302)—providing more support for the conclusion that MIT's initial response was unreasonable. This harassing and discriminatory behavior against Jewish and Israeli students has also been endorsed by official MIT academic departments and staff (*see id.* ¶¶ 11, 140–42, 179, 206)—and, again, the lack of any response to those facts were unreasonable.

Rather than take sufficient actions, one of the plaintiffs was told by her advisor to just "walk elsewhere" and avoid the antisemitic encampment on Kresge lawn, which, was directly across from Hillel. *Id.* ¶ 346. Jewish and Israeli students were urged by MIT's chancellor not to counterprotest, curbing those students' right to free speech and expression at the expense of other viewpoints and of those who were breaking MIT's rules. *Id.* ¶ 224. Jewish students were forced to move the location of their Passover seder, despite having followed MIT's rules for reserving the space, to accommodate for the encampment, which existed in contravention of MIT's rules. *Id.* ¶ 232. In January 2024, an MIT chaplain targeted Jewish attendees at an interfaith event, prompting a *non-Jewish* student to speak up and express the disturbing nature of the chaplain's remarks. *Id.* ¶¶ 192-93.

And, when Jewish students sought help from the school administrators tasked with protecting them, they told they were could not be protected. MIT's Institute Discrimination and Harassment Response and Diversity, Equity and Inclusion offices expressly told Jewish students they were not a protected class, in direct contravention to multiple letters and notices MIT received from the Department of Education and other governmental authorities. *Id.* ¶¶ 29, 36, 38, 205. There is no world in which that response is reasonable.

Meanwhile, MIT engaged with student protestors who broke a slew of MIT's rules and regulations. MIT's attempts to negotiate with the "pro-Palestinian" terror groups show that they can, in fact, meet with students and try to help them when they are so inclined, undermining the notion that they took reasonable steps to protect the Jewish population in light of the known circumstances. *Id.* ¶ 224 (citing email from Chancellor Melissa Nobles, who expressed MIT's desire to "move in a constructive direction with those who are protesting.").

MIT is not safe for Jewish students because the school's response to pervasive antisemitism has been clearly unreasonable. The burgeoning antisemitism, which escalated up until and even after the

filing of the First Amended Complaint, is evidence that MIT's remedial measures were inadequate. Although the law does not require MIT to respond *perfectly* to every instance of antisemitic activity, it is required to take actions proportionate to the degree of hostility on campus given all the circumstances. *Davis*, 526 U.S. at 648. MIT's remedial actions fell fall short of what the law requires.

MIT's response also falls far short of the responses implemented by peer schools—and it is reasonable for MIT to have taken those other school's actions into its own consideration. Again, the inquiry of a reasonable response turns on all the known circumstances. But the district court did not consider those allegations when it applied its narrow construction of Title VI.

The Anti-Defamation League publishes the campus antisemitism report card and assesses 85 schools per year, providing grades detailing their effectiveness at combatting campus antisemitism. MIT was one of nine schools that received an "F," demonstrating that MIT's actions have fallen far below the standards of many of its peer schools.[2]

---

[2] "Campus Antisemitism Report Card (Beta) > Massachusetts Institute of Technology," Anti-Defamation League, September 6, 2024, available at https://www.adl.org/campus-antisemitism-report-card/massachusetts-

As described in the First Amended Complaint, peer schools engaged in swift disciplinary responses towards those responsible for the encampments. At the University of Florida, student protestors erected the encampment on April 24. D.C. Dkt. 40 ¶¶ 234–35. By April 29, the encampment was disbanded, and nine protestors were arrested. *Id.* Similarly, at the University of Texas at Austin, the school disbanded the encampment on the same day student protestors erected it.[3] In a press release, the University of Texas at Austin explained that it acted "to preserve a safe, conducive learning environment for our 53,000 students as they prepare for final exams." *Id.* By failing to consider these adequate responses, the Court failed to undertake a holistic look at the circumstances known to MIT, and incorrectly determined that, as a matter of law, MIT's responses were reasonable.

---

institute-technology (last accessed December 17, 2024); "Campus Antisemitism Report Card (Beta)," Anti-Defamation League, available at https://www.adl.org/campus-antisemitism-report-card (last accessed December 17, 2024).

[3] "University of Texas at Austin Statement Regarding Today's Protest Events," UT News, April 29, 2024, available at https://news.utexas.edu/2024/04/29/university-of-texas-at-austin-statement-regarding-todays-protest-events/ (last accessed December 17, 2024).

To the contrary, MIT's actions were patently unreasonable in the totality of circumstances. MIT was deliberately indifferent to the hostile environment on campus because it failed to take additional remedial measures when it *knew* that those it had taken were ineffective. Under Title VI's well-established framework, the district court erred in dismissing the Appellants' complaint. Implementing the district court's interpretation of Title VI would render it meaningless.

### b. The District Court's Interpretation of the Deliberate Indifference Standard Would Render Title VI Meaningless

Adopting the district court's interpretation of the deliberate indifference standard would not only be detrimental to the Jewish plaintiffs and MIT students in this case, but it would also substantially water down Title VI enforcement. By requiring allegations of an *affirmatively* wrongful action or no action at all, the district court essentially created an immunity for ineffectual action, even when the school knows the action will be ineffective.

This will make it easy for schools to skirt their responsibility by implementing token measures and then defeating complaints at the pleading stage by pointing to those measures. Under the precedent of

other courts, students can plausibly allege that certain measures are still unreasonable in light of the known circumstances—as they were here. But, if affirmed, the effect of this ruling will make it nearly impossible for students in the First Circuit to plead sufficient allegations of deliberate indifference, and will potentially allow for more discriminatory, harassing conduct against all minorities.

This Court already recognized as much when it interpreted Title VI in *Grace*, holding that an institution can be deliberately indifferent to ongoing harassment if it "failed to take additional reasonable measures after it learned that its initial remedies were ineffective." *Grace*, 85 F.4th at 11. Thus, requiring students to show that a school either "did nothing or did the wrong thing, despite knowing what the law requires," (D.C. Dkt. 54 at 12) would make it nearly impossible for students facing harassment and discrimination to satisfy their burden at the pleading stage. This would have a chilling effect on students who are already hesitant to make complaints against the schools that have failed to protect them. *See* D.C. Dkt. 70 ¶ 190 ("I would be very cautious before accusing any one of our colleagues, staff, or trainees of hate speech.").

This chilling effect will impact other minorities students just as much, watering down the protections the law has afforded them.

Title VI was not intended to immunize schools from liability but to ensure that students in federally funded institutions have safe, non-hostile learning environments. *See* H.R. Misc. Doc. No. 124, 88th Cong., 1st Sess. 3, 12 (1963) ("Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of Federal funds, is just as invidious; and it should not be necessary to resort to the courts to prevent each individual violation."). The district court flipped this intent on its head by creating a perverse situation where a school can take meaningless steps, knowing those steps will be inadequate, and thereby insulate themselves from the affirmative responsibility of providing a safe learning environment.

## II. The District Court Misunderstood the Key Facts and the Nature of Antisemitic Harassment that Made MIT's Conduct Unreasonable

The district court also misunderstood key facts about the pervasive antisemitism at MIT, which necessarily made MIT's response to the ongoing harassment and discrimination unreasonable. As described

above, deliberate indifference turns on the degree of the environment's hostility compared to the reasonableness of the disciplinary measures imposed. The district court substantially understated the harmfulness of the conduct and antisemitic epithets, which significantly contributed to the hostility of the educational environment. The district court therefore overvalued MIT's response. While that analysis was premature and should have been for the factfinder, *amicus* explains why it was also wrong on the merits.

The district court's decision failed on the merits because it lacks any meaningful discussion regarding the MIT campus' environment during the 2023-2024 school year and particularly in the wake of October 7, when Hamas terrorists waged the deadliest attack on Jews since the Holocaust, slaughtering babies, committing sexual violence against women and girls, burning whole families alive, and taking 240 civilians hostage.[4] One hundred civilians remain hostages in Gaza today. The attack was depraved and indiscriminate. Hamas' victims ranged from

---

[4] "Israel at War: What You Need to Know," American Jewish Committee, available at https://www.ajc.org/IsraelHamasWar (last accessed December 16, 2024).

infants to octogenarian Holocaust survivors. Jews around the world suffered a collective trauma unlike anything since the Holocaust.

But at MIT, less than 24 hours after news of the atrocious attacks began to surface, Jewish students were bombarded with disgusting attempts by their peers to justify Hamas' actions and the slaughter of over 1,000 innocent civilians. D.C. Dkt. 40 ¶ 147. In the days that followed, Jewish students walked through campus as swaths of their peers openly called for their genocide, while MIT protected those students under the guise of free expression, though such expression was in direct contravention of MIT's written policies. *Id.* ¶ 65 (citing MIT's Events Policy, which provides that free expression on campus "must not be used for purposes of harassment, discrimination, retaliation . . . or threats or violence targeting of groups or individuals[.]").

While the district court's ruling acknowledged that the phrase "Palestine will be free, from the river to the sea" has been condemned by some as antisemitic (*see* D.C. Dkt. 54 at 3), the court still undervalued just how violent and harassing those statements are to Jewish students.

As explained by the American Jewish Committee, the phrase "from the river to the sea" is a call for the elimination of the State of Israel and

therefore the ethnic cleansing of Jews living there.[5] This was the signature phrase of the Palestine Liberation Organization and later became the rallying cry for terrorist groups, including Hamas. *Id.*; *see also* H.R. Res. 883, 118th Congress (2024) ("Whereas Hamas, the Palestinian Islamic Jihad, Hezbollah, and other terrorist organizations and their sympathizers have used and continue to use this slogan as a rallying cry for action to destroy Israel and exterminate the Jewish people."). Just days after October 7, Jewish students at MIT suffered as their peers uttered the same genocidal, terroristic rallying cries used by Hamas when they perpetrated the attacks. MIT students proudly chanted for the elimination of the Jewish state, which, for Jews, is akin to calling for the violent removal of all Muslims from Mecca, or all Catholics from Rome, or for calls by white nationalists to remove all Black people from America. It is also worth noting that in its charter, Hamas (the U.S. designated foreign terrorist organization the students were supporting) has officially called for the extermination of Jewish people

---

[5] "Translate Hate – From the River to the Sea," American Jewish Congress, available at https://www.ajc.org/translatehate/From-the-River-to-the-Sea (last accessed December 16, 2024).

*everywhere*, including in America, and at MIT.[6]

MIT students also shouted, "Globalize the Intifada," another terroristic rallying cry for the elimination of the Jewish people. Although "intifada" literally translates to "uprising," the statement in context means violence against Jews, Israelis, and institutions supporting Israel.[7] Both the First and Second Intifadas were periods of widespread violence against Jews, including suicide bombings in civilian areas and other terror attacks. *Id.* "Global[izing] the Intifada" calls upon people from around the globe to participate in violently "rising up" against Israel and against Jews. By encouraging "globalizing the intifada," student protestors encouraged bringing violent uprising and terrorism around the world, with the aim of "rising up" against the Jews. These rallying cries are directly connected to known terrorist groups and terrorist activity perpetrated against innocent Jewish civilians. *Id.* The district court's analysis was devoid of any mention of this vitriolic phrase or its

---

[6] *See* Hamas Covenant 1988, The Covenant of the Islamic Resistance Movement (Aug. 18, 1988), available at https://avalon.law.yale.edu/21st_century/hamas.asp.

[7] "Translate Hate – Globalize the Intifada," American Jewish Congress, available at https://www.ajc.org/translatehate/Globalize-the-Intifada (last accessed December 16, 2024).

effect on MIT's Jewish students.

MIT knew or reasonably should have known why these rallying cries were so harmful to Jewish students, and thus that they required strong remedial measures. President Kornbluth testified before Congress that she had heard chants for Intifada and knew that "can be antisemitic depending on the context when calling for the elimination of the Jewish people," (D.C. Dkt. 70 ¶ 198), as they were here. *See Counterman v. Colorado*, 600 U.S. 66, 72 (2023) ("True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection. And a statement can count as such a threat based solely on its objective content. . . Its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence."). But beyond this public acknowledgement of Intifada and what it means, Jewish students begged and pleaded with MIT administrators to address this conduct, to no avail. *See, e.g.*, *id.* ¶ 223 (citing email from student dated April 22, 2024, which stated, "[a]s students flagrantly break all sorts of MIT rules yet again to spew hatred, harassment, and calls to violence and genocide against Israelis and Jews, and as the administration appears yet again to have failed to preempt, act, or even meaningfully respond, I am writing to ask

for your help[.]").

Indeed, even if MIT did not, in fact, know how harmful these slurs are to Jewish students—that still demonstrates the Institute's unreasonableness. MIT had an affirmative obligation to educate itself on these issues upon receiving the student complaints. Part of a reasonable response to ongoing harassment and discrimination is investigation, education, and understanding about the plight of the students facing the ongoing harassment and discrimination. *See Grace*, 85 F. 4th at 11 (citing *Davis*, 526 U.S. at 648).

In fact, this is precisely what MIT offers other student minority groups. It takes particular notice of potentially offensive statements and conduct and then in turn imposes rules on its students. For example, MIT provides student training about the harms of "deadnaming," speech that the transgender community deems highly offensive. *Id.* ¶ 268. Accordingly, MIT offers a training on LGBTQ+, where it teaches students that "deadnaming" someone is "considered a violent act." D.C. Dkt. 40 ¶ 268. MIT's resources on the subject explain that deadnaming someone forces that person to deal emotionally with all of the trauma of their negative life experiences at a random moment when they may not be

prepared to do so. *Id.* MIT should employ the same efforts in understanding the conduct that may be so harmful or offensive to its Jewish students. Its failure to do so is clearly unreasonable in the totality of circumstances.

In similar situations involving other minority groups, courts addressing Title VI complaints have found that the use of epithets and racist imagery, alone, are sufficient to allege of a hostile environment. *Fennell*, 804 F.3d at 409. In assessing whether a school was deliberately indifferent to a racially hostile environment where students used racial slurs against the plaintiffs, the Fifth Circuit explained that "repeatedly 'being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race' is harassment." *Id.* (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033 (9th Cir. 1998)). For example, the use of a noose accompanied by a vitriolic and epithet-laden note was found to underscore the severe, pervasive, and objectively offensive nature of the harassment. *Fennell*, 804 F.3d at 409; *Porter v. Erie Foods Intern.*, 576 F.3d 629, 635–36 (7th Cir. 2009) (discussing the historical meaning and power of noose imagery). "[R]acist attacks need not be

directed at the complainant in order to create a hostile educational environment." *Monteiro*, 158 F.3d at 1033. As this line of cases emphasizes, context matters. The use of noose imagery and racial slurs cannot be assessed in a vacuum and, instead, have been assessed by reviewing courts considering the historic meaning of those terms and imagery. The same should be true of the terroristic rally cries threatening to Jewish students.

Chanting "from the river to the sea" and "globalize the intifada" at Jewish students, mere days after October 7 is akin to displaying noose imagery in the wake of George Floyd's murder. Again, President Sally Kornbluth testified before Congress that these chants "can be antisemitic depending on the context when calling for the elimination of the Jewish people."[8] The relevant context is that these phrases were adopted and used by terrorist groups, whose stated purpose is to annihilate the Jewish people, to *justify* what was the largest single day massacre of Jews since the Holocaust. MIT's conduct was unreasonable considering this context

---

[8] "Testimony before US House Committee on Education and the Workforce," MIT Office of the President, December 5, 2023, available at https://president.mit.edu/updates/testimony (last accessed December 16, 2024).

and given the terrorist sympathizers' extreme, consistent, and pervasive conduct.

MIT nonetheless permitted these vitriolic terror rally cries to ring through campus while Jewish students were prevented from freely walking through it. MIT protected offending students due to concerns for "collateral consequences," refusing to suspend any student involved in demonstrations that violated MIT's policies. They did so even when international students were violating their visa requirements by supporting or endorsing terror. *See* 8 U.S.C. § 1182(a)(3)(B); 8 U.S.C. § 1227(a)(4)(B).

Throughout the year, Jewish undergraduate students received multiple emails to their school email address attempting to justify the mass murder, rape, and kidnapping of Jews and Israelis. Jewish students were prevented from accessing Hillel and forced to move the location of a Passover seder because MIT preferred to cater to rule-violating terror sympathizers than protect its Jewish students. And although MIT may have engaged in some remedial measures, these measures were *clearly* unreasonable in light of the known circumstances.

But even if this were a close question on the facts alleged, it still

should be one for a factfinder to decide on a full record. Deliberate indifference is a fact-intensive inquiry and one for the jury. To state a plausible claim at this stage, plaintiffs need only recite facts sufficient at least to "raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Even though a school takes some action in response to known harassment, a jury is not precluded from finding that a school's response is clearly unreasonable. *Brooks*, 139 F. Supp. at 884 (citing *Patterson v. Hudson Area Sch.*, 551 F.3d 438, 338 (6th Cir. 2009) (school district is not shielded from liability if it knows that its response to harassment, though effective against an individual harasser, are ineffective against persistent harassment; that is for jury). Here, the district court erred by granting MIT's motion to dismiss and usurping the jury's fact-finding role. The district court is not tasked with determining how offensive certain conduct is to Jewish students and the impact it has on them— every minority group is entitled to define their identity and what may be harmful or offensive to them. Even if that were the court's role at this stage, *amicus* NJAC submits that the conduct on MIT's campus was highly threatening, violent, discriminatory, and harassing to Jewish

students. It demanded a strong response under Title VI, which MIT never provided.

***

Ultimately, adopting the district court's framework for Title VI cases will harm all minority groups protected by Title VI. The district court's analysis imposes a heightened standard, unduly raising plaintiffs' burden at the pleading stage. The district court failed to appreciate the severity of harassment and discrimination faced by Jewish students at MIT and, in doing so, made premature factual findings that are best left for the jury. Adopting the district court's framework would have a significant chilling effect for students facing harassment at a time and place where our judicial system should be encouraging students to speak up.

## CONCLUSION

For the reasons above, this Court should reverse the dismissal of Appellants' complaint against MIT.

NJAC

By Counsel

*/s/ Edward M. Wenger*

Edward M. Wenger
Bar No.: 1209692
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
(202) 737-8808 (phone)
*emwenger@holtzmanvogel.com*

## CERTIFICATE OF COMPLIANCE

I certify that his brief complies with the type-volume limitation of Rules 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 5,481 words, excluding the parts of the brief exempted by Rule 32(f). I further certify that this brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word Version 16.88 in 12-point Century Schoolbook font, a proportionally spaced typeface.

Date: December 23, 2024 /s/ *Edward M. Wenger*
Edward M. Wenger

## CERTIFICATE OF SERVICE

I, Edward M. Wenger, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: December 23, 2024

/s/ *Edward M. Wenger*
Edward M. Wenger