# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

## No. 24-1800

STANDWITHUS CENTER FOR LEGAL JUSTICE, KATERINA BOUKIN, AND
MARILYN MEYERS,

*Plaintiffs-Appellants*,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

*Defendant-Appellee.*

On Appeal from the United States District Court for the District of
Massachusetts, Case No. 1:24-cv-10577, Hon. Richard G. Stearns

## BRIEF OF DEFENDANT-APPELLEE
## MASSACHUSETTS INSTITUTE OF TECHNOLOGY

Daryl J. Lapp
daryl.lapp@troutman.com
Troutman Pepper Locke LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Ishan K. Bhabha
ibhabha@jenner.com
Lauren J. Hartz
lhartz@jenner.com
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Defendant-Appellee Massachusetts Institute of Technology*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Massachusetts Institute of Technology certifies that it is a charitable corporation, which has no parent corporation and no stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................... i

TABLE OF AUTHORITIES ................................................. iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ................ x

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............. 1

INTRODUCTION .................................................................. 1

STATEMENT OF THE CASE ............................................... 6

I.    Factual Background ....................................................... 6

    A.    Plaintiffs' Allegations Regarding Their Experiences ............ 7

    B.    MIT's Response To Alleged Antisemitism ........................... 10

II.    Proceedings Below ........................................................ 14

SUMMARY OF ARGUMENT .................................................. 19

STANDARD OF REVIEW ..................................................... 23

ARGUMENT ........................................................................ 24

I.    The Complaint Fails To State A Claim Under Title VI ................ 24

    A.    Even As Depicted In The Amended Complaint, MIT's Response Was Not Clearly Unreasonable. ........................... 26

    B.    The Amended Complaint Lacks Allegations That Plaintiffs Suffered Actionable Harassment And Notified MIT. ...................................................... 35

II.    The Complaint Fails To State A Claim Under Section 1986 ........ 44

    A.    The Amended Complaint Does Not Plausibly Allege Essential Elements Of The Purported Conspiracy ............... 46

B. The Deprivations Of Civil Rights Alleged In The Amended Complaint Cannot Sustain This Claim................55

C. The Amended Complaint Does Not Plausibly Allege MIT's Knowledge And Negligence.......................59

III. The District Court Did Not Err In Dismissing The Complaint Without Leave To Amend..........................60

IV. SCLJ Lacks Standing To Participate In This Litigation...............62

V. This Court Should Not Adjudicate The State-Law Claims...........64

CONCLUSION.........................................................68

# TABLE OF AUTHORITIES

*Alexander v. Sandoval*, 532 U.S. 275 (2001)....................................25, 41

*Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9 (D. Mass. 2024)....................................................................................54

*Alston v. Spiegel*, 988 F.3d 564 (1st Cir. 2021)..........................47, 48, 49

*Aulson v. Blanchard*, 83 F.3d 1 (1st Cir. 1996) ....................................46

*Bano v. Union Carbide Corp.*, 361 F.3d 696 (2d Cir. 2004)....................63

*Bhombal v. Irving Independent School District*, 809 F. App'x 233 (5th Cir. 2020)................................................................27

*Boston Parent Coalition for Academic Excellence Corp. v. School Committee for City of Boston*, 89 F.4th 46 (1st Cir. 2023), *cert. denied*, No. 23-1137, 2024 WL 5036302 (U.S. Dec. 9, 2024) ...................................................................... 63-64

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)..........................................................18, 47, 50, 53

*Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995)........................................................................35

*Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d Cir. 2001) ......................56

*Bryant v. Independent School District No. I-38 of Garvin County*, 334 F.3d 928 (10th Cir. 2003)........................................ 41-42

*Burt v. Board of Trustees of University of Rhode Island*, 84 F.4th 42 (1st Cir. 2023) ........................................................24

*Canty v. Old Rochester Regional School District*, 66 F. Supp. 2d 114 (D. Mass. 1999)........................................................32

*Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600 (1979)...................................................................... 44-45

*Creative Environments, Inc. v. Estabrook*, 680 F.2d 822 (1st Cir. 1982)......................................................................45, 59

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999)......................................25, 27, 30, 68

*Doe v. Brown University*, 896 F.3d 127 (1st Cir. 2018) ...................26, 35

*Doe v. East Haven Board of Education*, 200 F. App'x 46 (2d Cir. 2006)...................................................................................32

*Doe v. Fairfax County School Board*, 1 F.4th 257 (4th Cir. 2021)........................................................................................31

*Doe ex rel. Doe #2 v. Metropolitan Government of Nashville & Davidson County*, 35 F.4th 459 (6th Cir. 2022) .................................31

*Doe v. Pawtucket School Department*, 969 F.3d 1 (1st Cir. 2020)..............................................................24, 26, 27, 28

*Doe v. Princeton University*, 790 F. App'x 379 (3d Cir. 2019).................27

*Doe v. School Board of Broward County*, 604 F.3d 1248 (11th Cir. 2010)................................................................................43

*Doe v. Stonehill College, Inc.*, 55 F.4th 302 (1st Cir. 2022) ..............67, 68

*Donahue v. City of Boston*, 304 F.3d 110 (1st Cir. 2002).......................53

*Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988)...................................49, 50

*Felber v. Yudof*, 851 F. Supp. 2d 1182 (N.D. Cal. 2011).......36, 38, 39, 41

*Feminist Majority Foundation v. Hurley*, 911 F.3d 674 (4th Cir. 2018)....................................................................................32, 34

*Fitzgerald v. Barnstable School Committee*, 504 F.3d 165 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009)...........................................................................28, 30, 36

*Foman v. Davis*, 371 U.S. 178 (1962).....................................................62

*Forth v. Laramie County School District No. 1*, 85 F.4th 1044 (10th Cir. 2023) ................................................................43

*G. v. Fay School*, 931 F.3d 1 (1st Cir. 2019) ............................66

*Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002)................57

*Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998)......................................................25, 35, 42, 44

*Grace v. Board of Trustees*, 85 F.4th 1 (1st Cir. 2023) ............31

*Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320 (1st Cir. 2008)....................................................................60, 61

*Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979)..............................................................56

*Green v. Benden*, 281 F.3d 661 (7th Cir. 2002)........................47

*Griffin v. Breckenridge*, 403 U.S. 88 (1971)......................46, 56

*Groden v. N&D Transportation Co.*, 866 F.3d 22 (1st Cir. 2017)..........................................................................64, 65

*Guckenberger v. Boston University*, 957 F. Supp. 306 (D. Mass. 1997)..............................................................................40

*Halsey v. Fedcap Rehabilitation Services, Inc.*, 95 F.4th 1 (1st Cir. 2024)........................................................................24

*Hammond v. Kmart Corp.*, 733 F.3d 360 (1st Cir. 2013) ........57

*Hatch v. Department for Children, Youth & Their Families*, 274 F.3d 12 (1st Cir. 2001)..............................................62

*Healy v. James*, 408 U.S. 169 (1972) ........................................4

*Hochenfoner v. Genzyme Corp.*, 823 F.3d 724 (1st Cir. 2016) .......... 60-61

*Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802 (7th Cir. 2021)..............................................................27

*Jennings v. University of North Carolina*, 482 F.3d 686 (4th Cir. 2007)..........................................................................42

*Jimenez v. Wellstar Health Systems*, 596 F.3d 1304 (11th Cir. 2010)................................................................55, 56, 57

*Judge v. City of Lowell*, 160 F.3d 67 (1st Cir. 1998), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004)..........................................62

*Karasek v. Regents of University of California*, 956 F.3d 1093 (9th Cir. 2020) ............................................................27

*Kestenbaum v. President and Fellows of Harvard College*, __ F. Supp. 3d __, No. 24-CV-10092, 2024 WL 3658793 (D. Mass. Aug. 6, 2024) ............................................................66

*Kristiansen v. Town of Kittery*, No. 2:18-CV-420, 2019 WL 2619531 (D. Me. June 26, 2019), *report & recommendation adopted*, 2019 WL 3554694 (D. Me. Aug. 5, 2019).....................51, 52

*Landau v. Corporation of Haverford College*, No. 24-cv-2044, 2025 WL 35469 (E.D. Pa. Jan. 6, 2025) ..........................41, 43, 44, 53

*Lawrence General Hospital v. Continental Casualty Co.*, 90 F.4th 593 (1st Cir. 2024) ............................................23

*Libertad v. Welch*, 53 F.3d 428 (1st Cir. 1995)..............................45, 55

*M.L. ex rel. D.L. v. Concord School District*, 86 F.4th 501 (1st Cir. 2023)............................................................27, 31

*MacDonald v. Town of Eastham*, 745 F.3d 8 (1st Cir. 2014)................24

*Maymi v. Puerto Rico Ports Authority*, 515 F.3d 20 (1st Cir. 2008)............................................................45, 53

*Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511 (1985), *aff'd*, 397 Mass. 1004 (1986).......................................................65

*Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) ............................................................45

*Monteiro v. Tempe Union High School District*, 158 F.3d 1022 (9th Cir. 1998) ..............................................................41, 42

*Morton v. Arnold*, 618 F. App'x 136 (3d Cir. 2015).................................47

*Mouradian v. Gen. Elec. Co.*, 23 Mass. App. Ct. 538 (1987).................65

*Nguyen v. MIT*, 479 Mass. 436 (2018) ....................................................67

*Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019)...........................................................63, 64

*Pirghaibi v. Moss*, 175 F. App'x 120 (9th Cir. 2006)..............................56

*Pollard v. Georgetown School District*, 132 F. Supp. 3d 208 (D. Mass. 2015)...........................................................................................37

*Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007)...........26, 27, 31

*Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011).............................26

*Schaefer v. Fu*, 272 F. Supp. 3d 285 (D. Mass. 2017) ............................67

*Schaer v. Brandeis University*, 432 Mass. 474 (2000) ...................... 65-66

*Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018)....................52, 56

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996) .............................................63

*United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995)...........................58

*United States ex rel. Kelly v. Novartis Pharmaceuticals Corp.*, 827 F.3d 5 (1st Cir. 2016)...........................................................24, 61

*Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000) .................................................................................32

*Young v. Owens*, 577 F. App'x 410 (6th Cir. 2014) ................................56

*Zeno v. Pine Plains Central School District*, 702 F.3d 655 (2d Cir. 2012).......................................................................................32

**STATUTES**

42 U.S.C. § 1982...................................................................58

42 U.S.C. § 2000d................................................................25

42 U.S.C. § 2000d-1.............................................................25

**OTHER AUTHORITIES**

Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague* (July 28, 2003), https://bit.ly/4bY9Zid......................40

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter: Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic Characteristics* (Nov. 7, 2023), https://bit.ly/3yXqigp............................................................39

Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024), https://bit.ly/3z1ySeg.................................40, 54

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Massachusetts Institute of Technology respectfully requests oral argument in this appeal. It presents issues of significance for institutions of higher education, including the plaintiffs' attempt to impose a novel interpretation and application of the Ku Klux Klan Act on a private university. Resolution of these issues would help clarify the legal obligations of educational institutions facing similar challenges on their campuses since the Hamas attacks against Israel on October 7, 2023.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court correctly dismissed the federal claims pursuant to Rule 12(b)(6) without leave for further amendment.

2.     Whether the district court erred in concluding that the plaintiff advocacy organization has associational standing for injunctive-relief claims.

## INTRODUCTION

Since October 7, 2023, Massachusetts Institute of Technology ("MIT")—like universities across the country—has been the site of student-led protests involving expression that is deeply offensive to many in its community. MIT is firmly committed to free expression as one of its core values. But as MIT's President has explained, "there is a difference between what we can say – that is, what we have a right to say – and what we should say," and we must "find a way to express our political views with a basic sense of respect and empathy for other members of our community." JA-206. That principle is central to MIT's mission and its substantial and ongoing efforts to combat antisemitism and other forms of hate. Based on those efforts, the district court granted MIT's motion to dismiss claims under Title VI of the Civil Rights Act of 1964 and the Ku

Klux Klan Act of 1871. It rejected the extraordinary contentions that MIT was deliberately indifferent to antisemitic harassment and tolerated a student-led conspiracy to deprive Jewish and/or Israeli community members of their civil rights. The district court's decision faithfully applied binding precedent to the allegations in the Amended Complaint, and it should be affirmed.

The Amended Complaint acknowledges many of MIT's robust efforts, even as it seeks to downplay them. MIT's leaders swiftly and repeatedly condemned the October 7 attacks and the rising threat of antisemitism. The Institute has taken concrete steps to provide a safe and inclusive environment for all—including increasing safety patrols; providing supportive resources for students affected by the conflict in the Middle East or related campus activism; and launching educational and community-building efforts. Where community members have violated policies, MIT has taken remedial actions that have escalated as the activity has persisted or intensified—including interim suspensions, formal disciplinary proceedings, and arrests. The district court correctly concluded that Plaintiffs could not plausibly assert a "clearly unreasonable" response by MIT to events on campus.

Plaintiffs—a California-based advocacy organization and two MIT students it claims as members—now ask this Court to reinstate their case. They claim MIT has not only violated federal law but also breached its contractual obligations to a class of students and its duties of care. Plaintiffs demand damages as well as sweeping and unprecedented injunctive relief that, among other actions, would compel MIT to terminate tenured faculty members and staff, expel students, and ban student groups.

As the district court recognized during oral argument, this case effectively asks the courts "to take over [a] university," JA-244, supplanting the discretion typically afforded to educational institutions to apply their judgment and experience to address campus challenges. MIT reaffirms its unwavering commitment to combat antisemitism. But as the district court held, MIT's actions met its legal obligations, and the Amended Complaint fails to state a claim. The district court's decision straightforwardly applied established legal standards to a deficient pleading, and Plaintiffs identify no error that warrants reversal.

***First***, students cannot sue educational institutions under Title VI for the actions of fellow students, faculty, or staff based on vicarious

liability. Instead, Title VI requires plausible allegations that an institution had an official policy to discriminate or responded to known and actionable harassment in a manner so clearly unreasonable that it amounts to an official decision not to remedy the violation. The Amended Complaint does not meet that rigorous legal standard. Critically, courts and regulators recognize that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,'" *Healy v. James*, 408 U.S. 169, 180 (1972), and that fulfilling Title VI obligations does not require trammeling freedom of expression on campus, even when that expression is offensive or hurtful.

**Second**, attempting to circumvent Title VI's rejection of vicarious liability, Plaintiffs claim MIT should be held responsible under 42 U.S.C. § 1986 for the actions of student groups engaging in protest activity that purportedly conspired to deny Jewish and/or Israeli students their civil rights. Yet Plaintiffs do not plausibly allege essential elements of this novel application of the Ku Klux Klan Act. The Amended Complaint offers only conclusory assertions of conspiratorial purpose and discriminatory animus, confusing the purported *effect* of the alleged conspiracy with the actual *intent* of the alleged co-conspirators (of which

there are no plausible allegations). Plaintiffs also ignore decisions from multiple circuits rejecting a core element of their legal theory, asking this Court to create a circuit split and dramatically expand Section 1986 liability. This Court should decline Plaintiffs' invitation.

*Third*, the district court was correct in denying leave for further amendment—particularly in the absence of any motion for leave to amend or even any explanation of how amendment would salvage these claims.

*Fourth*, MIT preserves its argument that the advocacy group litigating these claims lacks standing to sue. The district court recognized that StandWithUs Center for Legal Justice ("SCLJ") lacks associational standing to seek money damages due to individualized issues of proof. Those same issues—and the participation they will require of the group's purported members—also defeat associational standing for the remaining claims seeking injunctive relief.

*Finally*, the district court properly declined to review the state law claims after dismissing the federal claims, and there is no basis for this Court to consider those claims in the first instance on appeal.

# STATEMENT OF THE CASE

## I.    Factual Background

Plaintiffs are two MIT students and an advocacy organization, SCLJ. JA-19-20 ¶¶18-20.[1] According to their Amended Complaint, two student groups—MIT Coalition Against Apartheid ("CAA") and Palestine@MIT—have organized protests and engaged in expression Plaintiffs find offensive, such as "denounc[ing] the Israeli occupation" in Palestine and using phrases like "[f]rom the river to the sea" and "[i]ntifada revolution." JA-57-58 ¶¶147, 150; JA-69 ¶186. The Amended Complaint asserts that these groups—along with Scientists Against Genocide, the Graduate Student Union, and the Black Graduate Student Association—conspired to "organize events on MIT's campus," including an encampment, "that created an openly hostile environment for Jewish and Israeli students" and deprived them of their civil rights. JA-110 ¶291; JA-112 ¶300. Plaintiffs allege MIT had knowledge of this alleged conspiracy but failed to prevent it. JA-140-141 ¶¶396-401.

_____

[1] "JA-__" refers to the Joint Appendix. "Dkt.__" refers to docket entries in the district court. "Add.__" refers to Appellants' Addendum. "Br.__" refers to Appellants' Opening Brief.

### A. Plaintiffs' Allegations Regarding Their Experiences

The only MIT students named in the pleading are Plaintiffs Katerina Boukin and Marilyn Meyers; only twelve of the pleading's 435 paragraphs describe their alleged experiences. *See* JA-60 ¶156; JA-76 ¶205; JA-94 ¶¶255-256; JA-110 ¶297; JA-113 ¶301; JA-127-128 ¶¶345-346; JA-130-131 ¶¶354-355.

Plaintiff Boukin, "a Jewish Israeli graduate student," JA-20 ¶20, alleges she was "subjected to antisemitic chants and violent speech" at campus protests, including the phrase "from the river to the sea," and was "prohibited from freely moving through the space" where these protests occurred. JA-131 ¶355. Boukin allegedly saw unspecified "antisemitic language" in broadcast messages from student groups sent to MIT email accounts, *id.*, and contends she and another student "were required to remove" Israeli flags they displayed on campus, even though "MIT administrators have allowed Palestinian flags to remain on campus," JA-94 ¶¶255-256. Boukin does not say who required her to remove the flags, when, or why; nor does she allege she was subject to any discipline. Moreover, she acknowledges MIT has a policy regulating the display of flags on campus. JA-31 ¶58; JA-95 ¶259 & n.154. Boukin

does not allege making any reports of antisemitism to any MIT officials at any time.

Plaintiff Meyers, "a Jewish undergraduate student," JA-20 ¶19, alleges she "was the recipient of antisemitic comments by other students on campus," JA-131 ¶354. During an outdoor rally, an unidentified protester—with no alleged connection to MIT—purportedly "raised the front wheels of his bike at" Meyers and another Jewish student and said, "Your ancestors [(referring to Holocaust victims)] didn't die to kill more people." JA-60 ¶156. Meyers alleges she contacted MIT's Institute Discrimination & Harassment Response Office ("IDHR") at one point and "was falsely told that she was not a member of a protected class and, subsequently, that what she experienced is not within the scope of the IDHR." JA-131 ¶354. Meyers does not allege she reported the bike incident to IDHR or other MIT officials, nor that she alerted MIT officials about "skipp[ing] several classes" and "avoid[ing]" her peers because she felt "socially isolated and shunned." *Id*.

The Amended Complaint also references three anonymous members of SCLJ claiming to be MIT students. JA-20 ¶¶21-23.[2] According to the allegations, these individuals avoided areas of campus and/or relocated events due to the encampment and unspecified "threats and hostility on campus," JA-128 ¶¶347-349; JA-131-133 ¶¶356-364; they witnessed "antisemitic emails" and "antisemitic rhetoric," including in one case being "heckled" by CAA members, and in another instance seeing an individual with no alleged MIT affiliation urinate on Hillel's building, JA-131-132 ¶¶356-357; and one of them moved her housing due to social isolation, JA-132-133 ¶¶358-364. Of these three students, only one allegedly reported her concerns to MIT, though the Amended Complaint does not allege what she reported or how MIT responded. JA-133 ¶363. Finally, the Amended Complaint alludes to experiences by "[o]ther Jewish and Israeli students at MIT" who are not parties or even alleged SCLJ members. JA-133 ¶365.

---

[2] Plaintiffs' brief erroneously refers to "five Plaintiffs," apparently counting these anonymous individuals. *E.g.*, Br.34. To be clear, the only parties litigating claims against MIT are Plaintiffs Boukin, Meyers, and SCLJ, the last of which lacks standing for reasons addressed below. *See infra* at 62-64.

## B. MIT's Response To Alleged Antisemitism

The Amended Complaint acknowledges—even as it attempts to downplay—MIT's multi-faceted response to the campus implications of the Israel/Hamas conflict since October 7, 2023. The Amended Complaint, together with MIT's public communications cited, quoted, and linked in the pleading, underscore MIT's active and continuous engagement.

For example, the Amended Complaint focuses on a protest that took place in Lobby 7 on MIT's campus on November 9, 2023. *See, e.g.*, JA-63-70 ¶¶170-188. But the Amended Complaint also acknowledges MIT took several actions before, during, and after that protest. On November 8, MIT officials sent "a communication outlining the boundaries for protests on [MIT's] campus," JA-196-199, which the Amended Complaint and its exhibit describe and cite, JA-94-95 ¶257; JA-160. MIT explained it had enhanced campus security measures and patrols; updated guidelines for expressive activities; created a team to respond promptly to reports of harassment and discrimination arising from campus activism relating to the conflict; and expanded supportive services for students. JA-196-199.

When protesters failed to respect MIT's boundaries for protests on November 9, they received a written warning from MIT's President, Provost, and Chancellor. Protesters were told their activity violated MIT rules and would result in disciplinary action if they failed to leave Lobby 7 by a designated time. JA-65-68 ¶¶177, 180, 183. Consistent with that warning, student protesters who remained in Lobby 7 after the deadline faced suspension from non-academic campus activities as an interim action pending final adjudication. JA-68 ¶184.

The same day, MIT's President issued a statement condemning the protest and detailing the Institute's actions in response. JA-201-203 (quoted and linked at JA-68 ¶¶182, 184). In the statement, President Kornbluth explained the steps MIT would take in response to the protesters' actions, including the actions described above and investigations into "additional complaints about conduct by individual protesters and counterprotesters." JA-202. President Kornbluth also reiterated MIT's policies and limits on expressive activity. *Id*.

The Amended Complaint also focuses on the actions of CAA, a registered student organization and the alleged ringleader of the conspiracy depicted in the pleading. Here, too, the pleading concedes MIT

provisionally suspended CAA based on its unauthorized campus demonstrations. JA-49 ¶125 n.73; JA-52 ¶135.

The encampment during the spring 2024 semester also features prominently in the Amended Complaint. *See, e.g.*, JA-80-91 ¶¶220-245. Once again, the pleading itself demonstrates that MIT's senior leadership was actively engaged in addressing and safely ending the encampment. For example, shortly after it began, President Kornbluth issued a statement condemning the encampment and chants used by the participants. JA-209-213 (cited and quoted at JA-86 ¶¶226-227, 229). President Kornbluth explained: "[T]o avoid any further escalation, we're working closely and constantly with our Student Life team, the faculty members who are advising the students, and our own campus police. Out of an abundance of caution, at my direction, the MIT[ Police Department] is on the scene 24 hours a day." JA-210-211. President Kornbluth also emphasized that "violence and threats of violence on our campus are utterly unacceptable" and violations of MIT rules would result in disciplinary action. *Id*.

As the Amended Complaint alleges, on May 6, the MIT administration directed all students to leave the encampment by a

designated time or face discipline—which President Kornbluth confirmed in yet another statement. JA-88-89 ¶238. After some protesters failed to heed that warning, they received interim suspensions and were referred for further disciplinary action. JA-216-217 (cited and quoted at JA-91 ¶¶243-245). On May 10, MIT cleared the encampment, JA-91 ¶244, and issued a statement providing a detailed timeline of encampment-related events and explaining that individuals who had remained in the encampment were arrested, JA-216-220 (cited and quoted at JA-91 ¶¶243-245). As President Kornbluth emphasized, "my responsibility is to the whole community: to make sure that the campus is physically safe and functioning for everyone, that our shared spaces and resources are available for everyone, and that everyone feels free to express their views and do the work they came here to do." JA-216.

The Amended Complaint also acknowledges MIT's efforts to strengthen its policies, practices, and campus climate. It details MIT's prohibitions on discrimination and harassment; its issuance of new or updated policies and statements regarding expressive activity on campus; and its formation of the Standing Together Against Hate ("STAH") initiative to, among other roles, "spearhead efforts to combat

antisemitism at MIT." JA-28-29 ¶49; JA-31 ¶57; JA-48 ¶123; JA-75 ¶201; JA-92-93 ¶251.

In MIT's community announcement regarding STAH, President Kornbluth underscored the importance of balancing MIT's profound commitment to freedom of expression with its imperative to maintain a welcoming, respectful, and safe community. JA-222-225 (cited and discussed at JA-75 ¶201). President Kornbluth also directly addressed antisemitism, stating that it "is real, and it is rising in the world," and MIT "cannot let it poison our community." JA-224. Indeed, the MIT administration has been clear that while it is "legitimate to criticize the policies of any government, including the current government of Israel – as indeed many Israelis do," it is *never* acceptable "to vilify and shun Israeli and Jewish members of our community." JA-206.

## II. Proceedings Below

Plaintiffs filed suit on March 7, 2024, during the spring semester. Their 71-page complaint alleged MIT violated Title VI by intentionally discriminating against Jewish and/or Israeli students and exhibiting deliberate indifference toward a hostile educational environment for those students. *See* Dkt.1. MIT moved to dismiss the complaint, arguing

it failed to state a claim and suffered from jurisdictional defects related to standing and ripeness. Dkt.32. MIT subsequently consented to an extension request allowing Plaintiffs time to "review the arguments in the Motion to Dismiss and determine whether any amendment would narrow or correct any alleged pleading deficiencies." Dkt.34.

Following that extension, Plaintiffs filed an Amended Complaint on May 17, 2024.[3] Dkt.36. This 129-page pleading added new factual allegations, including regarding the encampment and MIT's response. It also added new causes of action under the Ku Klux Klan Act and state common law, including a putative class action for breach of contract. *See* JA-140-147 ¶¶393-435. MIT moved to dismiss this Amended Complaint with prejudice, again arguing it failed to state any claim for relief and suffered from jurisdictional defects. Dkt.41. After full briefing and extensive oral argument, and "tak[ing the facts] in the light most

---

[3] Plaintiffs later filed a revised Amended Complaint, which is the operative pleading. *See* JA-8-9; Dkt.40. It corrected typographical errors but did not alter the substance of the allegations.

favorable to plaintiffs," Add.2, the district court (Stearns, J.) granted MIT's motion under Rule 12(b)(6).[4]

Starting with Title VI, the district court found that Plaintiffs had abandoned any "direct discrimination theory," which would fail in any event. Add.11 n.8. With respect to the deliberate-indifference theory, the district court recognized the five essential elements for stating a claim and the "stringent standard of fault" required for liability. Add.11-12. The district court emphasized that the test for deliberate indifference is not whether "one might envision things MIT could have done differently" with the benefit of hindsight, nor how "some campus administrators elsewhere … reacted to protests differently." Add.13.

Applying the correct standard and its requirement of a clearly unreasonable institutional response, the district court held that the Amended Complaint's own allegations defeated this claim. The pleading acknowledged that "MIT took steps to contain the escalating on-campus

---

[4] With respect to MIT's jurisdictional arguments under Rule 12(b)(1), the district court held that at least one plaintiff had standing for each form of relief sought and that ripeness was intertwined with the merits of the claims and thus unfit for early resolution. Add.7-10.

protests." Add.13. The court stated that "MIT began by suspending student protestors from non-academic activities, permitting them only to attend academic classes, while suspending one of the most undisciplined of the pro-Palestine student groups." *Id.* When protest activity escalated months later with an encampment, "MIT immediately warned students of impending disciplinary action," and, after "MIT's attempt to peacefully clear the encampment proved futile, it suspended and arrested trespassing students." *Id.*

The district court concluded: "That MIT's evolving and progressively punitive response largely tracked its increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students shows that MIT did not react in a clearly unreasonable manner." Add.13-14. While acknowledging "the pain and hurt felt," the district court declined "[t]o fault MIT for what proved to be a failure of clairvoyance and a perhaps too measured response to an outburst of ugliness on its campus." Add.14. Doing so "would send the unhelpful message that anything less than a faultless response in similar circumstances would earn no positive recognition in the eyes of the law." *Id.*

Turning to the Ku Klux Klan Act claim, the district court noted that Plaintiffs' attempt to hold a private party liable under Section 1986 for allegedly failing to prevent a conspiracy in which it had no involvement was unprecedented. The court nonetheless analyzed whether the Amended Complaint adequately alleged the requisite elements. Add.15 n.9. It found the Amended Complaint "fail[ed] to plead any conspiratorial agreement" among the MIT student groups to deprive Plaintiffs of their civil rights. Add.16. It explained that the "allegations establish that student groups acted in concert to plan protest events advocating their shared views, but nothing in the [Amended Complaint] raises a plausible inference that the groups agreed to plan the events 'at least in part for the very purpose of' depriving [P]laintiffs of their civil rights." *Id.* (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993)). And even if the purported conspiracy had the "clear practical effect" of impeding the rights of Jewish and/or Israeli students, as Plaintiffs alleged, the law requires conscious purpose—not just practical effect. *Id.*

Upon dismissing "all claims over which the court has original jurisdiction," the district court declined to exercise supplemental jurisdiction over the state-law claims. Add.17. It granted MIT's motion

without leave for further amendment and closed the case. Add.17-18. This appeal followed.

## SUMMARY OF ARGUMENT

The district court correctly concluded that the Amended Complaint fails to state a claim under Title VI or Section 1986 and properly dismissed the pleading without leave to amend.

I.     Binding precedent limits an educational institution's Title VI liability to narrow circumstances: Plaintiffs must show that a person with authority to take corrective action on the institution's behalf had actual knowledge of—but was deliberately indifferent to—harassment so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to the educational opportunities or benefits provided by MIT. The Amended Complaint's allegations fall far short of that exacting standard.

I.A.   Even as depicted in the Amended Complaint, MIT's institutional response was not "clearly unreasonable." The law reserves liability for abject institutional failures. Here, in stark contrast to the cases Plaintiffs cite, MIT actively addressed the campus climate and protest activity with a multi-faceted, dynamic, and escalating response that included public condemnations, educational interventions, policy

reforms, student support, security enhancements, disciplinary action, and arrests. Plaintiffs cannot ignore the allegations in their own pleading (nor the documents their pleading quotes, cites, and links) demonstrating a response that was anything but "clearly unreasonable."

I.B. The Amended Complaint also fails to adequately plead that Plaintiffs notified MIT of actionable antisemitic harassment. Antisemitism is abhorrent, regardless of its form or context. But university liability for deliberate indifference is limited to circumstances involving severe, pervasive, and objectively offensive harassment that interferes with the educational experience. The sparse allegations regarding Plaintiffs Boukin and Meyers fail to plead that such harassment occurred, much less that Plaintiffs provided actual notice of such harassment to an appropriate MIT official. Nor does the law governing this implied private right of action for damages permit Plaintiffs to aggregate the experiences and reports of all Jewish and/or Israeli individuals at MIT.

II. The Amended Complaint also fails to state a claim under the Ku Klux Klan Act. This Section 1986 claim requires Plaintiffs to plausibly allege not only an underlying conspiracy to deprive Jewish

and/or Israeli students of certain types of civil rights, but also that MIT had actual knowledge of that conspiracy and the power to prevent it yet failed to do so.

II.A. The Amended Complaint attempts to plead essential elements of the purported conspiracy only through conclusory assertions and unreasonable inferences, not well-pleaded factual allegations. For example, the law requires both conspiratorial purpose and discriminatory intent to deprive members of a protected class of their civil rights. At best, the Amended Complaint alleges various student groups coordinated to plan protest activity—not that their *conscious objective* was to target Jewish and/or Israeli students with serious racial violence. In this regard, Plaintiffs conflate a conspiracy's effect with its purpose, relying on allegations that the purported conspiracy disproportionately affected Jewish and/or Israeli students—not that it had that specific intent.

II.B. This claim also fails because the rights the purported conspiracy allegedly impaired are not cognizable under Section 1986. Plaintiffs cannot show that private conspirators deprived them of constitutional rights on these allegations, so they resort to statutory

rights. Yet they neglect to mention that multiple federal appellate courts have rejected—and none have accepted—the statutory rights they invoke as a basis for Section 1986 liability. This Court should not create a circuit split, especially without plausible allegations that the purported conspiracy was aimed at depriving students of rights related to making contracts (Section 1981) or transacting property (Section 1982).

II.C.  Beyond these problems with the alleged conspiracy, Plaintiffs do not plausibly allege MIT's knowledge and failure to prevent it. Plaintiffs wrongly equate knowledge of protest activity and policy violations with knowledge of an illegal civil-rights conspiracy, and in all events MIT *was* actively engaged in responding.

III.    The district court properly dismissed the Amended Complaint without leave for Plaintiffs to file a *third* pleading. Plaintiffs never moved for leave to amend, despite MIT expressly seeking dismissal with prejudice. Even if they had, the district court was amply justified in its decision to close the case.

IV.    SCLJ lacks standing to participate in this litigation. The standing problems go beyond SCLJ's efforts to seek damages, which the district court correctly rejected, and extend to SCLJ's claims for

injunctive relief, which would require individualized proof. In short, SCLJ lacks standing altogether.

V.    Finally, after dismissing all claims over which it had original jurisdiction, the district court rightly dismissed the state-law claims. There is no occasion for this Court to adjudicate those claims in the first instance. But even if this Court were to consider them, they are bald attempts to avoid the rigorous pleading standards of federal antidiscrimination law, and the Amended Complaint lacks plausible allegations that MIT breached a contractual obligation or tort duty.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6), reversing the dismissal only if 'the combined allegations, taken as true[,] state a plausible, not a merely conceivable, case for relief.'" *Lawrence Gen. Hosp. v. Cont'l Cas. Co.,* 90 F.4th 593, 598 (1st Cir. 2024) (quoting *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 74 (1st Cir. 2020)). Determining plausibility requires the Court to "separate factual allegations from conclusory ones." *Id.* (quoting *Conformis, Inc. v. Aetna, Inc.*, 58 F.4th 517, 528 (1st Cir. 2023)). The Court "do[es] not credit … legal labels or conclusions, or statements that

merely rehash elements of the cause of action." *Halsey v. Fedcap Rehab. Servs., Inc.*, 95 F.4th 1, 9-10 (1st Cir. 2024) (citation omitted).

This Court is "not bound by the district court's reasoning but, rather, may affirm an order of dismissal on any ground evident from the record." *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014). The record includes not just "the face of the complaint" but also "matters of public record" and "contents of documents 'expressly linked to' the factual allegations of the complaint and to documents upon which those allegations depend." *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 50 (1st Cir. 2023) (citations omitted); *see also Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 8 (1st Cir. 2020) (allowing consideration of documents "explicitly relied upon in the complaint").

This Court reviews for abuse of discretion a district court's denial of leave to amend the pleading. *United States ex rel. Kelly v. Novartis Pharms. Corp.*, 827 F.3d 5, 10 (1st Cir. 2016).

## ARGUMENT

## I.     The Complaint Fails To State A Claim Under Title VI.

Plaintiffs allege MIT violated Title VI, which prohibits discrimination based on race, color, and national origin in programs

receiving federal funding. 42 U.S.C. § 2000d. The statute charges federal agencies with enforcing this provision against their funding recipients. *Id.* § 2000d-1. In addition to that primary enforcement mechanism, the Supreme Court has recognized an implied private right of action to obtain injunctive relief and monetary damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). But it has limited such claims in several key respects, recognizing that Spending Clause statutes like Title VI—which impose conditions on federal funding—are categorically different from Commerce Clause statutes like Title VII that prohibit discrimination outright. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284-89 (1998). A Title VI private plaintiff can sue only for intentional discrimination by the funding recipient itself and cannot rely on vicarious liability or constructive notice. *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). Liability requires an "official policy of the recipient entity" to discriminate, or, once the recipient is informed of unlawful discrimination, an "official decision by the recipient not to remedy the violation"—a theory of liability known as "deliberate indifference." *Gebser*, 524 U.S. at 290-91.

Deliberate indifference is a "stringent standard of fault." *Porto v. Town of Tewksbury*, 488 F.3d 67, 73 (1st Cir. 2007). A plaintiff must plausibly allege five elements, each necessary to "eliminate any risk that the recipient [of federal funds] would be liable in damages not for its own official decision but instead for [others'] independent actions." *Santiago v. Puerto Rico*, 655 F.3d 61, 73 (1st Cir. 2011) (quoting *Davis*, 526 U.S. at 643). Those elements are: "(1) '[the plaintiff] was subject to severe, pervasive, and objectively offensive … harassment'; (2) 'the harassment caused the plaintiff to be deprived of educational opportunities or benefits'; (3) the funding recipient was aware of such harassment; (4) the harassment occurred 'in [the funding recipient's] programs or activities'; and (5) the funding recipient's response, or lack thereof, to the harassment was 'clearly unreasonable.'" *Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018) (quoting *Porto*, 488 F.3d at 72-73). Here, the Amended Complaint fails to plausibly allege these essential elements, which MIT challenged below. *See* Dkt.42.

## A. Even As Depicted In The Amended Complaint, MIT's Response Was Not Clearly Unreasonable.

Plaintiffs do not claim MIT "fail[ed] to take any action to stem the tide" of the antisemitism they allege, *Pawtucket Sch. Dep't*, 969 F.3d at

9-10, so they must adequately plead that MIT's response was clearly unreasonable. The "clearly unreasonable" standard precludes courts from second-guessing a school's response unless it rises to the level of abject institutional failure. The court's "inquiry is limited to whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." *M.L. ex rel. D.L. v. Concord Sch. Dist.*, 86 F.4th 501, 511 (1st Cir. 2023) (quotations omitted). Critically, "funding recipients are not required to have perfect foresight or manage all student interactions expertly," *Pawtucket Sch. Dep't*, 969 F.3d at 9, and "a claim that the [institution] could or should have done more is insufficient," *Porto*, 488 F.3d at 73. This "is not a mere reasonableness standard," and, consistent with the Supreme Court's directive, it is routinely resolved on the pleadings "as a matter of law." *Davis*, 526 U.S. at 648-49.[5]

---

[5] *See, e.g.*, *Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 808-09 (7th Cir. 2021); *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105-10 (9th Cir. 2020); *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 238 (5th Cir. 2020); *Doe v. Princeton Univ.*, 790 F. App'x 379, 384 (3d Cir. 2019).

This Court's analysis in *Doe v. Pawtucket School Department* underscores the type of egregious institutional failure required to state a claim. The thirteen-year-old plaintiff in that case "alleged that she was assaulted in physical education class and then raped two times in the subsequent months," and that the school principal took no action upon learning of the first rape, potentially leaving the plaintiff vulnerable to the second. 969 F.3d at 7-10. On those allegations, it was "plausible that [school] officials disregarded a known or obvious consequence of [their] action or inaction and thus contributed to her likelihood of sexual assault and rape." *Id.* (second alteration in original) (quotations omitted).

Here, by contrast, the allegations reflect an "evolving and progressively punitive response [that] largely tracked [MIT's] increasing awareness of the hostility that demonstrators directed at Jewish and Israeli students." Add.13-14. "As the scenario unfolded" on campus, administrators "paid close attention to new information[ and] emerging developments," escalating MIT's response as the circumstances intensified. *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *rev'd and remanded on other grounds*, 555 U.S. 246 (2009). The Amended Complaint itself acknowledges the range of actions MIT

officials took, including public condemnations, clear warnings, educational interventions, and disciplinary proceedings. *See supra* at 10-14. Plaintiffs criticize these actions, but the fact remains that their own pleading defeats a claim that MIT's response was clearly unreasonable.[6]

***First***, Plaintiffs obscure the timeline of events to claim MIT failed to take any action for months. *See* Br.31-43. The district court flatly rejected that effort. As it explained, MIT took a series of actions that escalated with the activity on campus—from first announcing discipline of individual students in November 2023, to suspending the student organization that the pleading calls the "ringleader" in February 2024, to safely ending the encampment in May 2024 and arresting those who refused to leave. Add.3-4, 13; *see supra* at 10-14. All the while, MIT officials communicated regularly with the community to condemn antisemitism, offer support, enhance policies, increase public safety efforts, and provide education. *See supra* at 10-14. These steps satisfied

_____

[6] The district court recognized that statements from MIT officials cited and linked in the Amended Complaint may be considered in assessing the sufficiency of the pleading. Add.5 n.6; *see supra* at 24. Each MIT statement discussed in this brief and included in the Joint Appendix is cited, quoted, and/or linked in the pleading. *See supra* at 10.

MIT's response obligations, even if Plaintiffs do not consider them "ideal." *Fitzgerald*, 504 F.3d at 174.

**Second**, Plaintiffs contend MIT's disciplinary actions were insufficiently definite or punitive. *E.g.*, Br.41-43. But it is settled law that litigants cannot use Title VI "to make particular remedial demands." *Davis*, 526 U.S. at 648. The Amended Complaint acknowledges that MIT pursued disciplinary action in connection with many of the events described in the pleading. *See supra* at 11-13. Of course, when MIT moves to discipline members of its community, it has procedural and privacy obligations "not only to the accuser but also to the accused." *Fitzgerald*, 504 F.3d at 174. Title VI does not override those obligations or require that discipline be immediately imposed or publicly announced. And "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to [other legal] claims." *Davis*, 526 U.S. at 649. Plaintiffs ignore these constraints and repeatedly invert the pleading burden by faulting MIT for failing to provide "evidence" of final disciplinary action. Br.38, 41, 46.

**Third**, Plaintiffs argue MIT's response was necessarily unreasonable because the activism on campus persisted. Br.46-47. This

Court has repeatedly rejected that logic: the test "is not one of effectiveness by hindsight," and "the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the institution] at the time." *Porto*, 488 F.3d at 74; *see also, e.g.*, *M.L. ex rel. D.L.*, 86 F.4th at 511 (rejecting claim even though harassment continued after student's original complaint and school's initial response). This is particularly true in the context of continued student activism related to unfolding and intensifying world events.

The cases Plaintiffs cite are readily distinguishable. They involve circumstances where school officials "[f]or more than a year[] … took no corrective or remedial action" in response to repeated harassment of the same child, *Grace v. Bd. of Trs.*, 85 F.4th 1, 12 (1st Cir. 2023); claimed they were powerless to address ongoing sexual harassment except to arrange homeschooling, *Doe ex rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 467 (6th Cir. 2022); made jokes about a reported assault and threatened to discipline the victim but not the alleged perpetrator, *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 272-73 (4th Cir. 2021); failed to address repeated and targeted threats of rape

and murder against particular students, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689-90 (4th Cir. 2018); did not strengthen their response as years of targeted harassment directed at a particular student worsened, *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669-70 (2d Cir. 2012); ignored repeated complaints by a rape survivor of ongoing harassment for five weeks before taking any action toward the perpetrators, *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 49 (2d Cir. 2006); refused any intervention beyond informally speaking with the perpetrators despite their escalating physical harassment, *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000); and continued to employ a coach who raped a student and persisted in inappropriate sexual contact even after being disciplined, *Canty v. Old Rochester Reg'l Sch. Dist.*, 66 F. Supp. 2d 114, 115-16 (D. Mass. 1999). Plaintiffs resort to these distinguishable cases because no court has endorsed their theory of clear unreasonableness in circumstances such as those alleged here.

***Fourth***, Plaintiffs insist that, at a minimum, MIT's response to the encampment was clearly unreasonable. Br.47-49. Plaintiffs point to allegations that the encampment took place over multiple weeks, during

which time Jewish students were urged to avoid the area and certain events organized by Jewish and/or Israeli students were relocated. According to Plaintiffs, "other universities were able to quickly dismantle similar encampments," suggesting that MIT's response was not fast or effective enough. Br.49 n.9. But the Amended Complaint's own allegations and cited sources demonstrate the encampment was a challenging and dynamic situation that MIT actively addressed, including through frequent discussions with community members, added security precautions, and repeated warnings to participants. *See supra* at 12-13. Ultimately, MIT cleared the encampment and arrested the individuals who remained. *Id*. Plaintiffs cite no case in which a court found analogous circumstances to evince a clearly unreasonable institutional response. Such a holding would interfere with an institution's judgment in how to engage constructively with campus activism while managing disruption and protecting community members.

***Finally***, Plaintiffs gesture at various allegations that supposedly reflect MIT downplaying or ignoring reports of antisemitism. None of those allegations remotely support their claim. Plaintiffs argue, for

example, that MIT adopted a "blame-the-victim mentality," but merely point to the allegation that MIT urged *all* students to avoid an unauthorized protest that presented public safety concerns. Br.48. Plaintiffs further insist MIT exhibited "a lack of good faith in its handling of campus antisemitism." Br.45. This, too, is an overstatement of what is alleged—that an employee allegedly told Plaintiff Meyers a particular report fell outside one office's jurisdiction, *id.* (citing JA-76 ¶205)—and does not move the needle toward a plausible claim.[7] Plaintiffs also argue that President Kornbluth downplayed the threat of antisemitism, Br.44, equating her sworn congressional testimony about whether and when certain speech would implicate MIT policies with the university president's statements minimizing harassment in *Hurley*. But *Hurley* itself recognized that "[s]chool administrators are entitled to communicate freely with students and faculty regarding the existence and severity of potential safety risks on the school's campus without fear

---

[7] Plaintiffs' brief claims that both IDHR and a "DEI office" "expressly told campus Jews and Israelis" that the offices "could not help them," Br.35, but the Amended Complaint nowhere alleges that either the "DEI office" or IDHR refused to help Jewish students. *See* JA-76 ¶205.

of creating future liability." 911 F.3d at 698. Finally, despite what Plaintiffs claim, Br.43-45, the actions of politicians are not germane to the legal standard for clear unreasonableness under *Davis*.

## B. The Amended Complaint Lacks Allegations That Plaintiffs Suffered Actionable Harassment And Notified MIT.

Title VI covers only harassment that is "so severe, pervasive, and objectively offensive" that it "ha[s] the systemic effect" of "den[ying] equal access to [the] institution's resources and opportunities." *Brown Univ.*, 896 F.3d at 132-33 (quoting *Davis*, 526 U.S. at 650-52) (second and third alterations in original). This objective standard focuses on factors including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating rather than a mere offensive utterance; and (4) whether it unreasonably interferes with" a student's education program. *Brown v. Hot, Sexy & Safer Prods., Inc.*, 68 F.3d 525, 540 (1st Cir. 1995). In addition, a plaintiff must provide actual notice of this actionable harassment to "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf." *Gebser*, 524 U.S. at 290. Plaintiffs

fail to allege either element, and they cannot salvage their claims by aggregating the experiences and reports of unidentified non-parties.

*First*, Plaintiffs do not cite a single case finding severe, pervasive, and objectively offensive harassment in circumstances like those alleged here. *See* Br.51-53. Plaintiff Boukin alleges that she witnessed "antisemitic chants" and "antisemitic rhetoric" during protests, where her movement in the protest area was somewhat restricted, and that emails from student groups "contained antisemitic language." JA-131 ¶355. While troubling if true, these allegations are conclusory, describe experiences that involve protected expression, and do not rise to the level of actionable harassment under Title VI, particularly where little if any of the conduct was alleged to focus on Boukin individually. For Plaintiff Meyers, the only specific harassment allegation is a single encounter at an outdoor rally with an unidentified individual with no alleged connection to MIT. JA-60 ¶156. Isolated incidents like these cannot sustain a claim. *See Fitzgerald*, 504 F.3d at 173 n.3. Critically, neither Plaintiff plausibly alleges "facts showing that they were denied access to the University's educational services in any meaningful sense." *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011). Plaintiffs contend

the encampment on Kresge Lawn qualifies, Br.53, but a campus disruption that precluded *all* community members from using portions of an outdoor space in the usual manner is not a "deprivation of access to school resources" on the basis of race or another protected category within the meaning of *Davis*.

Courts have repeatedly dismissed deliberate-indifference claims at the pleadings stage for failing to clear the high bar of alleging actionable antisemitic harassment. In *Pollard v. Georgetown School District*, for example, a student alleged he was "regularly emotionally, physically, and verbally bullied and abused," including because of his Jewish identity. 132 F. Supp. 3d 208, 218 (D. Mass. 2015). His peers mocked him "with snide comments about Jews being massacred and stat[ements] that the Holocaust was unsuccessful because [his] family survived." *Id*. Notwithstanding these disturbing allegations, the court concluded the complaint lacked "sufficient, non-conclusory factual allegations that the harassment was severe and pervasive." *Id*. at 230. "Although the comments [in *Pollard*] were certainly objectively offensive"—and, unlike virtually all the allegations in this case, specifically directed at an

individual—they did not "meet the high standard of severity or pervasiveness under well-developed case law." *Id.* at 230-31.

In *Felber v. Yudof*, the Jewish plaintiffs alleged harassment and intimidation by two pro-Palestinian student groups. 851 F. Supp. 2d at 1184. Those groups orchestrated several disruptive protests and a campus event called "Apartheid Week," during which they asked passing students whether they were Jewish. *Id.* The court found these troubling allegations insufficient to establish that the plaintiffs were denied equal access to resources and opportunities. "[A] very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct," the court explained, and the plaintiffs "appear[ed] to be attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel." *Id.* at 1188. In addition, "a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present," such that they could not "demonstrate that *plaintiffs* suffered severe and pervasive harassment." *Id.* (emphasis supplied). Here, the Amended Complaint offers even less than the insufficient pleadings in *Pollard* and *Felber*.

Notably, many of the Amended Complaint's allegations involve "language that [P]laintiffs believe was inflammatory, offensive, or untrue" but that nonetheless constitutes "protected speech." *Felber*, 851 F. Supp. 2d at 1188. Plaintiffs lean heavily on "antisemitic emails" to demonstrate actionable harassment, Br.52 (citing JA-129 ¶352), referring to broadcast communications that, for example, blamed the Israeli government for unfolding violence and addressed issues of colonization and resistance. *See* JA-57-58 ¶¶145-149. The U.S. Department of Education's Office for Civil Rights has repeatedly recognized that Title VI must be interpreted and applied to "comport with First Amendment principles," meaning the statute does not "require recipients to enact or enforce codes that punish the exercise of [free expression] rights."[8] This limitation applies on public campuses, and it demands "something beyond the mere expression of views, words, symbols or thoughts that some person finds offensive" for actionable

---

[8] Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter: Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic Characteristics* (Nov. 7, 2023), https://bit.ly/3yXqigp.

harassment.[9] As OCR reaffirmed in guidance issued just last year, an institution may thus "be constrained or limited in how it responds" to a hostile environment based on speech, because its response must "not restrict any rights protected by the First Amendment."[10] OCR identified steps an institution can take in such circumstances,[11] and MIT has taken each of those steps, among many others. *See supra* at 10-14. Plaintiffs' interpretation of Title VI—which would treat protected speech as harassment and require MIT to chill or even punish that expression— would contradict federal guidance in effect at the relevant time and "have serious First Amendment implications." *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997).

Nor can Plaintiffs base their claims on generalized allegations regarding Jewish and/or Israeli students who are not parties here (and, in many cases, not even members of SCLJ). *Felber* rejected a similar

---

[9] Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague* (July 28, 2003), https://bit.ly/4bY9Zid.

[10] Office for Civil Rights, U.S. Dep't of Educ., *Dear Colleague Letter* (May 7, 2024), https://bit.ly/3z1ySeg.

[11] *Id.* at 3.

effort, and with good reason: Plaintiffs must demonstrate *they* "suffered severe and pervasive harassment" actionable under Title VI. 851 F. Supp. 2d at 1188. Allegations about conduct "occurr[ing] at times and in places where plaintiffs were not present" would, at most, have "extremely marginal relevance to [the] plaintiffs' contention that they perceived a hostile environment." *Id.* Similarly, in *Landau v. Corporation of Haverford College*, the court rejected this type of aggregation because, even assuming it was a permissible theory, the complaint lacked well-pleaded factual allegations "that each Plaintiff was aware of each instance of harassment alleged." No. 24-cv-2044, 2025 WL 35469, at *5 (E.D. Pa. Jan. 6, 2025). So too here.

Plaintiffs acknowledge they are relying on this type of aggregation but insist that harassment "need not be directed at the complainant in order to create a hostile educational environment," Br.51-52, quoting *Monteiro v. Tempe Union High School District*, 158 F.3d 1022 (9th Cir. 1998). *Monteiro* relied on federal regulations for that proposition, 158 F.3d at 1033, and was abrogated when the Supreme Court ruled that such regulations are not enforceable by private plaintiffs. *Alexander*, 532 U.S. 275; *see Bryant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty.*, 334

F.3d 928, 932 (10th Cir. 2003) (recognizing that "*Monteiro* is no longer good law"). At any rate, *Monteiro* is factually distinct from this case: it involved allegations that a ninth grader not only saw offensive graffiti on school walls but also was directly targeted by white classmates with "the most noxious racial epithet in the contemporary American lexicon." *Monteiro*, 158 F.3d at 1034. *Jennings v. University of North Carolina* is readily distinguishable, too. It involved allegations that a male coach created a sexually hostile environment for his team, taking into account not only his abusive behavior toward the plaintiff but also the behavior toward teammates that the plaintiff witnessed as part of a captive audience subject to the coach's total control. 482 F.3d 686, 694-700 (4th Cir. 2007). In short, Plaintiffs cannot evade their own pleading burden by aggregating every experience of every Jewish and/or Israeli student, and their own experiences do not amount to actionable harassment.

**Second**, the Amended Complaint does not adequately allege Plaintiffs reported what they allegedly experienced to MIT officials with "authority to address the alleged discrimination and to institute corrective measures." *Gebser*, 524 U.S. at 290. There are zero allegations that Plaintiff Boukin made a complaint to an MIT official. As for Plaintiff

Meyers, the Amended Complaint alleges only that she made a general report about antisemitism, JA-130-131 ¶354—not when it occurred or what she said, including whether it encompassed the experiences alleged here. That silence speaks volumes, particularly given that MIT raised these deficiencies in its original motion to dismiss. *See* Dkt.33. This "dearth of information as to whether and when administrators with remedial authority were put on notice of alleged harassment makes it impossible to discern whether [MIT] acted with deliberate indifference—a fundamental element of a hostile environment claim." *Landau*, 2025 WL 35469, at *7.

Plaintiffs cannot establish the requisite notice by pointing to reports by other individuals about other alleged harassment. *Contra* Br.49-51. Plaintiffs rely on the risk-of-abuse framework some circuits have adopted for Title IX, under which prior reports to school officials about a specific individual were deemed to provide notice of a "substantial risk" that the individual would sexually abuse others. *See Forth v. Laramie Cnty. Sch. Dist. No. 1*, 85 F.4th 1044, 1054-57 (10th Cir. 2023); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1257-59 (11th Cir. 2010). That framework does not apply to the allegations here, which do

not involve repeated reports of sexual abuse by a specific individual. In effect, Plaintiffs ask this Court to conclude that MIT was required to assume, throughout the 2023-2024 academic year, that every single Jewish and/or Israeli student was experiencing severe and pervasive harassment that interfered with their educational program. That is not actual notice, and adopting that theory "would 'frustrate the purposes'" of this funding statute. *Gebser*, 524 U.S. at 285.[12]

"Ultimately, Plaintiffs repeatedly fail to show that they endured severe or pervasive harassment, either through their own experiences or through their awareness of others' experiences, that [MIT] had notice of the alleged harassment, and that its response or lack of response can be considered deliberate indifference." *Landau*, 2025 WL 35469, at *8.

## II.    The Complaint Fails To State A Claim Under Section 1986.

Enacted as part of the Ku Klux Klan Act of 1871, Section 1985 "provides a civil remedy in damages to a person damaged as a result of conspiracies to deprive one of certain civil rights." *Chapman v. Hous.*

_____

[12]  Plaintiffs also claim that MIT itself acknowledged actionable antisemitic harassment, which is not remotely substantiated by their allegations and does not relieve their duty to provide actual notice to an appropriate official of their own experience. Br.50.

*Welfare Rts. Org.*, 441 U.S. 600, 619 n.37 (1979) (citation omitted). The statute was "primarily motivated by the mob violence directed at the newly emancipated slaves in the Reconstruction era." *Libertad v. Welch*, 53 F.3d 428, 448 (1st Cir. 1995). Section 1986, in turn, imposes liability on "those who, having the power to intervene against Ku Klux Klan violence, neglected or refused so to do." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 n.57 (1978) (alterations and quotations omitted).

Plaintiffs must plead several elements, including most basically an underlying conspiracy in violation of Section 1985. *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822, 834 n.14 (1st Cir. 1982). "[A]bsent a showing of conspiracy, [a plaintiff] has no claim under § 1986, which extends liability to those who knowingly failed to prevent conspiracies under § 1985." *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 31 (1st Cir. 2008). Section 1986 liability also requires the plaintiff to establish that the defendant "knows of a conspiracy which would violate section 1985, has the power to prevent it, and fails to do so." *Creative Env'ts*, 680 F.2d at 834 n.14. The district court correctly concluded that the Amended Complaint fails to state a claim, rejecting Plaintiffs' novel effort to apply

Section 1986 to a private party with no alleged involvement in the underlying conspiracy. Add.16.

## A. The Amended Complaint Does Not Plausibly Allege Essential Elements Of The Purported Conspiracy.

Plaintiffs premise their Section 1986 claim on an underlying conspiracy in violation of Section 1985(3). JA-140 ¶396. Section 1985(3), in turn, requires: "the existence of (1) a conspiracy, (2) a conspiratorial purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Additionally, "a plaintiff may recover [under section 1985(3)] only when the conspiratorial conduct of which he complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" *Id.* (quoting *Griffin*, 403 U.S. at 102). The Amended Complaint falls far short of pleading such a conspiracy.

***First***, as the district court found, "Plaintiffs fail to plead any conspiratorial agreement." Add.16. This essential element requires well-

pleaded factual allegations "indicating an agreement among the conspirators to deprive the plaintiff of [his] civil rights." *Alston v. Spiegel*, 988 F.3d 564, 577-78 (1st Cir. 2021). Critically, the civil rights "must be '*aimed at*'; [their] impairment must be a conscious objective of the enterprise." *Bray*, 506 U.S. at 275 (emphasis in original). For the requisite "agreement," the co-conspirators must share that objective based on a meeting of the minds to act with a single plan. *Alston*, 988 F.3d at 577-78; *see also, e.g., Morton v. Arnold*, 618 F. App'x 136, 142 (3d Cir. 2015); *Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002).

Pleading this element demands more than "bald claims that certain [parties] 'conspired' with one another." *Alston*, 988 F.3d at 578 (quoting *Slotnick v. Garfinkle*, 632 F.2d 163, 166 (1st Cir. 1980)). Where "direct evidence of such an agreement is unavailable," a plaintiff "must plead plausible factual allegations to support a reasonable inference that such an agreement was made.'" *Id*. (quoting *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019)). Thus, in *Alston*, this Court affirmed dismissal of the plaintiff's Section 1985(3) claim because his complaint lacked allegations of any agreement between the co-conspirators "even minimally related to him (let alone the deprivation of his rights)." *Id*. The pleading's downfall

was "[v]ague and conclusory allegations about persons working together, with scant specifics as to the nature of their joint effort or the formation of their agreement." *Id*.

The same is true of the Amended Complaint. It describes protest activity by various individuals and groups without specifying when, where, or how they allegedly arrived at a conscious decision and plan to deprive Jewish and/or Israeli students of their civil rights. Although Plaintiffs insist the pleading "is replete with allegations" of conspiratorial purpose, Br.57, none of the cited allegations evince a meeting of the minds by the alleged co-conspirators—groups including CAA, Palestine@MIT, Scientists Against Genocide Encampment, the Graduate Student Union, and the Black Graduate Student Association. Some of the cited allegations concern activity by only a single alleged conspirator, *see* JA-56 ¶144; JA-59 ¶¶151, 153-154; JA-61-62 ¶162; JA-66-67 ¶179, and the rest concern alleged antisemitism unconnected to *any* of the supposed participants in the conspiracy, *see* JA-58-59 ¶¶150, 152; JA-70 ¶189; JA-71 ¶192; JA-80 ¶220; JA-81-83 ¶222. The Amended Complaint offers only "bald claims" and "conclusory allegations." *Alston*, 988 F.3d at 578; *see* JA-124-127 ¶¶331-342. Even construing these claims and allegations

"[g]enerously," Br.55, Plaintiffs are "not entitled to the benefit of speculation unanchored to sufficiently supportive facts." *Alston*, 988 F.3d at 578.

*Earle v. Benoit* does not lower the bar for pleading conspiratorial purpose, as Plaintiffs suggest. Br.59. There, this Court rejected the plaintiff's claim of a covert agreement by law enforcement officials to harass him with illegal arrests and searches. 850 F.2d 836 (1st Cir. 1988). Acknowledging that "the agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof," the Court nonetheless underscored that any inferences must account for the totality of the circumstances. *Id.* at 843. In *Earle*, those circumstances included "factors which strongly militated against an inference of conspiracy" and were better viewed "as the understandable if imperfectly calibrated efforts of peace officers to perform their jobs." *Id.* Similarly, the circumstances alleged here supply reasons for coordinated expressive activity by the "co-conspirators" that have nothing to do with consciously and purposefully depriving Jewish and/or Israeli students of their civil rights—namely, advocacy for Palestine and opposition to the Israeli government's actions. Even if certain activities had the effect of impairing civil rights, "this

would not compel the conclusion of an *agreement*" to do so given these circumstances. *Id.* (emphasis in original).

Relatedly, Plaintiffs continue to conflate a conspiracy's *effect* and its *purpose*. *See* Add.16. "A conspiracy is not 'for the purpose' of denying equal protection," as the plain language of the statute requires, "simply because it has an effect upon a protected right." *Bray*, 506 U.S. at 275. Conspiratorial purpose "demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Id.* at 275-76. Here, Plaintiffs cite various allegations that "the coconspirators impaired their contractual rights," Br.58, focusing on effect rather than purpose. That is because effect is all the Amended Complaint alleges. For example, it claims that the encampment "resulted in" various burdens for Jewish and/or Israeli students, JA-118 ¶318, including that certain events "had to be moved," JA-131 ¶357. Of course, the encampment burdened many members of the MIT community and disrupted multiple Institute functions (which is precisely why MIT took steps to end it safely). JA-89-90 ¶238; JA-91 ¶244; *see supra* at 12-13. Such allegations do not support the inference that depriving Jewish

and/or Israeli students of their civil rights was the goal of the campus activity described in the Amended Complaint.

Plaintiffs cite district court decisions that only underscore the deficiencies in their own pleading. In *Kristiansen v. Town of Kittery*, the court found a "plausible inference that the defendants had a conspiratorial purpose" to deprive a pro se rape survivor of her equal protection rights where the defendants allegedly failed to collect any evidence from her, withheld the confession of the rapist from her for decades, required her to confront the rapist even though he had confessed, rebuffed her efforts to pursue the matter, and buried additional evidence. No. 2:18-CV-420, 2019 WL 2619531, at *2, *5 (D. Me. June 26, 2019), *report & recommendation adopted*, 2019 WL 3554694 (D. Me. Aug. 5, 2019). In *Sines v. Kessler*, the court found "adequate[] alleg[ations] that [the d]efendants formed a conspiracy to hurt black and Jewish individuals, and their supporters, because of their race" where the defendants "invited white supremacist groups" to attend a deadly rally; directed "the intimidation of minority residents and those who advocate for equal rights of minority citizens"; and made explicit, violent, and racially motivated threats, including that "a lot more people are

going to die before we're done here, frankly." 324 F. Supp. 3d 765, 785-91 (W.D. Va. 2018). The complaint further alleged the defendants worked together closely to carry out the rally, including "coordinat[ing] marching and shield tactics," gathering intelligence on counter-protestors, and instructing participants to bring weapons. *Id.* at 785-88.

The allegations here are readily distinguishable. Plaintiffs allege, for example, that the "protests attracted large numbers of students," JA-111 ¶299, who chanted slogans such as "Palestine is free, Zionism out!" JA-118 ¶317. These allegations resemble ones the *Sines* court *rejected* as insufficient to state a claim. 324 F. Supp. 3d at 784. As the court explained in dismissing certain theories of the conspiracy and certain defendants, it is not enough for plaintiffs to assert that "all rally attendees who disagreed with them were part of one overarching conspiracy," and allegations about individuals who shouted or posted antisemitic slogans are insufficient to demonstrate they "entered an agreement to engage in racial violence at the events." *Id.* at 784, 794. And the allegations here are far afield from the extreme facts in *Kristiansen*, which involved a decades-long cover-up of a crime targeted at a single individual. 2019 WL 2619531, at *2.

***Second***, the Amended Complaint lacks plausible allegations of the requisite discriminatory animus. While the "intent to deprive" element requires a particular *purpose*, this "discriminatory animus" element requires a particular *motive*, namely, that "some class-based animus (usually racial) lay behind the conspirators' action." *Donahue v. City of Bos.*, 304 F.3d 110, 122 (1st Cir. 2002); *see also Maymi*, 515 F.3d at 30-31. Just like the "intent to deprive" element, the "discriminatory animus" element "requires that the defendant has taken his actions 'at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Bray*, 506 U.S. at 275-76 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

The only argument Plaintiffs offer regarding this element is their bare assertion that "the protests went beyond politics, particularly when the conspirators targeted Zionism, which the Complaint explains in detail is an antisemitic dog whistle." Br.62 (citing JA-42-45 ¶¶95-111). This Court should "reject Plaintiffs' embedded proposition that any anti-Israel speech is intrinsically antisemitic, because reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views." *Landau*, 2025 WL 35469, at *2; *see*

*also* Office of Civil Rights, "Dear Colleague Letter" at 16-17 & n.32 (May 7, 2024) ("Speech expressing views regarding a particular country's policies or practices is protected by the First Amendment and does not necessarily implicate federal civil rights laws."). Accepting Plaintiffs' view would mean any coordinated expressive activity in opposition to Israel or Israeli policy could amount to a conspiracy to violate civil rights under federal law.

The allegations here are readily distinguishable from *Alianza Americas v. DeSantis*, on which Plaintiffs rely. Br.56. The plaintiffs in *Alianza* alleged a conspiracy by various Florida officials to deceive recent immigrants into flying from San Antonio to Martha's Vineyard. 727 F. Supp. 3d 9 (D. Mass. 2024). On a motion to dismiss, the district court held that the pleading plausibly alleged discriminatory intent against Latin American immigrants (not just a disparate impact on them). *Id.* at 61-62. The district court relied on "allegations that Latinx individuals were (1) specifically targeted, (2) the only ones approached, and (3) the only ones on the [f]lights," which collectively permitted an inference of invidious discrimination. *Id.* at 62. Those allegations of animus are far more specific than anything Plaintiffs offer here.

**B.    The Deprivations Of Civil Rights Alleged In The Amended Complaint Cannot Sustain This Claim.**

The Amended Complaint also fails to allege the types of civil rights deprivations that can sustain this cause of action. "Section 1985(3) does not 'provide any substantive rights itself,'" so "[t]he rights, privileges, and immunities that § 1985(3) vindicates must therefore be found elsewhere, presumably in the Constitution." *Libertad*, 53 F.3d at 449 (quoting *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 833 (1983)). Moreover, as Plaintiffs concede, they must plausibly allege "that impairment of *those rights* was a 'conscious objective' of the conspiracy." Br.57 (emphasis supplied).

"The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude" under the Thirteenth Amendment. *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) (citing *Bray*, 506 U.S. at 278). Neither right is implicated here. Plaintiffs therefore rely on "an underlying right to be free from racial violence" implicit in the Thirteenth Amendment. Br.57. This theory is limited to serious racial violence—like dragging individuals from a vehicle and beating them with deadly weapons, or

driving a car into a crowd. *See Griffin*, 403 U.S. at 105; *Sines*, 324 F. Supp. 3d at 781-82. The Amended Complaint does not remotely allege serious racial violence.

Plaintiffs also rely on two sources of statutory rights, Br.56-57 (citing 42 U.S.C. §§1981 and 1982), but neither can sustain their claim. Courts have repeatedly rejected efforts to premise Section 1985(3) conspiracy claims on federal statutory rights. *See Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979) (Title VII); *Jimenez*, 596 F.3d at 1312 (Section 1981); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001) (Sections 1981 and 1982).[13] Plaintiffs fail to acknowledge this "great weight of precedential authority" rejecting their legal theory. *Brown*, 250 F.3d at 805-06. Relying on two district court decisions, Plaintiffs ask this Court to create a circuit split by endorsing Sections 1981 and 1982 as new sources of civil rights protected by Section 1985(3). Br.57. But "the Supreme Court has been conservative in

---

[13] Additional decisions have expressed doubt but stopped short of deciding the issue. *See, e.g.*, *Young v. Owens*, 577 F. App'x 410, 417 (6th Cir. 2014) (Section 1981); *Pirghaibi v. Moss*, 175 F. App'x 120 (9th Cir. 2006) (Sections 1981 and 1982).

designating which rights litigants may enforce against private actors under 1985(3)," *Jimenez*, 596 F.3d at 1312, and there is no basis to break new ground here.

In all events, the Amended Complaint does not allege the purported conspiracy deprived Plaintiffs of any rights protected by these statutes. Section 1981 prohibits race-based discrimination in making or enforcing contracts. *Hammond v. Kmart Corp.*, 733 F.3d 360, 364 (1st Cir. 2013). Allegations that Jewish and/or Israeli students had to alter plans for campus events or felt that MIT policies should have been enforced differently against other students do not amount to discrimination in contracting. *Contra* Br.57-58. Nor does the Amended Complaint plausibly allege that interfering with Jewish and/or Israeli students' contractual rights was the purported conspiracy's aim. *See* Br.58 (citing JA-124-27 ¶¶331-342).

For Section 1982, which "prohibits racial discrimination in the purchase of property," *Garrett v. Tandy Corp.*, 295 F.3d 94, 103 (1st Cir. 2002), the pleading nowhere alleges that the purported conspirators interfered with Plaintiffs' rights to "inherit, purchase, lease, sell, hold, and convey real and personal property" free from racial discrimination.

42 U.S.C. § 1982. Plaintiffs' contention that students have legal property rights in a campus center for Jewish life is unsupported, and the case upon which they rely involved acts of lethal violence directed at private property owned by the plaintiffs. *See United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995) (member of KKK fired several shots into a synagogue).[14] At any rate, it is simply not plausible that the aim of the coordinated expressive activity alleged in the Amended Complaint was to discriminate against Jewish students vis-à-vis their real property rights.

Finally, although the Amended Complaint also alleged deprivations of other constitutional and statutory rights, JA-124-125 ¶331, Plaintiffs have abandoned those theories, *see* Br.56-57, many of which are foreclosed by binding precedent.

---

[14] As another example of the many liberties that Plaintiffs take in their brief, they depict the Amended Complaint as alleging that multiple "protesters urinated on Hillel." Br.58. What the cited paragraph actually says is that a single individual—with no alleged affiliation to MIT—did so. JA-131 ¶357. While abhorrent if true, this alleged act does not involve a deprivation of property rights protected by Section 1982.

## C.  The Amended Complaint Does Not Plausibly Allege MIT's Knowledge And Negligence.

Beyond the deficiencies with the underlying-conspiracy element, Plaintiffs also cannot allege other required elements of their Section 1986 claim. The statute requires that a defendant "knows of a conspiracy which would violate section 1985, has the power to prevent it, and fails to do so." *Creative Env'ts*, 680 F.2d at 834 n.14. Here, Plaintiffs assert MIT's knowledge because "the co-conspirators announced their plans for their rallies, protests, and encampments on social media and through other publicly available means." JA-140-141 ¶397. But knowledge of anticipated campus protests is not knowledge of an unlawful conspiracy. *E.g.*, JA-67-68 ¶¶180-182; JA-86 ¶¶227-229. And knowledge of MIT policy violations—such as protests that did not respect time, place, and manner restrictions—or even knowledge of "disturbing" chants from protesters, JA-86 ¶227, is not knowledge of a conspiracy aiming to deprive civil rights protected by Section 1986.

Finally, the Amended Complaint's own allegations bely the claim that MIT "fail[ed] to take any steps to aid in preventing" the alleged conspiracy. JA-141 ¶401. As discussed above, the allegations show that MIT actively responded to unfolding events, including taking disciplinary

action against the "ringleader" of the challenged conduct. *See supra* at 10-14; JA-110 ¶293. For all these reasons, the Amended Complaint fails to state a Section 1986 claim.

## III. The District Court Did Not Err In Dismissing The Complaint Without Leave To Amend.

Having correctly determined that the Amended Complaint fails to state a claim for relief under federal law, the district court was correct in denying Plaintiffs the opportunity to amend their pleading once more.

Where, as here, the plaintiff has "already amended its complaint once as of right, any additional amendment required leave of court." *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 327 (1st Cir. 2008) (citing Fed. R. Civ. P. 15(a)). As in *Gray*, Plaintiffs "never moved for leave to file a second amended complaint." *Id.* Instead, they included a single sentence in their opposition to MIT's renewed motion to dismiss, stating: "To the extent the Court deems any of Plaintiffs' allegations inadequate, Plaintiffs request permission to amend their Complaint." Dkt.46 at 35. This bare statement plainly "does not constitute a motion to amend a complaint." *Gray*, 544 F.3d at 327. And without such a motion, "the district court cannot be faulted for failing to grant such leave *sua sponte*." *Id.*; *see also Hochenfoner v. Genzyme Corp.*, 823 F.3d 724, 735-36 (1st Cir.

2016) ("In the absence of exceptional circumstances, a district court is under no obligation to offer a party leave to amend when such leave has not been requested by motion.").

Even if the Court were to construe this sentence in Plaintiffs' brief as a Rule 15(a) motion, the district court's "implicit denial of this motion [would] be well within its discretion." *Gray*, 544 F.3d at 327. A district court need not explain its reasoning for denying leave to amend for that decision to be sustained on appeal. *Kelly*, 827 F.3d at 10. Here, multiple "reasons are apparent from the record." *Id*. Plaintiffs had already amended their pleading once. Dkt. 36. Before filing their Amended Complaint, they had the benefit of (1) MIT's original motion to dismiss setting forth many of the same arguments presented in the renewed motion and (2) an extension of time to "determine whether any amendment would narrow or correct any alleged pleading deficiencies." *See supra* at 14-15. The facts ultimately alleged in the Amended Complaint reinforced the futility of further amendment in the case. *See Gray*, 544 F.3d at 327-28. Moreover, MIT's renewed motion to dismiss expressly argued that "any claims or requests for relief dismissed for failure to state a claim … should be dismissed with prejudice." Dkt. 42 at

35 (citing authority). Plaintiffs nonetheless offered only a perfunctory request for permission to further amend. In these circumstances, denial of leave to amend is not an abuse of discretion.

Each of Plaintiffs' cited cases reinforces this conclusion. Br.66-68. Both appellate decisions affirmed denials of leave for amendment, with one emphasizing that the appellate court "defer[s] to the district court if any adequate reason for the denial is apparent on the record." *Judge v. City of Lowell*, 160 F.3d 67, 79 (1st Cir. 1998), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004); *Hatch v. Dep't for Children, Youth & Their Fams.*, 274 F.3d 12, 19 (1st Cir. 2001). Similarly, *Foman v. Davis* stands for the basic proposition that denial of leave to amend can be reversed only "[i]n the absence of any apparent or declared reason" for the denial. 371 U.S. 178, 182 (1962). Here, multiple reasons are readily apparent for dismissing without giving Plaintiffs a third bite at the apple.

## IV. SCLJ Lacks Standing To Participate In This Litigation.

The Amended Complaint fails to establish SCLJ's associational standing. Where, as here, an organization asserts standing based only on its members' alleged injuries, the organization must show that "neither

the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 551-53 (1996). The district court correctly determined that SCLJ lacks standing to seek damages for various counts, but it erred in concluding that individualized proof was "no bar to associational standing for purposes of injunctive relief." Add.9 (citing *Playboy Enters., Inc. v. Pub. Serv. Comm'n of P.R.*, 906 F.2d 25, 36 (1st Cir. 1990)).

Individualized proof can defeat associational standing even for claims seeking injunctive relief, as it does here. *Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 35 (1st Cir. 2019). The key inquiry is whether "'the fact and extent' of the injury that gives rise to the claims for injunctive relief 'would require individualized proof.'" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975)). Accordingly, associational standing is appropriate where it is unlikely that students "would need to do much, if anything, in the lawsuit"—as with challenges to a broadly applicable school policy with uncontested student-specific facts. *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 89

F.4th 46, 55 (1st Cir. 2023), *cert. denied*, No. 23-1137, 2024 WL 5036302 (U.S. Dec. 9, 2024). Here, by contrast, liability on each federal claim requires proof of multiple elements turning on "facts specific to each student," such that "[e]fficient and successful judicial resolution of the claims would thus require participation and cooperation by numerous students." *Parent/Pro. Advoc. League*, 934 F.3d at 35; *see supra* at 26, 45-46. Plaintiffs themselves emphasize the "intensely fact-bound issues" these claims present, Br.6, confirming SCLJ lacks associational standing for all claims asserted and types of relief sought.

## V. This Court Should Not Adjudicate The State-Law Claims.

Finally, the district court properly declined to exercise supplemental jurisdiction over the state-law claims after dismissing the federal claims. Add.17 (citing 28 U.S.C. § 1367(c)(3)). Plaintiffs now argue that if this Court reinstates any federal claim, it should also adjudicate the state-law claims. Br.63. Not so. Even when a claim establishing original jurisdiction is revived, "it is not [this Court's] role to consider in the first instance the factors informing the district court's discretionary judgment on whether to entertain supplemental claims." *Groden v. N&D Transp. Co.*, 866 F.3d 22, 31 (1st Cir. 2017). The right

approach in such circumstances is to vacate the decision and remand for further consideration by the district court. *Id*.

In all events, the Amended Complaint fails to state a claim for breach of contract or negligence. These claims seek to end-run the rigorous pleading standards for federal claims. The Amended Complaint "merely dresses" the same theories "in several different outfits," seeking "to recover on common law principles" for alleged discrimination. *Mouradian v. Gen. Elec. Co.*, 23 Mass. App. Ct. 538, 542-43 (1987). Massachusetts courts have rejected such efforts to interfere with "a comprehensive remedial statute" through "the creation of a new common law action based on the public policy expressed in that statute." *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985), *aff'd*, 397 Mass. 1004 (1986). As in those cases, "serious problems would be posed" by this effort to evade the pleading requirements of federal antidiscrimination law, *id.*, and, at any rate, the Amended Complaint fails to adequately allege key elements of these state-law claims.

Breach-of-contract claims against universities are limited to reflect the discretion afforded to private universities to make academic and disciplinary decisions. *Schaer v. Brandeis Univ.*, 432 Mass. 474, 482

(2000). To state a claim, students must identify "definite and certain" promises made in university publications that the university breached. *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019). The Amended Complaint falls far short of alleging such promises. It claims that MIT breached a promise to "provid[e] a safe, secure, and inclusive space for all students," JA-144 ¶422, relying on provisions in MIT's handbook stating that the Institute "is committed to the principle of equal opportunity in education and employment" and "prohibits discrimination" and harassment based on protected characteristics. Br.65; JA-28-29 ¶¶45-49. But "aspirational diversity statements" fail to state a breach-of-contract claim, *Fay School*, 931 F.3d at 12, and Plaintiffs cite no case holding that a university's simple recitation of antidiscrimination law creates an independent contractual obligation.[15] For good reason: universities seek to promote a safe and welcoming environment free from discrimination and

---

[15] Indeed, the district court rejected this theory in *Kestenbaum v. President & Fellows of Harvard College*, dismissing breach-of-contract claims based on "general statements of [the] school's core values" that were "not tethered to any promise to act or provide services to Harvard students," such as statements condemning and prohibiting harassment. __ F. Supp. 3d __, No. 24-CV-10092, 2024 WL 3658793, at *8 n.15 (D. Mass. Aug. 6, 2024) (alterations and quotations omitted).

harassment, and treating those policy statements as binding contractual commitments would open the floodgates to student claims and circumvent the well-established statutory standards for addressing discrimination and harassment.

Plaintiffs likewise fail to state a negligence claim. Massachusetts law holds that universities do not stand *in loco parentis* and are "not responsible for monitoring and controlling all aspects of their students' lives." *Nguyen v. MIT*, 479 Mass. 436, 451 (2018). Students must allege each element of negligence to state a claim, including a duty of care. *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 338 (1st Cir. 2022). In the postsecondary context, decisions recognizing duties of care are limited to specific circumstances absent here, such as when an institution has actual knowledge that a specific student poses a risk of serious bodily harm to himself or others. *Schaefer v. Fu*, 272 F. Supp. 3d 285, 288-89 (D. Mass. Aug. 10, 2017). The broad duties alleged here—including a duty to provide a discrimination- and harassment-free learning environment and to ensure all individuals comply with MIT's policies, JA-142 ¶¶404-409— are not recognized under state law, and each would undermine Massachusetts's rejection of *in loco parentis* liability. Ultimately,

Plaintiffs cannot use tort law to enforce university policies, *Stonehill College*, 55 F.4th at 338, or evade the Supreme Court's express rejection of a "negligence standard" for institutions combatting harassment on their campuses. *See Davis*, 526 U.S. at 642.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

February 3, 2025

*/s/ Ishan K. Bhabha*

Daryl J. Lapp
daryl.lapp@troutman.com
Troutman Pepper Locke LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Ishan K. Bhabha
ibhabha@jenner.com
Lauren J. Hartz
lhartz@jenner.com
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Defendant-Appellee Massachusetts Institute of Technology*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7), I certify that the foregoing brief has been prepared in Microsoft Word using 14-point Century Schoolbook typeface and is double-spaced (except for headings, footnotes, and block quotations). I further certify that the text is proportionally spaced and contains 12,958 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). Microsoft Word was used to compute the word count.

February 3, 2025

/s/ *Ishan K. Bhabha*

Ishan K. Bhabha
ibhabha@jenner.com
Jenner & Block LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

# CERTIFICATE OF SERVICE

I certify that, on February 3, 2025, a true and correct copy of the foregoing was filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


February 3, 2025                    /s/ *Ishan K. Bhabha*

                                    Ishan K. Bhabha
                                    ibhabha@jenner.com
                                    Jenner & Block LLP
                                    1099 New York Avenue NW
                                    Suite 900
                                    Washington, DC 20001
                                    (202) 639-6000