## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

StandWithUs Center for Legal Justice, Katerina Boukin, and
Marilyn Meyers

*Plaintiffs-Appellants*,

v.

Massachusetts Institute of Technology,

*Defendant-Appellee*,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Case No. 1:24-cv-10577; HON. RICHARD G. STEARNS

### PLAINTIFFS-APPELLANTS' REPLY BRIEF

Melissa S. Weiner
PEARSON
WARSHAW, LLP
328 Barry Avenue S,
Suite 200
Wayzata, MN 55391
Tel. (612) 389-0600

Glenn A. Danas
CLARKSON LAW
FIRM, P.C.
22525 Pacific Coast
Highway
Malibu, CA 90265
Tel. (213) 788-4050

Marlene J. Goldenberg
NIGH GOLDENBERG
RASO & VAUGHN,
PLLC
14 Ridge Square NW,
3rd Fl.
Washington, D.C.
20016
Tel. (202) 792-7927

*Attorneys for Plaintiffs-Appellants StandWithUs Center for Legal
Justice, Katerina Boukin, and Marilyn Meyers*

i

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 4

I. The Complaint Plausibly Alleges MIT's Violation of Title VI ........ 4

    A. Plaintiffs Sufficiently Allege that MIT's Response was Clearly Unreasonable. ............................................................. 4

        1. Even MIT's Selective Timeline Shows that MIT did Little for Eight Months. ....................................................... 5

        2. Far From "Making Particular Remedial Demands," Plaintiffs Allege MIT's Responses Were Designed to be, and Were in Fact, Ineffective. ........................................ 8

        3. Plaintiffs Allege that the Inefficacy of MIT's Responses was Immediately Apparent. .............................. 9

        4. Especially at the Pleading Stage, MIT Cannot Refute the Adequacy of Plaintiffs' Allegations that MIT's Response to the Three-Week Kresge Lawn Encampment Outside Hillel was Clearly Unreasonable.  13

        5. MIT's Arguments Merely Underscore that Dismissal on the Pleadings was Erroneous and that Factual Development Through Discovery is Necessary. ................ 14

    B. MIT Had Ongoing Notice of Severe and Pervasive Antisemitic Harassment that Caused Plaintiffs to be Deprived of Educational Opportunities and Benefits ............ 15

        1. Plaintiffs Sufficiently Allege Severe and Pervasive Antisemitic Harassment. ................................................... 15

        2. Plaintiffs Themselves Were Deprived of Access to MIT's Educational Resources due to the Hostile Environment, Including Through Disruption of Hillel Events and Avoidance of In-Person Classes ...................... 17

3. Harassment Need Not be Exclusively Directed at Plaintiffs to Prevail on a Title VI Theory. ......................... 18

4. Plaintiffs' Claims for Relief are Consistent with the First Amendment. ............................................. 20

5. MIT's Leaders had Ongoing Actual Knowledge of the Harassment.    21

II. Plaintiffs Plausibly Allege Section 1986 Violation. ...................... 23

A. Plaintiffs Sufficiently Allege an Underlying Conspiracy in Violation of Section 1985(3) ................................. 23

1. The Allegations of a Conspiratorial Agreement Should Survive Dismissal Because They Indicate a Conscious Objective of the Conduct was to Curtail the Protected Rights of Jewish and Israeli Students on Campus. .......... 23

2. The Complaint Similarly Sufficiently Pleaded Discriminatory Animus. ..................................... 26

B. Plaintiffs Sufficiently Alleged Deprivations of Civil Rights. 28

C. Plaintiffs Adequately Alleged MIT's Knowledge and Negligence. .................................................. 30

III. MIT's Argument Against SCLJ's Associational Standing is Improper and Should Be Disregarded Because MIT Failed to File a Cross-Appeal ................................................ 31

IV. The District Court Erred by Denying Leave to Amend to Address Perceived Deficiencies .................................... 32

V. Plaintiffs' State Law Claims Should Be Adjudicated ................... 33

CONCLUSION ...................................................... 36

CERTIFICATE OF COMPLIANCE ..................................... 37

CERTIFICATE OF SERVICE ......................................... 38

# TABLE OF AUTHORITIES

**Cases**                                                   **Page(s)**

*Alianza Americas v. DeSantis*
Case No. 22-cv-11550-ADB
2024 U.S. Dist. LEXIS 59893 (D. Mass. Mar. 29, 2024) ........ 24, 25

*Alder v. Columbia Historical Society*
690 F. Supp. 9 (D.D.C. 1998) ...................................................... 29

*Alston v. Spiegel*
988 F.3d 564 (1st Cir. 2021) ...................................................... 25

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .................................................................... 4

*Bhombal v. Irving Independent School District*
809 F. App'x 233 (5th Cir. 2020) ............................................... 13

*Brown v. Philip Morris Inc.*
250 F.3d 789 (3d Cir. 2001) ....................................................... 28

*Canaan v. Carnegie Mellon University*
Case No. 23-2107
2024 U.S. Dist. LEXIS 227575
(W.D. Pa. Dec. 17, 2024) .................................................. 12, 16, 17

*Darensburg v. Metropolitan Transportation Comm'n*
636 F.3d 511 (9th Cir. 2011) ..................................................... 32

*Davis v. Monroe County Board of Education*
526 U.S. 629 (1999) ........................................................ 8, 16, 17, 18

*Doe ex rel. Doe #2 v. Metropolitan Government
& Davidson County*
35 F.4th 459 (6th Cir. 2022) ..................................................... 11

*Doe v. Pawtucket School Department*
969 F.3d 1 (1st Cir. 2020) ......................................................... 16

*Doe v. Princeton University*
790 F. App'x 379 (3d Cir. 2019) ................................................. 13

*Doe v. School Administrative District No. 19*
   66 F. Supp. 2d 57 (D. Me. 1999) .................................................... 21

*Doe v. School Board of Broward County*
   604 F.3d 1248 (11th Cir. 2010).................................................... 22

*Earle v. Benoit*
   850 F.2d 836 (1st Cir. 1988) ....................................................... 25

*Felber v. Yudof*
   851 F. Supp. 2d 1189 (N.D. Cal. 2011) ...................................18, 32

*Fitzgerald v. Barnstable School Community*
   504 F.3d 165 (1st Cir. 2007) ......................................................... 7

*Forth v. Laramie County School District No. 1*
   85 F.4th 1044 (10th Cir. 2023) ................................................... 22

*Frankel v. Regents of the University of California*
   744 F. Supp. 3d 1015 (C.D. Cal. 2024) ....................................7, 18

*G. v. Fay School*
   931 F.3d 1 (1st Cir. 2019) ........................................................... 33

*Garrett v. Tandy Corp.*
   295 F.3d 94 (1st Cir. 2002) ......................................................... 29

*Gartenberg v. Cooper Union for the*
   *Advancement of Science & Art*
   Case No. 24 Civ.2669 (JPC)
   2025 U.S. LEXIS 20844 (S.D.N.Y. Feb. 5, 2025) .................. *passim*

*Gebser v. Lago Vista Independent School District*
   524 U.S. 274 (1998)........................................................................ 7

*Grace v. Board of Trustees*
   85 F.4th 1 (1st Cir. 2023)........................................................10, 11

*Great American Federal Savings & Loan*
   *Association v. Novotny*
   442 U.S. 366 (1979)...................................................................... 29

*Griffin v. Breckenridge*
   403 U.S. 88 (1971)...................................................................27, 28

*Groden v. N&D Transportation Co.*
866 F.3d 22 (1st Cir. 2017) ........................................... 32

*Hatch v. Department for Children, Youth & Their Families*
274 F.3d 12 (1st Cir. 2001) ........................................... 32

*Hammond v. Kmart Corp.*
733 F.3d 360 (1st Cir. 2013) ......................................... 28

*Hayut v. State University of N.Y.*
352 F.3d 733 (2d Cir. 2003) .....................................17, 18

*Jennings v. University of North Carolina*
482 F.3d 686 (4th Cir. 2007)......................................... 20

*Jauquet v. Green Bay Area Catholic Education, Inc.*
996 F.3d 802 (7th Cir. 2021)......................................... 12

*Jimenez v. WellStar Health Systems*
596 F.3d 1304 (11th Cir. 2010)...................................... 28

*Karasek v. Regents of University of California*
956 F.3d 1093 (9th Cir. 2020)........................................ 12

*Kestenbaum v. President & Fellows of Harvard College*
Case No. 24-CV-10092-RGS
2024 U.S. Dist. LEXIS 139180 (D. Mass. Aug. 6, 2024) ........33, 34

*Kristiansen v. Town of Kittery*
Case No. 2:18-cv-00420-JAW
2019 U.S. Dist. LEXIS 106905 (D. Me. June 2, 2019) ................ 25

*Landau v. Corporation of Haverford College*
Case No. 24-cv-2044
2025 U.S. Dist. LEXIS 1402 (E.D. Pa. Jan. 6, 2025) ........19, 26, 27

*Libertad v. Welch*
53 F.3d 428 (1st Cir. 1995) ....................................26, 27

*Melley v. Gillette Corp.*
19 Mass. App. Ct. 511 (1985)......................................... 33

*Monteiro v. Tempe Union High School District*
158 F.3d 1022 (9th Cir. 1998)........................................ 19

*Mouradian v. General Electric Co.*
23 Mass. App. Ct. 538 (1987)........................................ 33

*Murrell v. School District No. 1*
186 F.3d 1238 (10th Cir. 1999).................................... 21

*Mullins v. Pine Manor College*
47 N.E.2d 331 (Mass. 1983)........................................ 35

*Nguyen v. MIT*
479 Mass. 436 (2018) ................................................. 35

*Parent/Professional Advocacy League v. City of Springfield*
934 F.3d 13 (1st Cir. 2019) ......................................... 31

*Parker v. Landry*
935 F.3d (1st Cir. 2019) .............................................. 23

*Pirghaibi v. Moss*
175 F. App'x 120 (9th Cir. 2006)................................... 28

*Pollard v. Georgetown School District*
132 F. Supp. 3d. 208 (D. Mass. 2015).......................... 16

*Porto v. Town of Tewksbury*
488 F.3d 67 (1st Cir. 2007) ......................................9, 10

*R.S. v. Board of Education*
371 F. App'x 231 (2d Cir. 2010)..............................15, 16

*Regents of the University of California v. Bakke*
438 U.S. 265 (1978) ...............................................14, 32

*Riccio v. New Haven Board of Education*
467 F. Supp. 2d 219 (D. Conn. 2006) ......................... 16

*Santiago v. Puerto Rico*
655 F.3d 61 (1st Cir. 2011) .......................................... 8

*Schaefer v. Yongjie Fu*
272 F. Supp. 3d 285 (D. Mass. 2017).......................... 34

*Sines v. Kessler*
324 F. Supp. 3d 765 (W.D. Va. 2018) ......................26, 28

*Shulse v. W. New England University*
  Case No. 3:19-cv-30146-KAR
  2020 U.S. Dist. LEXIS 138106 (D. Mass, Aug. 4, 2020) .............. 34

*Students for Fair Admissions, Inc. v. President &*
  *Fellows of Harvard College*
  600 U.S. 181 (2023) ....................................................... 14

*Sueiro Vazquez v. Torregrosa de la Rosa*
  494 F.3d 227 (1st Cir. 2007) ........................................ 31

*United States v. Brown*
  49 F.3d 1162 (6th Cir. 1995) ........................................ 28

*United States v. Greer*
  939 F.2d 1076 (5th Cir. 1991) ...................................... 29

*Vance v. Spencer County Public School District*
  231 F.3d 253 (6th Cir. 2000) ....................................... 9, 10

*Waltman v. International Paper Co.*
  875 F.2d 468 (5th Cir. 1989) ........................................ 19

*Wells v. Rhodes*
  928 F. Supp. 2d 920 (S.D. Ohio 2013) .......................... 29

*Witten v. A.H. Smith & Co.*
  567 F. Supp. 1063 (D. Md. 1983) ................................. 29

*Young v. Owens*
  577 F. App'x 410 (6th Cir. 2014) .................................. 28

*Zeno v. Pine Plains Central School District*
  702 F.3d 655 (2d Cir. 2012) ................................. 12, 13, 21

**Statutes**

42 U.S.C. § 1981 .................................................. 3, 28, 39

42 U.S.C. § 1982 .................................................. 3, 28, 29

42 U.S.C. § 1985 .......................................... 3, 22, 28, 29, 33

42 U.S.C. § 1986 ...................................................... 3, 22

42 U.S.C. § 2000d ....................................................... 18

Title VI of the Civil Rights Act of 1964 ....................................*passim*

**Other Authorities**

Office for Civil Rights, U.S. Department of Education
    *First Amendment: Dear Colleague* (July 28, 2003)
    https://bit.ly/4bY9Zid ................................................................. 20

# INTRODUCTION

Plaintiffs' opening brief demonstrated that MIT was deliberately indifferent to rampant antisemitic conduct in violation of Title VI. In response, MIT argues that it appropriately addressed the campus's hostile environment with a "dynamic" and "escalating" response. However, MIT's characterization of events ignores the basic fact that, for months, its tepid response utterly failed to mitigate the ongoing hateful and discriminatory conduct that deprived its students of their civil rights.

MIT mischaracterizes Plaintiffs' allegations as an improper attempt to make "particular remedial demands," but Plaintiffs merely allege that MIT responded to the ongoing harassment in a manner that was clearly unreasonable, *i.e.*, minimally effective. MIT had ongoing notice that campus-wide antisemitic harassment continued unabated, garnering national attention and culminating in an encampment lined with signs promulgating hate speech designed to intimidate and terrorize Jewish and Israeli students.

MIT's arguments show that the dismissal depended on the district court improperly making findings of fact. Questions remain as to the nature and extent of MIT's discipline and what steps, if any, MIT took to

protect Jewish and Israeli students. Plaintiffs have more than met their burden to plead that MIT acted with deliberate indifference.

As to the remaining Title VI elements, Plaintiffs' allegations demonstrate severe and pervasive harassment on an increasingly hostile campus, including with large-scale protests where Plaintiffs and other Jewish and Israeli students were assaulted while participants chanted for violence against Jews and Israelis. The climate was so unbearable that some students could not return to campus after winter break, instead choosing to remain in Israel—a war zone—instead of returning to MIT. This Court should not affirm the trivialization of these allegations.

This harassment deprived Plaintiffs of access to MIT's educational resources, including in-person classes, Jewish and Israeli events and even access to campus altogether. While MIT argues that Plaintiffs' allegations insufficiently focus on their individual experiences, the widespread nature of the harassment demonstrates the severe and pervasive nature of the campus's hostile environment on campus that adversely affected *all* Jewish and Israeli students, *including* Plaintiffs.

Plaintiffs have also plausibly alleged Section 1986 violations. First, Plaintiffs have alleged a conspiratorial agreement among MIT's student groups, including collective planning and execution of rallies and encampments that promulgated antisemitic harassment, targeting Plaintiffs' civil rights, with conduct so forceful that it was not merely incidental to a legitimate political cause.

Plaintiffs' Section 1986 claim is also supported by sufficient allegations of discriminatory animus, explaining that anti-Zionism is a movement against an integral part of Jewish identity and that the co-conspirators' rhetoric was replete with anti-Zionist hate, such as "Zionism is a death cult."

Further, Plaintiffs properly allege that Sections 1981 and 1982 form additional bases for Section 1985(3) claims, to the extent the former protect contract and property rights. And Plaintiffs sufficiently allege MIT's knowledge of the ongoing harassment and its negligence in meaningfully addressing it.

Additionally, MIT's arguments against SCLJ's associational standing should not be considered because MIT failed to file a cross-

appeal, and, in any event, SCLJ has associational standing because it helps eliminate discrimination against its members.

Finally, Plaintiffs' state law claims should also be adjudicated because Plaintiffs adequately pled a specific promise by MIT of prohibiting discrimination, along with standards for violations and disciplinary measures. And Plaintiffs adequately allege that MIT was negligent in failing to protect students from harassment when it should have foreseen the need to take action to protect them from foreseeable harm.

This Court should reverse the district court's order of dismissal.

## ARGUMENT

## I. The Complaint Plausibly Alleges MIT's Violation of Title VI.

### A. Plaintiffs Sufficiently Allege that MIT's Response was Clearly Unreasonable.

Deliberate indifference is a fact-intensive inquiry. To state a plausible claim, plaintiffs need only recite facts sufficient to "raise a right to relief above a speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

### 1. Even MIT's Selective Timeline Shows that MIT did Little for Eight Months.

When considered against Plaintiffs' allegations of ongoing harassment, MIT's remedial efforts cannot be deemed even minimally appropriate.

In characterizing its response to campus harassment as appropriately "escalating," MIT highlights that it: first announced discipline of students in November 2023; then suspended a "ringleader" organization in February 2024; and, finally ended encampments with arrests in May 2024. ABr.29.[1] However: during that eight-month onslaught of hate targeted at Jewish and Israeli students, MIT: effectively nullified any "announced discipline" with an unenforced ban solely on non-academic activities (JA-68); suspended CAA—which nevertheless continued to operate while broadcasting its defiance of MIT policy (JA-69-70); and, arrested some protesters—only after permitting a weekslong encampment that targeted Hillel and was rife with antisemitic speech, all while Jewish and Israeli students begged the

---

[1] "ABr." refers to Appellee's Answering Brief. "J.A." refers to the Joint Appendix. "AOB" refers to Appellants' Opening Brief.

administration to take meaningful action (JA-81-86). In short, the actions identified by MIT were not a reasonable response.

MIT cites its November 8, 2023 announcement of "boundaries for protests[,]" "expan[sion] [of] supportive services[,]" and "creat[ion] [of] a team to respond promptly to reports of harassment and discrimination" (ABr.10), but Plaintiffs' allegations demonstrate the immediate failure of such measures to address extreme antisemitic conduct. For example, the very next day, CAA co-hosted a disruptive and unsanctioned protest in Lobby 7, calling for violence against Jews, harassing Jewish students, and forcing MIT to acknowledge "serious concerns that [the protest] could lead to violence." JA-65-67.

MIT claims it "communicated regularly," "offer[ed] support," and "enhance[d] policies." ABr.29-30. But none of these actions deterred the ongoing antisemitic harassment, as evidenced by: CAA's ongoing co-sponsoring of rallies to promulgate hate speech (JA-69 (describing yet another protested in Lobby 7 calling for violence against Jews)); CAA's pronouncement of MIT's hollow response as tacit approval (JA-69-70 (("We won't back down...We stood up to one of the most powerful institutes in the world and got THEM to back down!")); admissions by the

Discrimination & Harassment Response Office ("IDHR") to student complaints of antisemitism (JA-75 ("Jewish students [are] not members of a protected class")); one of MIT's most popular professors resigning because students condemned his Jewish identity (JA-77); and, CAA and other protesters barring students, including Plaintiff Boukin, from areas of campus (Lobby 7 and Kresge Lawn) because they are Jewish and therefore believe in the right of Israel to exist as a Jewish state. (JA-110,113).[2] Though the list goes on, these examples demonstrate that MIT's efforts utterly failed and their failure was immediately apparent.[3] Thus, MIT affirmatively decided "not to remedy the violation." ABr.25

---

[2] On March 17, 2025, the U.S. Attorney General filed a Statement of Interest in *Frankel v. Regents of the University of California*, 744 F. Supp. 3d 1015 (C.D. Cal. 2024) (Dkt. 139) opposing UCLA's motion to dismiss claims alleging that Jewish students were excluded from portions of the UCLA campus. The Attorney General argued that the plaintiffs' Title VI claims were sufficient to defeat the defendants' motion. With respect to the plaintiffs' Equal Protection claim, the Attorney General concluded that "because Plaintiffs allege that [defendants] refused to take action irrespective of their direct knowledge that encampment activists were using barricades to exclude Jews from campus, the [complaint] sufficiently alleges […] deliberate indifference." *Id.* at p. 17-18.

[3] MIT's reliance on *Fitzgerald v. Barnstable School Community*, 504 F.3d 165 (1st Cir. 2007), where the school's initial investigation *did not* corroborate allegations of harassment, therefore, fails. *See* ABr.28.

(citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 284-89 (1998)). Moreover, because Plaintiffs' allegations center on the actions of MIT leadership, there is no risk that MIT would be improperly held liable for the independent conduct of others. ABr.26 (citing *Santiago v. Puerto Rico*, 655 F.3d 61 (1st Cir. 2011)).

**2. Far From "Making Particular Remedial Demands," Plaintiffs Allege MIT's Responses Were Designed to be, and Were in Fact, Ineffective.**

MIT mischaracterizes Plaintiffs' allegations as an attempt to pursue particular remedial action in violation of *Davis v. Monroe County Board of Education,* 526 U.S. 629 (1999). *See* ABr.30. But *Davis* emphasized that school administrators "continue to enjoy the flexibility they require" in disciplinary decisions, provided their response is not clearly unreasonable in light of the known circumstances. *Id.*

Here, Plaintiffs' allegations demonstrate the clear unreasonableness of MIT's response because MIT's hollow measures were immediately ignored. As discussed above, the few disciplinary measures imposed from October to April were either walked back or had zero practical effect. *See, e.g.*, JA-68-70, JA-174, JA-113. Many of the harassing student groups, such as Palestine@MIT and Coalition for

Palestine, *continued* to operate without suspension or any other discipline from MIT. *See* JA-113-114.

MIT defends itself by citing its obligations to the accused and rejects the notion that discipline must be immediately undertaken or publicly announced. ABr.30. First, MIT's argument demonstrates the need for development of a factual record, which would inform questions of whether and to what extent obligations to the accused were considered, to what extent MIT sanctioned CAA and other harassing groups, and whether MIT knew that its limited mitigation efforts were likely to fail.

Second, even if true, none of these factors should have inhibited MIT from meaningfully responding to the ongoing harassment of its Jewish and Israeli students, as evidenced by MIT's swift and forceful response in solidarity with the Black Lives Matter movement (JA-96-101) and cancelling of speakers deemed hostile to other minority groups (JA-92, cancellation of Doran Abott).

### 3. Plaintiffs Allege that the Inefficacy of MIT's Responses was Immediately Apparent.

Plaintiffs do not fault MIT for lack of "foresight." *See* ABr.27. *Porto v. Town of Tewksbury*, 488 F.3d 67 (1st Cir. 2007), supports reversal because the facts here are akin to those it described as lacking in *Porto*,

namely, "where a school continued to use the same ineffective measures to no acknowledged avail," *Id.* at 75, (*citing Vance v. Spencer County Public School District*, 231 F.3d 253, 262 (6th Cir. 2000)); *see also Vance* at 262 (ruling that once the school had knowledge that its response was inadequate, it was "required to take further reasonable action in light of the circumstances to avoid new liability").

The facts alleged by Plaintiffs align with *Vance*—for months, MIT puffed "warnings" and "policies," all the while, the unmitigated spread of antisemitic harassment continued to plague Jewish and Israeli students. MIT threatened punishment and then reversed course. *See* JA-68. MIT provisionally suspended CAA, and then it allowed CAA to continue unabated. *See* JA-49, 113. MIT's IDHR said that the antisemitism was not harassment and that Jews are not a protected class. *See* JA-76.

While MIT critiques Plaintiffs' reliance on *Grace v. Board of Trustees*, 85 F.4th 1 (1st Cir. 2023) (*see* ABr.31), *Grace* aligns with the facts here where the school's responses were "not reasonably calculated" to stop the harassment and the school exhibited deliberate indifference by characterizing the harassment as "peer-to-peer conflict" as opposed to bullying. *Id.*

MIT also critiques Plaintiff's reliance on *Doe ex rel. Doe #2 v. Metropolitan Government of Nashville & Davidson County*, 35 F.4th 459 (6th Cir. 2022), but like *Grace*, the *Metro. Gov't* court's analysis sheds light on MIT's (specifically its IDHR's) wrongdoing. *See id.* at 466-67 (plausible allegations of deliberate indifference where school official characterized the matter as "out of [her] hands" and failed to refer the victim to any other administrator or provide the victim any indication of remedial efforts).

Finally, MIT claims that no court has endorsed Plaintiffs' theory of clear unreasonableness in circumstances such as those alleged here, but that entirely ignores the recent holding in *Gartenberg v. Cooper Union for the Advancement of Science & Art*, 2025 U.S. Dist. LEXIS 20844 (S.D.N.Y. Feb. 5, 2025). Per *Gartenberg*, among its other faults, the university "did nothing to prevent [...] protestors from trespassing into and occupying the Foundation Building, where they disrupted school activities and intimidated Jewish students," and "took no action to disperse the protestors as the demonstration spiraled out of control." Other courts addressing Title VI violations involving antisemitism have also found that "toothless" and "dismissive" reactions can show deliberate

indifference, and mere "lip service" can support an inference that the response was clearly unreasonable. *See Canaan v. Carnegie Mellon University*, 2024 U.S. Dist. LEXIS 227575 at *43-44 (W.D. Pa. Dec. 17, 2024). The facts here are not analogous to MIT's cited cases, where the school's response actually abated discriminatory conduct. *See* ABr.27 (citing *Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802 (7th Cir. 2021) (immediate school response abated bullying); *Karasek v. Regents of University of California*, 956 F.3d 1093 (9th Cir. 2020) (school met with assailant less than one month after assault to discuss charges and issued formal sanctions)).[4]

At bottom, the litany of issues identified by Plaintiffs in the FAC are all issues for the factfinder. *See Zeno v. Pine Plains Cent. School District*, 702 F.3d 655, 671 (2d Cir. 2012).

---

[4] MIT's other cases are likewise inapposite. *Bhombal v. Irving Independent School District*, 809 F. App'x 233 (5th Cir. 2020) (allegations failed to connect incidents with victim's race or national origin); *Doe v. Princeton University*, 790 F. App'x 379, 384 (3d Cir. 2019) (one instance of a slur is not pervasive harassment).

**4. Especially at the Pleading Stage, MIT Cannot Refute the Adequacy of Plaintiffs' Allegations that MIT's Response to the Three-Week Kresge Lawn Encampment Outside Hillel was Clearly Unreasonable.**

MIT contends that it "actively addressed" the Kresge Lawn encampment through frequent discussions, added security, and repeated warnings. *See* ABr.33. But none of MIT's assertions resolve at the pleading stage that its response was designed to, or did in fact, protect Jewish and Israeli students. For example, Jewish and Israeli students: remained subjected to antisemitic signs stating "Zionism is a death cult" (JA-82); felt they had to "beg[ ]" the administration to consider their safety (JA-83); and, altered plans for Passover for fear of being "attacked for merely existing" (JA-84).

Moreover, nothing in the FAC suggests that the Kresge Lawn encampment was any more "challenging and dynamic" (ABr.33) than the encampments at other schools, none of which took three weeks to disband. JA-87-88. Whether MIT acted with clear unreasonableness considering the many other universities that promptly handled encampments effectively is a question for the jury. *See Zeno*, 702 F.3d at 670-71.

MIT argues against interfering with a school's judgment of how to engage with campus activism while protecting community members (ABr.33), but it would defy the very purpose of Title VI for a court, on the pleadings, to categorically reject that the members of a protected class experienced severe harassment and discrimination, despite detailed allegations to that effect. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 343 (1978) (emphasizing Congress' expectation that Title VI "would be administered in a flexible manner" to address discrimination); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 310 (2023) ("Under Title VI, it is *always* unlawful to discriminate among persons even in part because of race, color, or national origin.").

**5. MIT's Arguments Merely Underscore that Dismissal on the Pleadings was Erroneous and that Factual Development Through Discovery is Necessary.**

Many of MIT's contentions demonstrate that dismissal without adequate development of the factual record was improper. Countless facts bear on the unreasonableness of MIT's response, including: whether MIT ever formalized CAA's "provisional" suspension (ABr.2, 17, 29); what it means to be suspended from "non-academic activities"—

given that protest activity and student group affiliation continued undeterred (ABr.11); what actions MIT took to "protect" Jewish and Israeli community members (ABr.33); and, whether any students involved in the Kresge Lawn encampment were subjected to meaningful punishment (*see* ABr.17). *See Gartenberg,* 2025 U.S. Dist. LEXIS at *67 (emphasizing the need for discovery to determine the nature and extent of the university's investigative and disciplinary action).

**B.    MIT Had Ongoing Notice of Severe and Pervasive Antisemitic Harassment that Caused Plaintiffs to be Deprived of Educational Opportunities and Benefits.**

**1.    Plaintiffs Sufficiently Allege Severe and Pervasive Antisemitic Harassment.**

MIT faults Plaintiffs because their primary argument of severe, pervasive, and objectively offensive harassment turns on facts instead of analogous case law.  ABr.36. But the elucidation of facts is ***the primary way*** to inform the Court's analysis of the extent of harassment.

When assessing such factual issues, courts have cautioned that "appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable." *R.S. v. Board of Education*, 371 F. App'x

231, 233 (2d Cir. 2010) (cleaned up).[5] Here, Plaintiffs' allegations include more than sufficient detail. *See generally,* JA-48-103; JA-150-189. This contrasts with *Pollard v. Georgetown School District,* 132 F. Supp. 3d. 208 (D. Mass. 2015) (*see* ABr.37), where the complaint contained one single allegation related to ethnic or national origin harassment.

In addition, Plaintiffs' allegations parallel other examples of actionable harassment. AOB at 11-22; accord *Davis,* 526 U.S. at 633-34 (describing five-month "string of incidents," including verbal harassment and unwanted touching, sufficient to plead severe and pervasive harassment); *Riccio v. New Haven Board of Education,* 467 F. Supp. 2d 219, 227 (D. Conn. 2006) (finding harassment was severe and pervasive where "near daily occurrence" in which the plaintiff "would attend school reasonably sure she would be harassed again").

This Court should reject MIT's attempts to downplay Plaintiffs' allegations as "conclusory" and "not actionable harassment" as a matter of law (ABr.36). *See Canaan*, 2024 U.S. Dist. LEXIS 227575 at *28-29

---

[5] MIT's suggestion that actionability is only proper on facts akin to knowing failure to prevent repeated rape should be rejected. ABr.28 (citing *Doe v. Pawtucket School Department*, 969 F.3d 1 (1st Cir. 2020)).

(rejecting defendants' attempt to draw inferences in their favor and to ignore or minimize the severity of objectively offensive conduct). Making a hostility determination entails examining the totality of the circumstances, which is a fact-specific inquiry, and "therefore […] is best left for trial." *Hayut v. State University of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003); *see also Gartenberg*, 2025 U.S. Dist. LEXIS 20844 at *48.

> **2. Plaintiffs Themselves Were Deprived of Access to MIT's Educational Resources due to the Hostile Environment, Including Through Disruption of Hillel Events and Avoidance of In-Person Classes.**

Harassing behavior is characterized as severe, pervasive, and objectively offensive when it denies its victims equal access to education. *Davis*, 526 U.S. at 652. Here, both Plaintiffs were deprived of the use of school facilities and academic buildings, as well as participation in student groups and Jewish and Israeli student events, and other academic offerings such as in-person classes. *See* JA-128-129.

Moreover, the facts of this case present ***such*** pervasive harassing conduct that many of the educational deprivations have been suffered by

a legion of Jewish and Israeli students[6]—not just Plaintiffs—such as the deprivation of access to Kresge Lawn[7] and scheduled Hillel events (JA-118), as well as the monthslong deprivation of access to common throughfares on campus without being exposed to antisemitic rhetoric. *See* JA-128-129; *see also Davis*, 526 U.S. at 650-51 (obvious example of deprivation of resources is the physical deprivation of an athletic field); *accord Hayut*, 352 F.3d at 750.

### 3. Harassment Need Not be Exclusively Directed at Plaintiffs to Prevail on a Title VI Theory.

MIT next argues that too few of the allegations focus on Plaintiffs individually. ABr.36. Thus, in addition to MIT's contention that

---

[6] This contrasts *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011), where plaintiffs' allegations referenced conduct that occurred years before plaintiffs' enrollment or at different campuses entirely. ABr.38.

[7] Plaintiff Boukin was prevented from entering Lobby 7 and the Kresge Lawn encampment because she was Jewish, Israeli, and a Zionist. JA-110, 113. *Id.* Relevant here, the court in *Frankel*, 744 F. Supp. 3d at 1027, granted a preliminary injunction against UCLA where Jewish students were denied entry to encampments on campus, requiring that, if any part of UCLA's ordinarily available programs, activities, and campus areas become unavailable to certain Jewish students, UCLA must stop providing those offerings to any students.

Plaintiffs' allegations do not rise to the level of pervasive harassment (ABr.36), MIT seeks to conjure a new rule that, if harassment is **too pervasive**, so that it affects many other members of the protected class, the harassment is non-actionable. Such argument is wrong and undercuts the very purpose of Title VI. 42 U.S.C. § 2000d. MIT's position is also unsupported by the case law. *See Gartenberg*, 2025 U.S. Dist. LEXIS 20844, at *56-57 (finding widespread campus antisemitism[8] including vandalism and offensive signage sufficient to allege severe and pervasive harassment because of unmistakable message of national-origin-based hostility); *see also id.* at *46, (citing *Patane v. Clark*, 508 F.3d 106, 114-15 (2d Cir. 2007) ("[A] plaintiff need only allege that she suffered a hostile [ ] environment because of her [protected

---

[8] The widespread campus antisemitism here and in *Gartenberg* starkly contrasts with *Landau v. Corporation of Haverford College*, 2025 U.S. Dist. LEXIS 1402 (E.D. Pa. Jan. 6, 2025) (*see* ABr.43), which involved one isolated comment from a professor that other students allegedly heard secondhand.

characteristic], not that all of the offensive conduct was *specifically* aimed at her.") (emphasis added)).[9]

Thus, the fact that the ongoing harassment was not exclusively aimed at Plaintiffs[10] only underscores the strength of Plaintiffs' allegations of pervasiveness. As explained in *Jennings v. University of North Carolina*, 482 F.3d 686, 698 (4th Cir. 2007), alleged instances of direct harassment should be considered in the broader context of ongoing offensive conduct.

### 4. Plaintiffs' Claims for Relief are Consistent with the First Amendment.

MIT's response to the hostile environment was not, as MIT argues, hamstrung by the First Amendment. ABr.40. While courts should interpret Title VI to comport with First Amendment principles (ABr.39,

---

[9] MIT critiques Plaintiffs' reliance on *Monteiro v. Tempe Union High School District*, 158 F.3d 1022 (9th Cir. 1998) for a similar proposition (ABr.41), but *Montiero* cited many cases in support of its assertion (*e.g.*, *Waltman v. International Paper Co.,* 875 F.2d 468 (5th Cir. 1989)) beyond the federal regulation with which MIT takes issue.

[10] The complaint is replete with examples of Plaintiffs' personal experiences of harassment and discrimination. *See, e.g.,* JA-60, JA-65, JA-76, JA-80, JA-87, JA-110, JA-113. If necessary, Plaintiffs can amend to provide further specificity that they themselves are among the "Jewish and Israeli students" referenced in countless allegations in the FAC. *See, e.g.,* JA-16, JA-18, JA-57-58, JA-59, JA-76, JA-96, JA-118.

(citing Nov. 7, 2023 Dear Colleague Letter)), the First Amendment is not an excuse for MIT's deliberate indifference to pervasive harassment. Reasonable people can understand the difference between speech on matters of public concern, directed to the community at large through generally accepted methods of communication, and targeted harassment. *Gartenberg,* 2025 U.S. Dist. LEXIS 20844, at *36.

There is ample room between the First Amendment and Title VI for institutions to curtail harassing speech. *See* July 28, 2003 Dear Colleague Letter[11] (ABr.40). Indeed, other universities (many of them public) have successfully halted similar discriminatory and offensive conduct, despite being more formally constrained by the First Amendment than MIT. JA-87-88; *see also Gartenberg,* 2025 U.S. Dist. LEXIS, at *19-20, *30.

### 5. MIT's Leaders had Ongoing Actual Knowledge of the Harassment.

MIT misstates Title VI's "actual knowledge" standard and incorrectly asserts that the university's knowledge of harassment is measured only by allegations of direct reporting by Plaintiffs.

---

[11] Office for Civil Rights, U.S. Dep't of Educ., *First Amendment: Dear Colleague* (July 28, 2003), https://bit.ly/4bY9Zid.

The requirement that an institution have actual knowledge stems from the basic principle that an institution needs to know about the conduct to address it. *See Murrell v. School District No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999); *Zeno*, 702 F.3d at 666; *Doe v. School Administrative District No. 19*, 66 F. Supp. 2d 57, 63 (D. Me. 1999). Thus, *how* MIT obtained the knowledge—by named Plaintiffs or otherwise—is not relevant.

MIT characterizes Plaintiffs' allegations of actual notice as an improper extension of "risk of abuse" cases involving individual perpetrators (ABr.43-44), but even those cases reiterate that the actual notice requirement centers around the school's awareness of the harassment, even where it stems from a variety of sources. *See Doe v. School Board of Broward County*, 604 F.3d 1248, 1257-59 (11th Cir. 2010); *Forth v. Laramie County School District No. 1*, 85 F.4th 1044, 1054-57 (10th Cir. 2023).

Accordingly, the answer to MIT's obtuse question about "whether and when administrators with remedial authority were put on notice," (ABr.43) is, for example, when mass protests involving openly hostile antisemitic speech and conduct usurped major throughfares on campus

(to which the administration, including MIT President Sally Kornbluth, directly responded in writing and/or video) (JA-63–68), or when President Kornbluth was called before Congress to address the rampant antisemitism at MIT (JA-72-74).[12]

## II. Plaintiffs Plausibly Allege Section 1986 Violation.

### A. Plaintiffs Sufficiently Allege an Underlying Conspiracy in Violation of Section 1985(3).

#### 1. The Allegations of a Conspiratorial Agreement Should Survive Dismissal Because They Indicate a Conscious Objective of the Conduct was to Curtail the Protected Rights of Jewish and Israeli Students on Campus.

While MIT faults Plaintiffs for failing to specify exactly when, where, or how co-conspirators arrived at a conscious decision and plan to deprive Jewish and/or Israeli students of their rights (ABr.48), MIT's inquiry overstates the standard for alleging an agreement. Where direct evidence of an agreement is unavailable, plaintiffs can allege "facts that would permit [the court] to plausibly infer an agreement among" conspirators, motivated by some discriminatory animus. *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019). Here, Plaintiffs showcase images of the co-conspirators' published joint efforts to organize the rallies that

---

[12] Plaintiffs also alleged they notified MIT directly. *E.g.,* JA-130; JA-132.

promulgated antisemitic hate speech, *see, e.g.*, JA-108; JA-112. In addition, Plaintiffs set forth the so-called "coalitions" and "collectives" among the co-conspirators that facilitate overlapping membership and shared events. JA-109.

Thus, Plaintiffs have alleged that the co-conspirators acted on a shared objective based on a meeting of the minds as demonstrated by the public coordination of several protests in Lobby 7 that promulgated hate speech against Jews and Israelis, as well as of the Kresge Lawn encampment—key features of both were hostile, antisemitic conduct. Plaintiffs' allegations starkly contrast with cases lacking allegations that the alleged co-conspirators had cooperated. ABr.47.

As MIT admits, deprivation of plaintiffs' civil rights must be *a* conscious objective of the conspiracy, not *the* conscious objective. ABr.47. Here, the co-conspirators' actions aimed to impair the rights of Jews and Israelis because: they repeatedly impaired their contractual rights, including violations of MIT's student handbook and policies and procedures (JA-124-26); impaired contracts that Jewish and Israeli students had with MIT (JA-118); and, violated their property rights when they were prevented from using Hillel (JA-118). Given the antisemitic

conduct forcefully portrayed throughout these violations, MIT cannot plausibly argue that the deprivation of Plaintiffs' rights was merely incidental to a political cause. Indeed, as demonstrated in *Alianza Americas v. DeSantis*, 2024 U.S. Dist. LEXIS 59893 (D. Mass. Mar. 29, 2024) (*see* ABr.54), allegations of this ilk "support an inference that [plaintiffs were] specifically targeted" because of their protected characteristics. *Id.* at *86–87.

While MIT critiques Plaintiffs' theory on the grounds that some of the allegations concern activity by "only a single alleged conspirator" (ABr.48), those allegations demonstrate the conspirator's pattern and practice of targeting Jews and Israelis, separate and apart from its political "activism." JA-56 (depicting CAA's showcasing defacement of Holocaust memorial).

The allegations here are a far cry from the "scant specifics as to the nature of [the co-conspirators'] joint effort" in *Alston v. Spiegel*, 988 F.3d 564, 578 (1st Cir. 2021) (finding that though it may have been in the realm of possibility that the alleged conspirators had collaborated, nothing in the complaint permitted a reasonable inference to that effect) And unlike *Earle v. Benoit*, 850 F.2d 836 (1st Cir. 1988), where other

factors, such as the town police's duty to cooperate with other law enforcement, "strongly militated against an inference of conspiracy," here, Plaintiffs' allegations plausibly support a reasonable inference of a conspiratorial agreement. *See Kristiansen v. Town of Kittery*, 2019 U.S. Dist. LEXIS 106905, (D. Me. June 26, 2019) (*see* ABr.51) (finding facial plausibility of conspiracy even where conspiratorial purpose was "equally plausible" to a conclusion of no conspiratorial purpose).

MIT attempts to distinguish *Sines v. Kessler*, but there, the court found that the plaintiffs had plausibly alleged that an organizational defendant was part of a conspiracy to engage in racially motivated violence, 324 F. Supp. 3d 765, 788 (W.D. Va. 2018), which echoes Plaintiffs' allegations that the various student groups were co-conspirators in racially and ethnically motivated violence. Similarly, here, Plaintiffs' complaint focuses on the online organization and collective action of several coordinated student groups, not, as MIT contends, "all rally attendees who disagreed with them." ABr.52.

## 2. The Complaint Similarly Sufficiently Pleaded Discriminatory Animus.

MIT attempts to refute allegations of discriminatory animus by impermissibly substituting its own definitions of antisemitic

26

harassment. As alleged, anti-Zionism is a movement against an integral part of Jewish identity and is therefore antisemitic. *See* JA-41,44.

MIT invites this Court to reject Plaintiffs' "embedded proposition" that anti-Israel speech is intrinsically antisemitic (ABr.53 (citing *Landau*, 2025 U.S. Dist. LEXIS 1402, at *5)), but MIT fails to consider Plaintiffs' specific explanation that Zionism does not require an endorsement of the Israeli government, nor does it preclude support for Palestinian self-determination. JA-43. Indeed, Plaintiffs' allegations explain that Zionist beliefs leave ample room for disagreement with Israel's policies and practices. *Compare* JA-44 ("there are many Zionists who have legitimate criticisms of the Israeli government"), *with* ABr.53-54 ("Accepting Plaintiffs' view would mean any coordinated expressive activity in opposition to Israel or Israel policy could amount to a conspiracy to violate civil rights[.]").

MIT is bound by the facts alleged in Plaintiffs' complaint, which explain in detail how "Anti-Zionism" is an antisemitic dog whistle. JA-42-45. Thus, even assuming the generous characterization of the co-conspirators' conduct as "expressive activity in opposition to Israel or Israel policy" (ABr.54), the co-conspirators' pervasive invocation of anti-

Zionist rhetoric[13] nonetheless satisfies the "animus" requirement. *See Libertad v. Welch*, 53 F.3d 428, 447 (1st Cir. 1995) (animus can be shown by "assertedly benign"—though objectively invidious—discrimination).

## B. Plaintiffs Sufficiently Alleged Deprivations of Civil Rights.

MIT argues that the right to be free from racial violence under the Thirteenth Amendment is limited to "serious racial violence" such as dragging someone from a vehicle. ABr.55. But the law imposes no such limitation. *See Sines*, 324 F. Supp. 3d at 781-82; *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) (*see* ABr.55-56). Indeed, as alleged, calling for violence against Jews and the extermination of the State of Israel is "serious racial violence".

Additionally, Sections 1981 and 1982 form additional bases for Section 1985(3) claims to the extent they protect contract and property rights. To refute these bases, MIT relies heavily on out-of-circuit authority. *See* ABr.56 (citing *Jimenez v. WellStar Health Systems*, 596 F.3d 1304 (11th Cir. 2010); *Brown v. Philip Morris Inc.*, 250 F.3d 789 (3d

---

[13] *See* JA-82 ("Zionism is a death cult"); JA-89 ("From water to water, death to Zionism"; "We want to talk about the obvious, we don't want to see Zionists").

Cir. 2001); *Young v. Owens*, 577 F. App'x 410 (6th Cir. 2014); *Pirghaibi v. Moss*, 175 F. App'x 120 (9th Cir. 2006)). But this Court should follow other, better-reasoned jurisprudence that has recognized the importance of preserving additional bases of liability. *See Hammond v. Kmart Corp.*, 733 F.3d 360 (1st Cir. 2013) (Section 1981 prohibits race-based discrimination in enforcing contracts); *Witten v. A.H. Smith & Co.*, 567 F. Supp. 1063, 1072 (D. Md. 1983); *Wells v. Rhodes*, 928 F. Supp. 2d 920, 930-31 (S.D. Ohio 2013); *Alder v. Columbia Historical Society*, 690 F. Supp. 9, 15 (D. D. C. 1988).

Moreover, the fact that establishing bases for liability under Sections 1981 and 1982 would not otherwise burden a relevant statutory scheme weighs in favor of Plaintiffs' position. *Compare Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 372 (1979) (cited at ABr.56) (effective obliteration of extensive administrative process contemplated by Title VII weighed against Title VII as a basis for 1985(3) claim), *with Hudson*, 536 F. Supp. at 1147 ("unlike Title VII […], § 1981 is not derived from a statutory scheme whose policies would be frustrated by the relitigation under another remedial statute.").

Plaintiffs' complaint also adequately pleads that co-conspirators interfered with their property use rights. JA-16, 25-26, 49-104. *See United States v. Greer*, 939 F.2d 1076, 1083-91 (5th Cir. 1991); *United States v. Brown,* 49 F.3d 1162 (6th Cir. 1995) ("a Jewish person's 'use' of property is protected under Section 1982"). These courts reject MIT's suggestion that property rights are ***only*** protected for the legal owners or purchasing process of a property. *See* ABr.58 (*citing Garrett v. Tandy Corp.*, 295 F.3d 94, 103 (1st Cir. 2002)).

And the FAC also alleges that co-conspirators impaired Plaintiffs' contractual rights. *See* JA-27-132 (detailing violations of the student handbook, and MIT's policies and procedures).

## C. Plaintiffs Adequately Alleged MIT's Knowledge and Negligence.

MIT contends that "knowledge of anticipated campus protests is not knowledge of an unlawful conspiracy," but MIT's suggestion that it simply did not know of co-conspirators' repeated harassment and targeting of Jewish and Israeli students is unavailing given the highly public nature of the antisemitic conduct. *See* JA-72-74; *see also*, Section I.B.5., *supra*.

Co-conspirators' published intention to carry on—indeed, to escalate—also informed MIT of their conspiracy. JA-108,112. While MIT contends it took an "active response" to the hateful conduct, as discussed in Section I.A.1., *supra*, MIT did not take further steps when, for example, their "disciplinary action against the 'ringleader'" (*see* ABr.59-60) only served to incite renewed conspiratorial conduct, including the Kresge Lawn encampment. JA-121.

## III. MIT's Argument Against SCLJ's Associational Standing is Improper and Should Be Disregarded Because MIT Failed to File a Cross-Appeal

"A party who neglects to file a cross-appeal may not use his opponent's appeal as a vehicle for attacking a final judgment...." *Sueiro Vazquez v. Torregrosa de la Rosa*, 494 F.3d 227, 232 (1st Cir. 2007) (citation omitted). So MIT cannot use Plaintiffs' appeal to attack the district court's finding on associational standing.

MIT's challenge to SCLJ's associational standing is also meritless. MIT contends that individualized proof related to damages bars associational standing. ABr.63-64 (citing *Parent/Professional Advocacy League v. City of Springfield*, 934 F.3d 13 (1st Cir. 2019)). But here, it is not necessary to go student-by-student to catalogue the widespread and

31

public antisemitic conduct and harm to Plaintiffs and other Jewish and Israeli students. While there are countless questions of fact necessary to elucidate the details of the monthslong hate campaign, that actually only demonstrates the unsuitability of these claims for resolution on a motion to dismiss, not that the issues are too individualized to proceed. Nor would the development of facts surrounding events experienced by Plaintiffs necessitate "much, if anything" from other students. *See* ABr.63-64.

Moreover, associational standing for SCLJ serves to facilitate the "eliminat[ion] of discrimination against racial minorities." *Bakke*, 438 U.S. at 355; *see also Darensburg v. Metropolitan Transportation Comm'n*, 636 F.3d 511, 522 (9th Cir. 2011).

## IV. The District Court Erred by Denying Leave to Amend to Address Perceived Deficiencies

Even if the district court felt that it was "far from clear that plaintiffs [would] be able to allege facts sufficient," the court should have granted leave to amend. *Felber*, 851 F. Supp. 2d at 1189. Here, the district court provided no basis for denying leave to amend. *Cf. See Hatch v. Department for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st

Cir. 2001) (denials of leave to amend will be affirmed only where the record supports the court's decision).

Although unnecessary to have overcome MIT's motion, Plaintiffs could allege additional facts regarding the relevant timeline and MIT's knowing indifference to ongoing harassment, or the realities of the assessed punishments to students and student groups, to refute the district court's factual conclusion that "MIT's evolving and progressively punitive response largely tracked its increasing awareness of hostility." Add.13-14.

## V. Plaintiffs' State Law Claims Should Be Adjudicated

Plaintiffs request that this Court reverse the district court's dismissal of their state law claims (AOB 63), which is consistent with *Groden v. N&D Transportation Co.*, 866 F.3d 22, 31 (1st Cir. 2017).

Unlike *Mouradian v. General Electric Co.*, 23 Mass. App. Ct. 538, 542-43 (1987) and *Melley v. Gillette Corp.*, 19 Mass. App. Ct. 511, 513 (1985), Plaintiffs' state law claims are based on independent and cognizable contract and negligence claims, separate and apart from any alleged federal violations.

Here, as to contract, MIT's handbook specifically contains a nondiscrimination policy that "prohibits discrimination against individuals on the basis of race, […] or national or ethnic origin." JA-28-29. MIT's handbook also describes its standards for finding a violation of the harassment policy and the scope of disciplinary measures available. *See* JA-28. These are not "aspirational diversity statements" akin to those in *G. v. Fay School*, 931 F.3d 1, 12 (1st Cir. 2019). And in *Kestenbaum v. President & Fellows of Harvard College*, the court indicated that statements of school policy that are tethered to a promise to act are actionable. 2024 U.S. Dist. LEXIS 139180, at *8 n.15 (D. Mass. Aug. 6, 2024).

*Shulse v. W. New England University* remains on point. No. 3:19-CV-30146-KAR, 2020 U.S. Dist. LEXIS 138106, at *30-31 (D. Mass. Aug. 4, 2020) (allegations plausible that school breached contractual obligation to provide student with an academic environment free from discrimination as stated in student handbook); *see* JA-28 ("[MIT] is committed to providing […] [an] environment that is free from discrimination and discriminatory harassment").

Nor can MIT overcome Plaintiffs' negligence claim. *Schaefer v. Yongjie Fu*, 272 F. Supp. 3d 285, 288-89 (D. Mass. Aug. 10, 2017), demonstrates that in the university context, an institution has a duty to protect its students from harassment when it could have foreseen that the institution would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from failure to do so. Here, MIT repeatedly articulated its knowledge of the harassing nature of the conduct that was occurring, *see* JA-67-86, and at minimum, its president's appearance before Congress (JA-72-73) and the subsequent opening of a Title VI investigation (JA-74) put MIT on notice that it would be expected to address the harassment or else risk further harm to its Jewish and Israel students. Because MIT's duty of care arises independent of its university policies, Plaintiffs are not "us[ing] tort law to enforce university policies," as argued. ABr.67-68.

Imposing a duty to mitigate severe harassment does not render MIT "responsible for monitoring and controlling all aspects of their students' lives." ABr.67 (citing *Nguyen v. MIT*, 479 Mass. 436, 451 (2018)). And contrary to MIT's assertion, Massachusetts' rejection of *in*

*loco parentis* does not absolve a university of this duty. *See Mullins v. Pine Manor Coll*ege, 449 N.E.2d 331, 335-36 (Mass. 1983).

## CONCLUSION

The district court erred by dismissing Plaintiffs' claims. For the reasons explained above, this Court should reverse and remand the action.


Dated: March 26, 2025          By: */s/ Glenn A. Danas*
                                   Glenn A. Danas
                                   CLARKSON LAW FIRM, P.C.

                                   Melissa S. Weiner
                                   PEARSON WARSHAW, LLP

                                   Marlene J. Goldenberg
                                   NIGH GOLDENBERG RASO &
                                   VAUGHN, PLLC

                                   Attorneys for Plaintiffs-
                                   Appellants StandWithUs
                                   Center for Legal Justice,
                                   Katerina Boukin, and Marilyn
                                   Meyers

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,494 words, excluding parts of the brief exempted by Fed. R. App. P 32(f).

2.     This brief complies with the typeface and type-size requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in proportionally spaced typeface using Microsoft Word, in 14-point size.

Dated: March 26, 2025          By:  */s/ Glenn A. Danas*
                                     Glenn A. Danas
                                     CLARKSON LAW FIRM, P.C.

                                     Melissa S. Weiner
                                     PEARSON WARSHAW, LLP

                                     Marlene J. Goldenberg
                                     NIGH GOLDENBERG RASO &
                                     VAUGHN, PLLC

                                     Attorneys for Plaintiffs-
                                     Appellants StandWithUs Center
                                     for Legal Justice, Katerina
                                     Boukin, and Marilyn Meyers

# CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2025 I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system:

Dated: March 26, 2025      By: */s/ Glenn A. Danas*
                                       Glenn A. Danas
                                       CLARKSON LAW FIRM, P.C.

                                       Melissa S. Weiner
                                       PEARSON WARSHAW, LLP

                                       Marlene J. Goldenberg
                                       NIGH GOLDENBERG RASO & VAUGHN, PLLC

                                       Attorneys for Plaintiffs-Appellants StandWithUs Center for Legal Justice, Katerina Boukin, and Marilyn Meyers