# United States Court of Appeals
## For the First Circuit

---

No. 24-1800

STAND WITH US CENTER FOR LEGAL JUSTICE;
KATERINA BOUKIN; MARILYN MEYERS,

Plaintiffs, Appellants,

v.

MASSACHUSETTS INSTITUTE OF TECHNOLOGY,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

---

Before

Gelpí and Kayatta, Circuit Judges,
and Smith, District Judge*

---

Glenn A. Danas, with whom Ashley M. Boulton, Clarkson Law
Firm, P.C., Melissa S. Weiner, Pearson Warshaw, LLP, Marlene J.
Goldenberg, and Nigh Goldenberg Raso & Vaughn, PLLC were on brief,
for appellants.

Ishan K. Bhabha, with whom Lauren J. Hartz, Jenner & Block
LLP, Daryl J. Lapp, and Troutman Pepper Locke LLP were on brief,
for appellee.

---

October 21, 2025

---

* Of the District of Rhode Island, sitting by designation.

KAYATTA, Circuit Judge.  This case emerges from a school year of tension among students, faculty, and administrators at the Massachusetts Institute of Technology (MIT) in response to extraordinary violence in the Middle East.  Two plaintiffs are MIT students.  The third is StandWithUs Center for Legal Justice, the legal arm of a California-based membership organization "dedicated to combatting antisemitism."  Together, plaintiffs allege that MIT failed to take sufficient action to curtail a surge of anti-Israel and pro-Palestinian student protests, thereby allegedly subjecting MIT's Jewish and Israeli students to antisemitic harassment.  The district court dismissed the suit for failure to state a claim.  For the reasons that follow, we affirm.

**I.**

We begin by summarizing the facts not as they necessarily are, but as plaintiffs allege them to be, drawing all reasonable factual inferences in plaintiffs' favor.  See Douglas v. Hirshon, 63 F.4th 49, 55 (1st Cir. 2023); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

On October 7, 2023, the Palestinian group Hamas launched a grotesque attack on Israel, intentionally killing hundreds of unarmed civilians and taking many others hostage.  That same day, the MIT Coalition Against Apartheid, a student group recognized at the time by the university, reposted tweets from other accounts stating:  "Palestinians cannot invade Palestine"; "What is

happening in occupied Palestine is a response to weeks and months and years of daily Israeli military invasions into Palestinian towns, killing of Palestinians, and the very fact that millions of Palestinians in the Gaza Strip are besieged under Israeli blockade"; and "Progressive commentators saying Palestinians have entered 'Israeli territory' . . . baby, check yourselves. You're part of the problem."

The following day, the MIT Coalition Against Apartheid and another student group, Palestine@MIT, sent an email to all undergraduate students with a "Joint Statement on the Current Situation in Palestine." The statement said, among other things, that the student groups "h[e]ld the Israeli regime responsible for all unfolding violence"; "unequivocally denounce[d] the Israeli occupation, its racist apartheid system, and its military rule"; and "affirm[ed] the right of all occupied people to resist oppression and colonization." It was signed "[u]ntil liberation." An Instagram post by Palestine@MIT indicated that the MIT Black Graduate Student Association and a group named MIT Reading for Revolution also supported the joint statement.

On October 10, 2023, pro-Palestinian students wrote "Free Palestine" and "Occupation on Gaza" in chalk outside a vigil organized by Jewish students. Seven days later, a student from the MIT Coalition Against Apartheid sent an email to all student group members at MIT stating that "Israel dropped bombs on the al-

Ahli Arab Hospital" and killed "[o]ver 500 people and counting" -- an allegation plaintiffs say was later "discredited by a variety of governmental and independent sources." Jewish students "responded by sharing information which discredited this rumor" but "were attacked online by their peers," and one unidentified student "felt they could no longer participate" in a study group because of this criticism.

On October 19, 2023, pro-Palestinian students led by the MIT Coalition Against Apartheid held a rally outside the MIT Student Center, at which attendees chanted "Palestine will be free, from the river to the sea!" and "There is only one solution! Intifada revolution!"[1] Plaintiff Meyers and another Jewish student were approached by one rally attendee who "raised the front wheels of his bike at them" and said, in reference to Holocaust victims, "Your ancestors didn't die to kill more people." This rally caused plaintiffs and other Jewish and Israeli students to feel unsafe or unwelcome on campus. MIT knew about the rally through reports, security monitoring of events, and "other means."

---

[1] Plaintiffs' complaint states that "From the River to the Sea" is "a call for a Palestinian state extending from the Jordan River to the Mediterranean Sea . . . which would mean the dismantling of the Jewish state." The complaint also states that "intifada" means "uprising" or "shaking off" and is "used to describe periods of intense Palestinian protest against Israel," which have historically included "violence" and "mass suicide bombings."

- 4 -

Four days later, the MIT Coalition Against Apartheid staged a walkout in which an unspecified number of protestors left classes, disrupted some other classes by shouting and unfurling Palestinian flags, and gathered in the vicinity of Lobby 7, a major thoroughfare through which Plaintiffs Boukin and Meyers often traveled to attend classes and on-campus events. Lobby 7 was not a permitted protest area. The following week, the MIT Coalition Against Apartheid organized a "Die In" in Lobby 7 and taped posters of Gazans on lecture halls and campus buildings.[2] MIT did not halt the "Die In."

On November 2, 2023, the MIT Coalition Against Apartheid staged a fourth event, this time outside the offices of Jewish professors and MIT's Israel internship program, MISTI.[3] Protestors rattled the door handles of offices, chanted "From the river to the sea" and "MISTI, MISTI, you can't hide," and verbally charged "MISTI with genocide." Staff members "reported feeling alarmed, intimidated, and even afraid." Plaintiffs do not allege that they or any Jewish or Israeli students were present during this activity.

---

[2] Plaintiffs offer no further information as to what this "Die In" entailed.

[3] MISTI stands for MIT International Science and Technology Initiatives.

MIT did not send police or discipline students who participated in any of those four protest events.  Rather, six days after the fourth alleged protest, MIT issued a communication outlining more restrictive policies around campus protests, postering, and free expression.  The policies indicated, among other things, that students were not permitted to disrupt living, working, and learning spaces at MIT, and that large banners and flags could not be displayed.

The next day, November 9, 2023, the MIT Coalition Against Apartheid, Coalition for Palestine, and other student groups led another protest in Lobby 7.  The protestors included MIT faculty and staff and members of the general public.  Protest chants included "[F]rom the river to the sea," "Resistance is justified," and calls for "intifada."  A Jewish student recording the protest on her phone was shoved by an unidentified protestor.  MIT Hillel[4] cautioned Jewish students not to "directly engage the protestors for your physical safety and wellbeing" and suggested that they "choose paths around campus that avoid Lobby 7."

At 12:00 p.m., four hours after the protest began, MIT officials warned protestors that they could be disciplined if they did not leave Lobby 7 in the next fifteen minutes.  While a group

---

[4]  MIT Hillel is an organization that "serves as a hub for Jewish life on campus."  About Us, MIT Hillel, https://hillel.mit.edu/aboutus [https://perma.cc/XW8Z-39H7] (last visited Oct. 2, 2025).

of Jewish counter-protestors departed as ordered, the pro-Palestinian protestors did not comply. Afterward, MIT President Sally Kornbluth sent a letter to the MIT community regarding the protest, stating that it was "disruptive, loud, and sustained through the morning hours," that it violated "MIT guidelines and policies," that "the administration had serious concerns that it could lead to violence," and thus that "the administration felt it was essential to take action." The letter announced that the protestors who had remained past the 12:15 p.m. deadline would be "suspended from non-academic campus activities" as an interim action, and that the disciplinary cases would be referred to the Ad Hoc Complaint Response Team for "final adjudication." MIT did not publicize whether any "actual disciplinary measures . . . were taken" against the student protestors. The head of the MIT Department of Urban Studies and Planning sent an email to students in the department indicating that he would protect students involved in the protest.

Sometime before February 26, 2024, the MIT Coalition Against Apartheid held a protest outside of MIT's Institute Discrimination and Harassment Response (IDHR) office. After that protest, IDHR issued orders forbidding contact between the MIT Coalition Against Apartheid members and IDHR staff. In mid-February, the MIT Coalition Against Apartheid held another protest in Lobby 7, in which students "unfurled large flags" and "chanted

'From the River to the Sea, Palestine will be free!'"  The next day, MIT suspended the MIT Coalition Against Apartheid as a student group.

The campus turmoil extended beyond protest alone.  On November 14, 2023, MIT announced a new "Standing Together Against Hate" initiative to combat antisemitism on campus.  Sometime later, however, Jewish and Israeli faculty members resigned from the committee because they did not think it was doing enough to address antisemitism on campus.  In the November/December 2023 issue of the Faculty Newsletter, MIT professor Michel DeGraff published an opinion expressing support for pro-Palestinian student protestors, denouncing "ongoing bombing (that is, war crimes) against hospitals in Gaza" and "genocide" of Palestinians by the Israeli army, and arguing that "racism" might be fueling the MIT administration's alleged decision to denounce antisemitism but not islamophobia with regard to the campus protests; the letter closed with the slogan "from the river to the sea, from Gaza to MIT."

In December 2023, the MIT Women's and Gender Studies Department and the MIT Coalition for Palestine co-hosted an event and invited students to join a book club discussing a book by Ahed Tamimi, a Palestinian activist who on one occasion allegedly posted online, "Come on settlers, we will slaughter you. . . . What Hitler did to you was a joke."  On December 6, 2023, Israeli-American author Miko Peled gave a talk organized by the MIT Coalition

Against Apartheid and MIT Coalition for Palestine, in which Peled "encouraged his audience to go to MIT Hillel and confront MIT's Jewish students there about Gaza"; Peled joked about not being able to say "From the river to the sea," and students in the audience began chanting the phrase.

On December 13, 2023, lecturer Mauricio Karchmer publicly resigned from MIT, stating that he could no longer "teach those who condemn [his] Jewish identity or [his] support for Israel's right to exist in peace with its neighbors." The following month, a non-Jewish student emailed MIT to complain about an interfaith event in which MIT's Interfaith Chaplain and Spiritual Advisor to the Indigenous Community stated that Palestinians were being "wrongly subjugated and oppressed by white European colonizers." A few days later, MIT Israel Alliance, "of which at least one [p]laintiff is a member," emailed MIT's administration to complain about MIT's failure to deter "discriminatory and harassing behavior toward Jewish and Israeli students," informing the university that some Jewish students had "relocated or chosen to stay in Israel" as a result.

On March 7, 2024, plaintiffs filed their initial complaint in the District of Massachusetts, alleging antisemitic and anti-Israeli discrimination in violation of Title VI of the Civil Rights Act of 1964. That same month, pro-Palestinian student activists began a new campaign in which they emailed faculty whose

research related to Israel and accused them of being "complicit in . . . [Israel's] crimes against humanity." The activists asked these faculty to "immediately cease these [Israel-related] projects and reject all future contracts" with the Israeli military and similar entities, and they contacted students of the targeted faculty asking them to "reflect" on their professors' receipt of Israeli funding. Two student groups, the MIT Coalition Against Apartheid and Graduates for Palestine, made posts on Instagram that "shamed by name" faculty whose research was funded by the Israeli government and noted that the information came from an "internal [MIT] grant management tool" that, per plaintiffs, is meant only for MIT faculty and staff use.

Additionally, according to plaintiffs, "[t]hroughout the spring" MIT allowed what plaintiffs call "antisemitic posters" to "be displayed on campus." As an example, plaintiffs point to a poster that "remain[ed] hanging for approximately one month" depicting two fists in handcuffs and proclaiming, "No to Zionism and Racism."

Matters came to a head on April 21, 2024, when pro-Palestinian protestors erected an encampment on Kresge Lawn, toward the center of MIT's campus and adjacent to Hillel. The encampment included approximately 30 students[5] and 15 tents.

_____

[5] MIT reports having over 11,000 students as of October 2024. Enrollment Statistics, MIT, https://facts.mit.edu/enrollment-

Protestors displayed signs stating, "Zionism is apartheid, it's a genocide, it's murder, it's a racist ideology rooted in settler expansion and racial domination and we must root it out of the world.  Zionism is a death cult," and "Boys in Blue, KKK, IOF[,] They are all the SAME."

Through social media, the MIT Coalition Against Apartheid further called for action from others, stating:  "We stand in solidarity with our steadfast siblings in Palestine. We rebuke the complicity of our institution, and today, we take the next step together in fighting for what we believe in. Everyone, come support the encampment on Kresge Lawn."  They posted further calls to "vote yes" on a referendum calling for a "permanent ceasefire" and the cutting of ties "between MIT and the Israeli military."  In another social media post, the MIT Coalition Against Apartheid stated, "We will continue to be loud and be heard and not be deterred away from our fight for Palestine and our fight against MIT's complicity with the occupation."

Disturbed by the student encampment and protests, some Jewish students at MIT moved their Passover seder from Hillel to "an off-campus location" and asked MIT to permit them to attend class remotely.  An unnamed graduate student emailed President Kornbluth, MIT Chancellor Melissa Nobles, and other university

statistics [https://perma.cc/6D55-7MSD] (last visited Aug. 7, 2025).

administrators demanding that they "assure" Jewish and Israeli students that MIT would not "'both sides' the encampment" and accusing the protestors of "ma[king] campus such a hostile environment that it is nearly impossible for [Jewish and Israeli students] to work, study, or keep up with [their] research commitments." Nobles replied by email that MIT "underst[oo]d" the student's concern and was "working to move in a constructive dialogue with those who are protesting," and she asked the student for "patience and understanding as [MIT did] this hard work." She further "urge[d the student and the student's peers] not to counterprotest."

The encampment remained in place from April 21, 2024, to May 10, 2024. One week in, Kornbluth released a video and statement about the protests and MIT's response.[6] Kornbluth explained that while the encampment was "a clear violation of [MIT's] procedures for registering and reserving space for campus demonstrations," the situation had "so far been peaceful." She noted that the students who had broken MIT's rules would "face

---

[6] Plaintiffs excerpt portions of Kornbluth's remarks in their complaint, and the complaint includes a hyperlink to the statement in its entirety. See Video transcript: MIT Community Message from President Kornbluth, MIT Office of the President, https://president.mit.edu/writing-speeches/video-transcript-mit-community-message-president-kornbluth [https://perma.cc/E25Q-DX9E] (last visited Oct. 16, 2025). We therefore treat the full statement as incorporated in the complaint by reference. See Watterson, 987 F.2d at 3. We treat other statements contained in documents relied upon and linked to by the complaint similarly.

disciplinary action," described an agreement reached with protestors "not to make noise after 7:30 pm," and stated that to "avoid any further escalation," she had directed campus police to monitor the encampment "24 hours a day."  She rejected calls to "compromise the academic freedom of our faculty" whose research involved Israel or who received Israeli funding.  Finally, she stated that while she "believe[d the protestors' chants were] protected speech, under [MIT's] principles of free expression," the encampment "need[ed] to end soon."

Nonetheless, the encampment continued, and on May 3, 2024, MIT installed high fencing around the encampment to contain it.  The following day, journalists recorded protestors at the encampment chanting slogans in Arabic, which -- according to plaintiffs -- could be translated as "From water to water, Palestine is Arab!"; "Palestine is free, Israel out"; "We want to talk about the obvious, we don't want to see Zionists"; "The iron gates of Al Aqsa, open for the martyr!"; and "From water to water, death to Zionism!"[7]

By May 6, 2024, the encampment still had not ended, and MIT attempted to draw a harder line:  It informed protestors that if they did not depart by 2:30 p.m., they would face discipline.

---

[7] Plaintiffs do not allege that they or others informed MIT of the English translations of these chants, nor that MIT was otherwise on notice of their meaning.

But this strategy appears to have backfired. The protest organizers posted on social media calling for others to join the encampment. As tensions mounted, an individual jumped over the fence surrounding the encampment, sparking a "surge" in which a new wave of protestors breached the fence. By the evening of May 6, approximately 150 protestors had gathered at the encampment.

The next day -- May 7 -- Hillel had planned to use Kresge Lawn to celebrate the state of Israel. But because the lawn was occupied by the protest encampment, Hillel moved the event. On May 8, protest activities intensified. Protestors blocked the entrance and exit to Stata Center garage, a campus building a short distance from Kresge Lawn, and defaced and discarded Israeli and American flags. Protestors repeated the tactic the following day, again blocking the entrance to the garage and preventing MIT "community members" from entering and exiting, as well as shutting down nearby Vassar Street. This time, nine students were arrested.

On May 10, 2024, MIT successfully cleared the encampment, and the ten students who remained were arrested. MIT issued a statement indicating that "freedom of expression . . . does not protect the continued use of a shared Institute resource in violation of long-established rules" and providing a timeline of events justifying the decision to clear the encampment and arrest the remaining student protestors.

On May 17, 2024, plaintiffs filed their amended complaint, which included new causes of action under the Ku Klux Klan Act and state common law. MIT moved to dismiss the suit, and the district court granted the motion. This appeal followed.

**II.**

We review de novo a district court's decision to dismiss a lawsuit for failure to state a claim. _Douglas_, 63 F.4th at 54-55. Our task is to determine whether plaintiffs' complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" _Id._ at 55 (quoting _Ashcroft_ v. _Iqbal_, 556 U.S. 662, 678 (2009)). A plausible claim, in turn, is one in which plaintiffs "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." _Iqbal_, 556 U.S. at 678. In assessing whether plaintiffs have stated a facially plausible claim to relief, we accept as true the complaint's well-pleaded factual allegations and draw all reasonable factual inferences in plaintiffs' favor. _McKee_ v. _Cosby_, 874 F.3d 54, 58 (1st Cir. 2017). However, we do not credit "conclusory legal allegations," nor "factual allegations that are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture.'" _Douglas_, 63 F.4th at 55 (quoting _Legal Sea Foods, LLC_ v. _Strathmore Ins. Co._, 36 F.4th 29, 33 (1st Cir. 2022)).

With this framework in place, we advance to the merits of plaintiffs' arguments:  Did the district court err by dismissing their claims under Title VI, the Ku Klux Klan Act, and Massachusetts common law?  We consider each claim in turn.

**III.**

Title VI of the Civil Rights Act mandates that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance."  42 U.S.C. § 2000d.[8]  To hold MIT liable for violating this mandate, plaintiffs pursue a hostile environment, or "harassment," theory analogous to a theory of liability developed under Title IX.  See Porto v. Town of Tewksbury, 488 F.3d 67, 72–73 (1st Cir. 2007) (citing Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999)).  Under this theory, a school can be held liable if it was "deliberately indifferent" to "severe, pervasive and objectively offensive" harassment that "caused the [plaintiff] to be deprived of educational opportunities or benefits."  D.L. ex rel. M.L. v. Concord Sch. Dist., 86 F.4th 501, 511 (1st Cir. 2023) (citations omitted).  Though these cases involved a sexual harassment claim under Title IX, the standards

_____

[8]  The parties do not dispute that MIT is subject to Title VI as a "program . . . receiving [f]ederal financial assistance."

for sexual harassment under Title IX and racial harassment under Title VI are often treated as harmonious. See Adams v. Demopolis City Sch., 80 F.4th 1259, 1273 (11th Cir. 2023) (collecting cases applying Title IX's deliberate indifference standard to claims of student-on-student racial harassment under Title VI); see also Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 258 (2009) (noting, in a case alleging a violation of Title IX, that "Congress modeled Title IX after Title VI of the Civil Rights Act of 1964"); Faragher v. City of Boca Raton, 524 U.S. 775, 787 n.1 (1998) (explaining, in the context of a Title VII sexual harassment claim, that "[a]lthough racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment"). No party suggests that we should proceed otherwise in evaluating plaintiffs' complaint.

As we will explain, plaintiffs' proposed use of this theory fails for two independent reasons. First, Plaintiffs' allegations do not plausibly rise to the level of actionable harassment required by Title VI. Second, even if the protestors' conduct as a whole was actionable harassment under Title VI, MIT is not liable because it was not deliberately indifferent to the effects of the protests on Jewish and Israeli students. Our reasoning follows.

**A.**

Our conclusion that plaintiffs have failed to allege actionable racial harassment consists of three parts. To begin, most of the conduct about which plaintiffs complain is speech protected by the First Amendment, and we do not construe Title VI as requiring a university to quash protected speech. Furthermore, by gathering together in groups on campus, disrupting campus tranquility, and impeding travel for many students, the protestors did not render their speech antisemitic, much less unprotected. Finally, to the extent that plaintiffs allege isolated incidents that are plausibly antisemitic, the complaint's allegations are not sufficiently severe, pervasive, and offensive to constitute actionable harassment under Title VI. We address each part in turn.

**1.**

Because plaintiffs base their claim so heavily on what the protestors said and wrote, we consider first whether plaintiffs' proposed application of a harassment claim under Title VI comports with First Amendment principles.

The Supreme Court has long recognized "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). By removing "governmental restraints from the arena of public discussion," the First

Amendment places "the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 203 (2014) (alteration in original) (quotation marks omitted) (quoting Cohen v. California, 403 U.S. 15, 24 (1971)).

In light of this overriding interest in open debate, speech made in public that is related to matters of public concern has been given "special protection under the First Amendment" and thus "cannot be restricted simply because it is upsetting or arouses contempt." Snyder v. Phelps, 562 U.S. 443, 458 (2011) (internal quotations omitted) (protecting speech of Westboro Baptist Church protestors chanting "God Hates You," "Thank God for Dead Soldiers," and "Priests Rape Boys" at a funeral for a deceased soldier); see also Boos v. Barry, 485 U.S. 312, 322 (1988) (reasoning that "in public debate . . . citizens must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment" (quotation marks omitted) (quoting Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 56 (1988))); Street v. New York, 394 U.S. 576, 592 (1969) (reaffirming that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"); Rodriguez v. Maricopa Cnty. Cmty. Coll.

Dist., 605 F.3d 703, 706–708 (9th Cir. 2010) (finding a community college was not required to restrict a professor's emails related to immigration, race, and the "preservation of [a] White majority" because "[t]he Constitution embraces . . . a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race").

Similarly, the Supreme Court has long upheld "[t]he essentiality of freedom in the community of American universities," warning that "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957) (plurality opinion). A university's "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978) (opinion of Powell, J.); see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 217 (2023) (recognizing a "tradition of giving a degree of deference to a university's academic decisions . . . within constitutionally prescribed limits" (quotation marks omitted) (quoting Grutter v. Bollinger, 539 U.S. 306, 328 (2003))). And "private schools," in particular, "have a First Amendment right to

academic freedom." Asociación de Educación Privada de P.R., Inc.
v. García-Padilla, 490 F.3d 1, 11 (1st Cir. 2007).[9]

Here, the student protestors engaged in speech on a
matter of public concern[10] -- the conflict in Gaza -- while on the
campus of a private university in which they were enrolled. MIT
chose to restrict that speech in part and allow it to continue in
part. Now, plaintiffs seek to hold MIT liable, under a federal
statute, for its failure to curtail that speech even further.

As a private institution, MIT could choose to curtail
political speech by its students without First Amendment scrutiny.
See, e.g., United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S.
825, 831-33 (1983) (explaining that the First Amendment protects
against state interference, not purely private conduct). But MIT's

---

[9] García-Padilla focused on private primary and secondary
schools. However, given our reasoning in that case, its pertinent
conclusion applies with at least equal force to universities. See
García-Padilla, 490 F.3d at 8-9 (finding that the Supreme Court
has "invoked academic freedom to protect universities, as academic
institutions, against government control").

[10] "Speech deals with matters of public concern when it can
'be fairly considered as relating to any matter of political,
social, or other concern to the community.'" Snyder, 562 U.S. at
453 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). Speech
also qualifies as a matter of public concern "when it 'is a subject
of legitimate news interest; that is, a subject of general interest
and of value and concern to the public.'" Id. (quoting City of
San Diego v. Roe, 543 U.S. 77, 83-84 (2004)). The student
protestors' expression on a highly publicized conflict in the
Middle East meets this standard.

authority to decide for itself whether to prohibit certain political speech is not the issue here. Rather, the question is whether Title VI required MIT to try to put an end to the protestors' speech. And requiring MIT to restrict students' expression merely because those students opposed Israel and favored the Palestinian cause would infringe upon MIT's freedom to encourage, rather than suppress, a vigorous exchange of ideas. See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 836 (1995) ("For the University . . . to cast disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses.").

Using Title VI to compel adherence to a preferred political viewpoint would also implicate students' First Amendment freedoms. A law punishing private citizens for expressing political opinions disfavored by Congress would be subject to "the most exacting" First Amendment scrutiny. Texas v. Johnson, 491 U.S. 397, 412 (1989); see also Cox v. Louisiana, 379 U.S. 536, 545–51 (1965) (holding that a state violated the First Amendment when it prosecuted and convicted a student protestor for "disturbing the peace" based merely on "hostility" to the views the protestor expressed). "When the government targets not subject matter, but particular views taken by speakers on a subject, the

violation of the First Amendment is all the more blatant."
Rosenberger, 515 U.S. at 829 (citing R.A.V. v. St. Paul*,* 505 U.S.
377, 391 (1992)).  As such, "[t]he government must abstain from
regulating speech when the specific motivating ideology or the
opinion or perspective of the speaker is the rationale for the
restriction."   Id. (citing Perry Ed. Assn. v. Perry Local
Educators' Assn*.,* 460 U.S. 37, 46 (1983)).  Viewpoint restrictions
are all the more perturbing in the context of speech the government
deems offensive.   Cf. Matal v. Tam, 582 U.S. 218, 223 (2017)
(finding trademark restriction prohibiting an Asian American rock
band from registering their band under a derogatory racial term
"offend[ed] a bedrock First Amendment principle" that "speech may
not be banned on the ground that it expresses ideas that offend").
Nor can the reactions of an offended audience serve as grounds for
the government to suppress such speech.   See id. at 250
(Kennedy, J., concurring in part and concurring in the judgment)
("[A] speech burden based on audience reactions is simply
government hostility and intervention in a different guise.").

It makes no difference that, in this case, restriction
of speech comes by way of a civil suit brought by private parties.
Congress cannot skirt First Amendment concerns by passing a law
requiring someone else to punish protected speech.  See Nat'l Rifle
Ass'n of Am. v. Vullo, 602 U.S. 175, 187, 190 (2024) (explaining
that "viewpoint discrimination is uniquely harmful to a free and

democratic society" and holding that "[a] government official cannot coerce a private party to punish or suppress disfavored speech on her behalf").  Likewise, the government cannot empower a private party to punish speech on a matter of public concern absent unusual circumstances not present here.  See Sullivan, 376 U.S. at 283 (limiting "a [s]tate's power to award damages for libel in actions brought by public officials against critics of their official conduct"); Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986) (explaining that the protections of Sullivan extend -- albeit to a lesser extent -- to speech on issues of "public concern," even where the plaintiff is not a public official or public figure).  The government may not permit juries to "punish" private speech merely because it expresses an "unpopular opinion," either.  Gertz v. Robert Welch, Inc., 418 U.S. 323, 348–49 (1974) (limiting the remedies available to private defamation plaintiffs on First Amendment grounds); see also Sullivan, 376 U.S. at 277 ("What a [s]tate may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel.").

Nor has MIT forfeited its right to make or allow speech disfavored by the government by receiving federal funds for programs or activities unrelated to the speech at issue here.  See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 570 U.S. 205, 218 (2013) (finding that the First Amendment prohibited a

statutory provision that "demand[ed] that [federal] funding
recipients adopt -- as their own -- the Government's view on an
issue of public concern," and thus "by its very nature affect[ed]
'protected conduct outside the scope of the federally funded
program'" (quoting Rust v. Sullivan, 500 U.S. 173, 197 (1991))).

    In sum, the First Amendment erects safeguards that limit
the ability of the government or private plaintiffs to punish MIT
for not restricting more severely the student protestors'
protected speech.

                                **2.**

    In view of that anodyne conclusion, we find no surprise
in plaintiffs' agreement that "courts should interpret Title VI to
comport with First Amendment principles."  In keeping with that
agreement, plaintiffs do not expressly argue that Title VI can be
used to punish a school for not stifling student speech that the
government itself could not punish.  Instead, plaintiffs argue
that much of the protestors' speech fell outside the protection of
the First Amendment -- and thus within the reach of a government
censor -- because the speech was racist (i.e., antisemitic).

    This argument poses two nettlesome issues.  First, under
what circumstances, if any, can racist speech be punished pursuant
to Title VI without violating the First Amendment?[11]  See Davis,

----

[11]  Amicus curiae National Jewish Advocacy Center (but not
plaintiffs) also suggests that calls for "intifada" or chants of

526 U.S. at 667–68 (Kennedy, J., dissenting) (reviewing the
"difficult [First Amendment] problems raised by university speech
codes designed to deal with peer . . . harassment"); Rodriguez,
605 F.3d at 708 ("There is no categorical 'harassment exception'
to the First Amendment's free speech clause." (quoting Saxe v.
State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001)));
see also Todd E. Pettys, Hostile Learning Environments, the First
Amendment and Public Higher Education, 54 Conn. L. Rev. 1, 37–55
(2022) (analyzing hypothetical scenarios under which a university
may or may not be able to constitutionally restrict speech for
creating a hostile learning environment).  Second, even assuming
that some racist speech can constitutionally be punished pursuant
to Title VI, have plaintiffs adequately alleged that the
protestors' expression was racist (i.e., antisemitic)?[12]  Because

---

"from the river to the sea" were "true threats" unprotected by the
First Amendment.  True threats are "statements where the speaker
means to communicate a serious expression of an intent to commit
an act of unlawful violence to a particular individual or group of
individuals."  Virginia v. Black, 538 U.S. 343, 359 (2003)
(plurality opinion).  Plaintiffs themselves make no such argument,
never claiming that any alleged expression of intent to commit
unlawful violence can plausibly be inferred from the complaint's
description of the roughly seven months of peaceful protest.

[12]  For purposes of reviewing plaintiffs' complaint, we assume
that antisemitic harassment constitutes actionable racial
harassment under Title VI.  Cf. Sinai v. New England Tel. & Tel.
Co., 3 F.3d 471, 474 (1st Cir. 1993) (noting in construing 42
U.S.C. § 1982 that the "Jewish/Hebrew" identity has been "defined
as a protected race by the Supreme Court") (first citing Saint
Francis Coll. v. Al-Khazraji, 481 U.S. 604 (1987); and then citing
Shaare Tefila Congregation v. Cobb, 481 U.S. 615 (1987)).

we can decide this appeal without addressing the first issue, we proceed directly to the second.

To suggest that the protestors as a group were guilty of antisemitism, plaintiffs point to two categories of expression by protestors: the chants, emails, and signs that formed the general thrust of the protestors' message; and the gatherings that impeded movement on MIT's campus.  We consider each category, beginning with the verbal and written messages that focused and spread the protestors' views.

**a.**

The sordid history of antisemitism provides a litany of epithets and tropes widely understood as expressions of religious or racial animus.  As described by plaintiffs, the scores of protestors holding handmade signs and voicing various chants eschewed those epithets and tropes, directing their ire instead at the Israeli state and its treatment of Palestinians.

To support their claim of antisemitism, plaintiffs point to the protestors' opposition to Zionism, which they argue is inherently antisemitic.  "Zionism," plaintiffs explain, "is the belief that Jews have the right to self-determination in their ancestral homeland of Israel."  Plaintiffs argue that because "most Jews" see Zionism as "a key component of their Jewish ethnic and ancestral identity," "'anti-Zionism' is . . . antisemitism."  In plaintiffs' view, speech is anti-Zionist, and therefore

antisemitic, if it "oppose[s] Jewish self-determination in the State of Israel"; if it "claim[s] that the existence of a State of Israel is a racist endeavor"; if it "requir[es] of [Israel] a behavior not expected or demanded of any other democratic nation"; and if it "draw[s] comparisons of contemporary Israeli policy to that of the Nazis."  Under this framework, plaintiffs also treat as antisemitic any criticism of Israel's conduct in Gaza, any suggestion that violence by Palestinians can be understood as resistance to colonial rule and Israeli expansion, and any implication that Palestinians should govern -- or even simply be "free" -- in all of Palestine (i.e., "from the river to the sea").

Plaintiffs are entitled to their own interpretive lens equating anti-Zionism (as they define it) and antisemitism.  But it is another matter altogether to insist that others must be bound by plaintiffs' view.  Plaintiffs' equation finds no consensus support in dictionary definitions.[13]  Nor does a review of the

---

[13]    Compare       Anti-Semitism,       Merriam-Webster, https://www.merriam-webster.com/dictionary/antisemitism [https://perma.cc/Q32E-YSN7] (last visited Oct. 14, 2025) (defining antisemitism as "hostility toward or discrimination against Jews as a religious, ethnic, or racial group"), with Anti-Zionism,        Merriam-Webster,        https://www.merriam-webster.com/dictionary/anti-Zionism [https://perma.cc/KF59-N2VC] (last visited Oct. 14, 2025) (defining anti-Zionism as "opposition to the establishment or support of the state of Israel: opposition to Zionism"), and Zionism, Merriam-Webster, https://www.merriam-webster.com/dictionary/Zionism [https://perma.cc/9BQQ-RTWD] (last visited Oct. 14, 2025) (defining Zionism as "an international movement originally for the establishment of a Jewish national or

academic literature point to any consensus that criticism of
Zionism is antisemitic.[14]  And we do not find it dispositive that
the United States Department of State has defined antisemitism as
"[d]enying the Jewish people their right to self-determination,
e.g., by claiming that the existence of a State of Israel is a
racist endeavor."  Office of the Special Envoy to Monitor and
Combat Antisemitism, Defining Antisemitism, U.S. Dep't of State
https://www.state.gov/defining-antisemitism

---

religious community in Palestine and later for the support of
modern Israel").

   [14] See, e.g., Itamar Mann & Lihi Yona, Defending Jews from
the Definition of Antisemitism, 71 UCLA L. Rev. 1150, 1150, 1155
(2024) (arguing that the conflation of "sharp criticism of Israel"
with antisemitism produces "a narrowing of Jewish identity and a
delegitimization of anti-Zionist and non-Zionist Jewish
communities"); Frederick P. Schaffer, Title VI, Anti-Semitism, and
the Problem of Compliance, 46 J. Coll. & U.L. 71, 77 (2021)
(observing that "arguments about Zionism and Israel are political
arguments that are not logically connected to anti-Semitism," but
"criticism of Israeli policy . . . can be expressed in ways that
indicate an underlying anti-Jewish animus or that help create an
environment conducive to anti-Semitism"); Note, Wielding
Antidiscrimination Law to Suppress the Movement for Palestinian
Rights, 133 Harv. L. Rev. 1360, 1373, 1376 (2020) (arguing that
"Zionism does not reflect the views of all Jewish people" and
"equating anti-Zionism (a political ideology that opposes Jewish
ethno-nationalism) with anti-Semitism (anti-Jewish animus)
requires a logical leap that defeats finding direct evidence of
religious discrimination"); Derek Penslar, Who's Afraid of
Defining Antisemitism?, 6 Antisemitism Stud. 133, 136 (2022)
(contending that "[a]lternatives to sovereign Jewish
statehood . . . are not antisemitic," and observing that even if
antisemitism is defined to permit "criticism of Israel similar to
that leveled against any other country," "separatists have long
called for . . . dissolution" of countries like Canada and Spain,
and some people have labeled the United States "structurally
racist").

[https://perma.cc/2KZF-TRBY] (last visited Sept. 29, 2025). As the Supreme Court has repeatedly emphasized, "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 791 (2011) (citing United States v. Stevens, 559 U.S. 460, 469-472 (2010)).

This absence of consensus reflects ongoing debate as to the relationship between anti-Zionism and antisemitism -- debate that our constitutional scheme resolves through discourse, not judicial fiat. Indeed, the debate on occasion has been formal and high profile. See, e.g., Munk Debate on Anti-Zionism, Munk Debates (June 17, 2024), https://munkdebates.com/debates/munk-debate-on-anti-zionism [https://perma.cc/9MQ6-Y2EK] (debating the proposition that "anti-Zionism is antisemitism"); Anti-Zionism is Anti-Semitism, Intelligence Squared (June 20, 2019), https://www.intelligencesquared.com/events/anti-zionism-is-anti-semitism [https://perma.cc/28M6-7XGS] (same). We decline to interpret Title VI as arming either side of that debate with the powers of a censor.

MIT also had to contend with the inverse of plaintiffs' contention: that Muslim and Palestinian students could, by similar logic, claim that expressing support for Israel's actions in the West Bank and Gaza was Islamophobic or anti-Arab. Indeed, plaintiffs' complaint cites a faculty note arguing that MIT's

response to the campus conflict manifested racism against Arab and Muslim students. We struggle to imagine how a university faced with such conflicting views could plausibly eliminate all unwelcome speech without quashing all speech concerning the conflict between Israelis and Palestinians, particularly because -- as MIT's president Kornbluth observed in a statement cited by plaintiffs -- MIT's community included both "people who lost friends and family to the brutal terror attack of October 7, and people with friends and family currently in mortal danger in Rafah." Cf. Rosenberger, 515 U.S. at 831 ("[E]xclusion of several views on [a] problem is just as offensive to the First Amendment as exclusion of only one.").

This is not to say that anti-Zionism is never wielded as a tool of the antisemite. See Gartenberg v. Cooper Union for the Advancement of Sci. & Art, 765 F. Supp. 3d 245, 269 (S.D.N.Y. 2025) (finding that "From the river to the sea, Palestine will be free" graffiti on a bathroom stall that was "made to resemble the stylized font commonly associated with Hitler's Mein Kampf" could be used, among other evidence, to show antisemitic motivation). It is to say, instead, that one person does not lose the right to express a political opinion on a matter of public concern merely because another who expresses the same view does so for condemnable reasons. One individual might criticize a government program as an inefficient use of taxpayer resources; another might criticize

the program because of hostility toward its beneficiaries on the basis of their race or religion. The latter individual's view, while reprehensible, could not justify restricting the former individual's speech, nor imposing a categorical ban on criticism of the program. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 915–20 (1982) (holding that civil rights protestors did not forfeit their First Amendment rights merely because certain group members' conduct exceeded the scope of constitutional protections); cf. Black, 538 U.S. at 365 ("The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech."). Nor can the possibility that antisemitism motivates one speaker's anti-Israel speech justify assuming that all criticism of Israel or advocacy for Palestinian sovereignty is motivated by antisemitism. We therefore reject plaintiffs' claimed right to stifle anti-Zionist speech by labeling it inherently antisemitic.

Nor do plaintiffs allege facts that, if true, would otherwise permit the inference that in these specific circumstances the protestors' strident criticisms of Israel were driven by antisemitism. Without such an inference, the protestors' speech cannot constitute racial harassment for Title VI purposes. See Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004) (observing that "racial animus" is "a necessary component of . . .

claims under" Title VI); <u>Doe</u> v. <u>Brown Univ.</u>, 43 F.4th 195, 208
(1st Cir. 2022) ("To succeed on his race-based claims, [plaintiff]
must show, among other things, that [defendant] acted with
discriminatory intent."). Here, plaintiffs proffer only
conclusory allegations of antisemitic animus that are "not
entitled to be assumed true." <u>Iqbal</u>, 556 U.S. at 680-81 (rejecting
as conclusory the allegation that officials "adopted a policy
'"because of," not merely "in spite of," its adverse effects upon
an identifiable group'" (quoting <u>Pers. Admin'r of Mass.</u> v. <u>Feeney</u>,
442 U.S. 256, 279 (1979))). Plaintiffs allege no facts plausibly
establishing that the protestors, as a group, opposed Israeli
actions in Gaza or supported the Palestinian cause because of
antisemitic animus. Nor do plaintiffs allege facts plausibly
showing that the protestors as a group shared plaintiffs' view
that anti-Zionism was inherently antisemitic.

We also reject plaintiffs' implicit contention that the
choice to criticize Israel's actions in Gaza -- rather than, for
example, choosing to criticize some other alleged atrocity
elsewhere in the world -- necessarily manifests antisemitism.
Political advocacy, by its nature, involves a choice to focus on
certain issues or causes over others. Title VI does not preclude
the protestors, U.S. university students, from responding to the
headlines by choosing Israel as their target, particularly given
the protestors' perception of the significant role played by the

United States and U.S.-supplied arms in the conflict between Israelis and Palestinians. Cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514 (1969) (upholding students' rights to "exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and . . . to influence others to adopt them").

Finally, plaintiffs point to the fraught subject of genocide. First, plaintiffs claim that accusing Israel of committing genocide against Palestinians is antisemitic. But even prominent Israelis have lodged the same accusation. See, e.g., Omer Bartov, Opinion, I'm a Genocide Scholar.  I Know It When I See It., N.Y. Times (July 15, 2025), https://www.nytimes.com/2025/07/15/opinion/israel-gaza-holocaust-genocide-palestinians.html [https://perma.cc/P9GM-3RRX]. Second, plaintiffs claim in their brief that some protestors called for the genocide of the Jewish people. But there are no factual allegations supporting this claim. Rather, plaintiffs say that we should construe chants of "from the river to the sea, Palestine will be free" and "intifada revolution" as calls to wipe out the Jewish people as such. But neither slogan says as much on its face, nor do plaintiffs allege facts suggesting that either chant was commonly so construed by the protestors. So plaintiffs must again rely on a theory that they can dictate the interpretation of the protestors' speech in order to suppress it,

without any facts suggesting that the protestors were using these slogans in the way plaintiffs claim.

In reviewing these claims, our role is not to approve or disapprove of the protestors' strident advocacy, nor of the ideas they so vigorously expressed.  We do not question the anguish plaintiffs felt at hearing a few of their peers justify the October 7 massacre or deny Israel the right to defend itself.  But our Constitution bars the government from forcing a private university to prohibit students from voicing vehement support for, or opposition to, the policies and conduct of the United States and its allies.  For these reasons, we decline plaintiffs' invitation to hold that the protestors' speech constituted antisemitic harassment actionable under Title VI merely because it was stridently pro-Palestinian and anti-Zionist.

**b.**

Trying a different approach to support their claim that the protests constituted antisemitic harassment, plaintiffs also point to the protestors' disruptive physical presence.  This presence first impeded travel across and within MIT's campus during seven days of protest spread out over approximately five months, and later included a three-week encampment by a small group of students.  For the most part, even as alleged by plaintiffs, these impediments rendered travel more difficult for all students and prevented all students from using Kresge Lawn as they might

otherwise have planned -- including, as plaintiffs describe, for a planned celebration of the state of Israel.

Certainly, the protests may have interfered with campus life and the university's educational mission in a way that could have disappointed many students (and their parents).  But our Title VI focus is not on how the protests affected students generally.  Rather, we train our focus only on the extent to which the protests might have harassed Jewish students as such.  See Davis, 526 U.S. at 651 (explaining that to plead deliberate indifference, a plaintiff must plausibly allege that she was "deprived . . . of an educational opportunity on the basis of" her protected characteristic).  We recognize that because the encampment, in particular, took place across from Hillel, its impact on Jewish students was plausibly heightened.  Indeed, plaintiffs allege that they moved a scheduled Passover seder "to an alternate location" because MIT had not yet cleared the encampment and thus students did not feel comfortable attending the seder at Hillel.  But plaintiffs allege no facts to plausibly indicate that the protestors chose Kresge Lawn for their encampment because of its proximity to Hillel rather than for its prominent location and preferred terrain for tents.

We are also unpersuaded by plaintiffs' position that the pro-Palestinian students surrendered some of their First Amendment rights by gathering together, chanting, and holding signs.  "[B]y

collective effort individuals can make their views known, when, individually, their voices would be faint or lost." Citizens Against Rent Control v. City of Berkeley, 454 U.S. 290, 294 (1981). This practice is "deeply embedded in the American political process." Id.; see Boos, 485 U.S. at 318 (emphasizing that the display of signs criticizing foreign governments are "at the core of the First Amendment" and constitute "classically political speech"); see also Claiborne Hardware, 458 U.S. at 910 (1982) ("Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action.").

      For these reasons, we conclude that plaintiffs have failed to plausibly allege facts showing that the disruptive protests and campsite gatherings were antisemitic in message or purpose. Rather, they were time-worn methods of grabbing more attention for the broadcast of the protestors' political views.

**3.**

      That being said, the cacophony of protests and ensuing debates over the course of seven months, as alleged, plausibly spun off several isolated incidents of antisemitism. Plaintiffs allege that student protestors specifically blocked Plaintiff Boukin from entering Lobby 7 on one occasion while a protest was underway "because she was Jewish," while permitting other students and faculty to cross. They also allege Boukin was denied access to the Kresge Lawn encampment area on one occasion "because she was

Jewish," while others were allowed to enter. One protestor on October 19, 2023, seemed to presume that Plaintiff Meyers bore responsibility for the actions of the Israeli government because her ancestors were Jewish. MIT Coalition Against Apartheid members allegedly "heckled" another individual "because he was visibly Jewish." Plaintiffs also allege that on December 6, 2023, an Israeli-American speaker urged listeners to "go to MIT Hillel and confront MIT's Jewish students there about Gaza,"[15] and that on one occasion a graduate student authored a tweet equating Jews with Nazis.[16] So although we find no basis for insisting that MIT view the thrust of the protests themselves or even a large subset of the protestors as antisemitic, we agree that plaintiffs allege a handful of incidents, occurring over the course of seven months, that any thoughtful person would regard as antisemitic -- that is, as confronting Jewish students "on the ground," 42 U.S.C. § 2000d, that they were Jewish.[17]

---

[15] In reviewing the link to a video of the speaker's talk, which plaintiffs supplied in their complaint and thereby incorporated by reference, we were unable to identify this statement.

[16] The allegation to which plaintiffs cite does not allege what the student actually said, nor that plaintiffs themselves were even aware of the tweet.

[17] We do not, however, credit plaintiffs' conclusory assertions that other scattered speech and conduct manifested antisemitism: for example, a book group discussing a controversial memoir, at which an MIT staff member "invited students to sympathize" with a Palestinian author (an unremarkable invitation for any curious reader), or an event at which an MIT staff member

That these incidents were few in number and, even then, not all trained on any plaintiff raises the question of whether the antisemitic conduct that plaintiffs plausibly allege was "severe, pervasive, and objectively offensive." Davis, 526 U.S. at 633. MIT makes a convincing case that it was not. Indeed, it is hard to see how plaintiffs' allegations could plausibly show that these antisemitic incidents were so pervasive and disruptive as to "effectively bar the victim[s'] access to an educational opportunity or benefit." Id. As the Supreme Court has emphasized in the analogous Title IX context, "the [harassing] behavior [must] be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." Id. at 652 (emphasis added). The requirement that the deprivation of educational access be systemic is key: "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect," the Supreme Court has deemed it "unlikely that Congress would have thought such behavior sufficient to rise to this level." Id. at 652–53.

Additionally, that the alleged incidents were perpetrated by other students or by guest speakers further undermines any inference of severe or pervasive harassment. "The

expressed her view that Palestinians were being "wrongly subjugated and oppressed by white European colonizers" and asked attendees if they were Kosher in order to give them a dessert that matched their dietary needs.

relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach" Title VI. Id. at 653. "Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment." Id. In light of these considerations and without more instances of such conduct, the alleged incidents fall short of the "systemic" deprivation of educational opportunities and benefits required by Davis.

In any event, plaintiffs fail to plausibly allege that MIT had any knowledge of these isolated events. Liability under Title VI requires that an "'appropriate person' . . . with authority to take corrective action to end the harassment" have "actual knowledge" of the offending conduct. Grace v. Bd. of Trs., Brooke E. Bos., 85 F.4th 1, 11 (1st Cir. 2023) (quoting Santiago v. Puerto Rico, 655 F.3d 61, 74 (1st Cir. 2011)); see also Davis, 526 U.S. at 650 (requiring that a recipient of federal funding have "actual knowledge" of harassment to be held liable under Title IX). Although MIT was clearly aware of the protests generally, plaintiffs do not allege that they or others brought the specific, identified incidents of antisemitism to the attention of MIT officials who could take corrective action.

Given the foregoing findings, plaintiffs' Title VI claims fail even assuming that Title VI compels a private university to take reasonable steps to shield its students from

racist speech per se. The disruptive political protests sympathetic to Palestinian views of the conflict with Israel were not, by and large, antisemitic. And to the extent that the complaint alleges any incidents that were plausibly antisemitic and targeted at one or more plaintiffs, such incidents were not sufficiently severe and pervasive to constitute actionable harassment; furthermore, the complaint is bereft of any allegation that appropriate MIT officials were made aware of such incidents or who the perpetrators were. For these reasons alone, we can affirm the dismissal of plaintiffs' Title VI claim.

**B.**

Although the foregoing analysis suffices to dispose of plaintiffs' Title VI claim, for the sake of completeness, we proceed to examine the alternative grounds adopted by the district court -- that even if the protests are viewed as the type of harassment proscribed by Title VI, MIT was not deliberately indifferent. For the following reasons, we agree with the district court's reasoning.

This is not a case in which plaintiffs claim their school took no action in response to reported harassment. See Grace, 85 F.4th at 12-14 (finding a triable issue as to deliberate indifference where a jury could conclude that school officials took no remedial measures for more than a year despite reports that students repeatedly targeted their classmate with homophobic

epithets); Doe v. Pawtucket Sch. Dep't, 969 F.3d 1, 7-8, 10, 11
(1st Cir. 2020) (vacating dismissal of complaint where plaintiff
could plausibly show that the school took no action whatsoever
upon learning plaintiff had been raped by another student in a
school bathroom).

Rather, plaintiffs claim that MIT "dragged its feet,"
"took only minimal action," and "fail[ed] to discipline" student
protestors so as to effectively deter their conduct. But as our
caselaw makes clear, Title VI does not subject a private entity to
damages liability merely because its response did not deter or
eradicate the alleged peer harassment. See Fitzgerald v.
Barnstable Sch. Comm., 504 F.3d 165, 175 (1st Cir. 2007), rev'd on
other grounds, 555 U.S. 246 (2009) ("To avoid Title IX liability,
an educational institution must act reasonably to prevent future
harassment; it need not succeed in doing so."); Davis, 526 U.S. at
648 (explaining that schools need not "purg[e] their schools of
actionable peer harassment" to avoid suit under Title IX). A
university is deliberately indifferent under Title VI only if its
response to known harassment is "so lax, so misdirected, or so
poorly executed as to be clearly unreasonable under the known
circumstances." D.L., 86 F.4th at 511 (quoting Fitzgerald, 504
F.3d at 175). As we will explain, MIT's response to the political
divide among its students was far from "clearly unreasonable."

As the protest gatherings occurred over the course of seven months, culminating in the Kresge Lawn encampment, MIT took an escalating series of actions aimed at calming the turmoil without violence. Following the first student protests after the October 7 attack, MIT revised its campus expression rules and policies and, on November 8, 2023, issued a letter "announcing procedures for accelerated action on reports of harassment and discrimination." During the rally in Lobby 7 on November 9, 2023, MIT met with "leaders of the Jewish community." It instructed protestors to vacate the area by a set time or face discipline. It then announced that it would suspend from non-academic activities students who remained after that deadline.

MIT then formed a Standing Together Against Hate initiative to combat antisemitism on campus, hosting an event about antisemitism on February 12, 2024. When the MIT Coalition Against Apartheid protested that event via an "emergency rally" that violated MIT rules, MIT suspended the organization's student-group privileges. And when the Kresge Lawn encampment was installed in late April 2024, MIT escalated its suppressive efforts by prohibiting evening noise and installing a 24-hour police presence. On April 27, President Kornbluth called for a peaceful end to the encampment. When the student protestors continued the encampment and outside community members began to join, MIT placed high fencing around the encampment to contain it. And,

significantly, when MIT first attempted to impose a deadline for the encampment to cease, a flood of new arrivals, many from outside MIT, knocked down and demolished the safety fencing, further swelling the encampment. As tensions rose, MIT suspended students following unruly protests, and nine protestors were arrested for blocking the Stata Center garage. Finally, MIT managed to clear the encampment successfully on May 10, 2024, and it had the remaining ten protestors arrested.

Fair-minded persons might question whether MIT acted quickly and decisively enough.[18] Other fair-minded persons might be sympathetic to a university's concern that it not counterproductively aggravate the situation, as might have occurred on May 6 when the university attempted to clear the encampment and instead sparked a surge that overwhelmed the barricade. We need to keep in mind, too, the nature of the activity that plaintiffs say MIT should have eliminated more quickly. Even if we accept plaintiffs' position that some conduct of some

---

[18] Plaintiffs also point to two letters received by MIT: one from a member of Congress that plaintiffs describe as "urg[ing]" President Kornbluth "to take more proactive measures to ensure the safety and inclusion of Jewish students on MIT's campus," and another from Department of Education "reminding schools of their obligations under Title VI." Although plaintiffs rely on these letters to bolster their complaint, the issue is not whether MIT was aware of its obligations -- we assume that it was -- but rather whether MIT was deliberately indifferent to antisemitic harassment constituting a Title VI violation.

protestors was antisemitic, that would not provide a Title VI pretext for requiring MIT to eliminate the protests entirely. In that respect, by managing the situation so as to avoid escalation and violence, MIT was much more effective than plaintiffs claim. All in all, the complaint simply fails to allege facts plausibly supporting a claim of deliberate indifference to antisemitic harassment.

Nor are we persuaded by plaintiffs' theory that the university's response was "clearly unreasonable" because it "failed to take additional reasonable measures after it learned that its initial remedies were ineffective," Grace, 85 F.4th at 11 (quoting Porto, 488 F.3d at 73-74), or because its strategies "produced no results," Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F.3d 253, 262 (6th Cir. 2000). To the contrary, any reasonable school administrator in MIT's position could have reasonably surmised that its progressively evolving responses prevented the on-campus conflict from exploding into real violence between October 2023 and May 2024. Based on plaintiffs' allegations, we are confident that, as the district court ably explained, MIT's handling of this challenging situation was simply not indifferent.

As we have often repeated, Title VI does not require schools to "craft perfect solutions," D.L., 86 F.4th at 511 (quoting Fitzgerald, 504 F.3d at 174), nor does it entitle students to their preferred "remedial demands," Davis, 526 U.S. at 648. It

simply requires that a school's response to known harassment not be "clearly unreasonable." Id. at 649. Plaintiffs do not allege facts plausibly indicating that MIT's course of action fell below that standard. See D.L., 86 F.4th at 514 (affirming that in assessing a school's response to alleged harassment, "perfection is not the test").[19]

We therefore agree with the district court that even were we to accept plaintiffs' view of the protests as manifesting a degree and form of antisemitism that could be viewed as actionable harassment under Title VI, MIT's reaction was not clearly unreasonable. For that reason -- independent of our conclusion as to the nature of the student protestors' speech and conduct -- plaintiffs' challenge to the dismissal of their Title VI claim fails.

**IV.**

Plaintiffs next claim that MIT violated the Ku Klux Klan Act, 42 U.S.C. § 1986, by knowingly failing to prevent a conspiracy

---

[19] Nor does the unnamed MIT staff member's incorrect suggestion that Jewish students were "not members of a protected class" make MIT's otherwise reasonable handling of the campus conflict clearly unreasonable. In a different setting, the remark might have implied indifference to complaints of antisemitism if made by a senior official "with authority to take corrective action." Grace, 85 F.4th at 11. But here, as we have described, plaintiffs' allegations make clear that senior university administrators were not indifferent, and plaintiffs allege no facts suggesting that those decisionmakers agreed with the unnamed staff member's statement.

by the student protestors to deprive Jewish and Israeli students of their civil rights. To state a claim under § 1986, a plaintiff first must plausibly plead a conspiracy under 42 U.S.C. § 1985(3). Gattineri v. Town of Lynnfield, 58 F.4th 512, 516 (1st Cir. 2023). And to state a claim under § 1985(3), a plaintiff must plausibly allege:

> (1) a conspiracy, (2) a conspiratorial purpose to deprive a class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities under the laws, (3) an overt act in furtherance of the conspiracy, and (4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege.

Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996). Furthermore, a plaintiff may recover "only when the conspiratorial conduct of which he complains is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'" Id. (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

The district court dismissed plaintiffs' claim because it found that they failed to plead a conspiratorial agreement. Specifically, it held that plaintiffs failed to raise a plausible inference that the student protestors acted in concert "at least in part for the very purpose" of depriving plaintiffs of their civil rights. See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 276 (1993)). This was error, plaintiffs argue, because

their allegations give rise to a plausible inference that the student activists' "conscious objective" was the impairment of Jewish and Israeli students' rights to be free from racial violence under the Thirteenth Amendment, to make and enforce contracts under 42 U.S.C. § 1981, and to hold real and personal property under 42 U.S.C. § 1982.

For purposes of this appeal, we assume without deciding that violations of §§ 1981 and 1982 can form the basis of an unlawful conspiracy under § 1985(3).  But see Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 378 (1979) ("[D]eprivation of a right created by Title VII cannot be the basis of a cause of action under § 1985(3)."); Jimenez v. WellStar Health Sys., 596 F.3d 1304, 1312 (11th Cir. 2010) (extending that logic to bar claims based on violations of § 1981); see also Brown v. Philip Morris Inc., 250 F.3d 789, 806 (3d Cir. 2001) (observing that "[t]he great weight of precedential authority . . . does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action"); Pirghaibi v. Moss, 175 F. App'x 120, 122 (9th Cir. 2006) (noting that "whether violations of sections 1981 and 1982 [could] serve as the basis for a § 1985(3) claim" was an "uncertain proposition under Supreme Court precedent").  We need not reach this issue because, for the reasons explained below, we hold that plaintiffs failed to plead that the student activist groups conspired "for the very purpose" of depriving plaintiffs of

their constitutional right to be free from racial violence, their contractual rights, or their property rights.  <u>Bray</u>, 506 U.S. at 276.

We begin with plaintiffs' claim that the MIT Coalition Against Apartheid and other MIT student groups conspired to engage in "racially and ethnically motivated violence against Jews and Israelis in contravention of the Thirteenth Amendment."  But plaintiffs have supplied no facts that, if proven, could justify recovery on this theory.  <u>See</u> <u>Aulson</u>, 83 F.3d at 3-7 (affirming dismissal for failure to state a claim where complaint failed to plausibly allege discriminatory animus).  Plaintiffs' complaint alleged two acts of arguable "violence" against Jewish or Israeli students: a protestor, who plaintiffs do not allege was even affiliated with MIT or belonged to the challenged student groups, raising a bike tire at a passing Jewish student; and a single, unnamed protestor shoving a Jewish student who was filming the protest.  Plaintiffs' complaint did not allege that these two incidents were authorized, endorsed, or planned by any student group, let alone that they were the purpose of the protests.  To imagine that these two altercations were the "conscious objective" of protests coordinated, as plaintiffs allege, by multiple groups and involving dozens of students overly strains credulity, as does the suggestion that only these two incidents would have occurred if "racially and ethnically motivated violence" were the explicit

purpose of the protests.  And for the reasons we have already expressed, we are not persuaded by plaintiffs' assertion that the student protestors' speech itself constituted "serious racial violence" under the Thirteenth Amendment.  Although we must draw reasonable factual inferences in plaintiffs' favor at this stage, we need not credit "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like."  Aulson, 83 F.3d at 3; see Iqbal, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Plaintiffs' next theory is that the purpose of the alleged conspiracy between the student groups was to interfere with Jewish and Israeli students' property and contract rights by forcing them to "endure[] chants that [were] overtly antisemitic" and to be "subjected to walkouts," "doxed," "kicked out of study groups," and "prevented from entering public areas of campus" because they were Jewish or Israeli.[20]  As we have explained above, little of what occurred can be deemed antisemitic merely because plaintiffs declare it to be so, and plaintiffs' allegations offer

_____

[20] Plaintiffs also claim that their property rights were violated when a man "urinated on [Hillel] after being provoked at" a MIT Coalition Against Apartheid protest.  However, the complaint does not allege that the man was in any way affiliated with MIT or the student groups it accuses of conspiracy, and the report plaintiffs attached to their complaint indicates that the man was someone with "paranoid beliefs" who had "nothing to do with MIT."

no facts to plausibly suggest that the protestors agreed to target Jewish students, as opposed to agreeing to demand that the university adopt the activists' position regarding the conflict between Israelis and Palestinians.

In lieu of pointing to any evidence of the student groups' purpose, plaintiffs instead catalogue the harms suffered by Jewish and Israeli students. They argue that "the co-conspirators' actions aimed to impair the rights of Jews and Israelis because[] they repeatedly impaired their contractual rights . . . and[] violated their property rights." But "[a] conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect on a protected right." Bray, 506 U.S. at 275. In short, plaintiffs' conclusory assertions fail to state a claim that impairing the rights of Jewish students was among the student protestors' "conscious objective[s]." Bray, 506 U.S. at 275-76; see Alston v. Spiegel, 988 F.3d 564, 577-78 (1st Cir. 2021) (observing that inferences "are not infinitely elastic").

Plaintiffs' theory is particularly implausible given the joint statements from the student groups to which it points as evidence of a conspiracy. Those statements state plainly the protestors' purported goals: to pressure MIT to "divest" from Israel and to cease "sponsored research for the Israeli Occupation Forces," to express "solidarity with Columbia students" who were

"calling for divestment," to "speak out" to "stop the genocide" and "defend Palestine," and to express their shared desire for a "permanent ceasefire in Gaza." We need not, of course, take the protestors' word for it. But where plaintiffs have failed to adduce any facts suggesting a purpose beyond or behind these stated goals, "dismissal is proper." Alston, 988 F.3d at 571; see Iqbal, 556 U.S. at 681 (holding that, while plaintiffs' allegations were "consistent with" a discriminatory purpose, they did not "plausibly establish this purpose" given "more likely explanations").

All told, plaintiffs have failed to state a claim of conspiracy under § 1985(3), and thus their § 1986 claim must fail.

**V.**

Plaintiffs' final claims are that MIT is liable under Massachusetts law for breaching its contracts with Jewish and Israeli students by failing to uphold various policies, and for negligently failing to protect its students from antisemitic harassment. After dismissing plaintiffs' federal claims, the district court declined to exercise supplemental jurisdiction over plaintiffs' state-law claims. Because we agree that plaintiffs failed to state a federal claim, we affirm the dismissal without prejudice of plaintiffs' state-law claims. See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal

claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims.").

## VI.

One loose end remains.  Plaintiffs contend that the district court abused its discretion by denying plaintiffs leave to amend their amended complaint yet again after it was found lacking.  The district court's final order made no mention of plaintiffs' request for leave to amend, which -- plaintiffs argue -- means there was "no adequate basis for the court's decision."  See Foman v. Davis, 371 U.S. 178, 182 (1962) ("[O]utright refusal to grant the leave [to amend] without any justifying reason appearing for the denial . . . is merely abuse of [a district court's] discretion . . . "); Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires.").

It is unsurprising that the district court did not grant plaintiffs the leave they desired, because plaintiffs never moved to amend their complaint any further.  Instead, plaintiffs added a single sentence in their memorandum of law opposing MIT's motion to dismiss:  "To the extent the Court deems any of Plaintiffs' allegations inadequate, Plaintiffs request permission to amend their complaint."  This cursory mention, presented not as a motion but embedded in some other document, does not require a district

court's express response under our caselaw.  "It is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss." Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 247 (1st Cir. 2015) (quoting Joblove v. Barr Labs, Inc., 466 F.3d 187, 220 (2d Cir. 2006), abrogated on other grounds by, F.T.C. v. Actavis, Inc., 570 U.S. 136 (2013)).  Furthermore, this court has specified that a statement that "in the event that the Court finds that the Amended Complaint fails to state a claim, Plaintiff requests leave to replead," contained within an opposition to defendants' motion to dismiss, does not constitute a motion for leave to amend under Rule 15(a). Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 327 (1st Cir. 2008).  Here, as in Gray, plaintiffs "failed to request leave to amend," and the district court "cannot be faulted for failing to grant such leave sua sponte." Id.  The district court did not abuse its discretion by declining to grant plaintiffs an additional opportunity to amend their complaint a second time.

**VII.**

For the foregoing reasons, we affirm the district court's order on all counts.[21]

---

[21]  This conclusion moots any need to consider MIT's challenge to the standing of the organizational plaintiff.